# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DANIEL BRINK )
11 Keurhoek Street )
Clairemont Johannesburg )
2091 South Africa )
 )
RONALD BELL, )
12014 FM 179 )
Wolfforth, TX  79382 )
 )
MERLIN CLARK and MARCIE CLARK, )
406 Sandpiper Dr. )
Satellite Beach, FL 32937 )
 )
CJ MERCADANTE )
382 NE 191st Street Unit 53975 )
Miami, FL 33179 )
 )
JOHANN STEENBERG )
17 Keurboom Str. )
Wilropark Rdpt South Africa )
 )
STEVEN THOMPSEN )
P.O. Box 386 )
Randleman, NC 27317 )
 )
JACK JONES )
174 Edmondson Dr. )
Willow Springs, NC 27592 )
 )
FRED BUSSE )
405 East 6th Street )
Laddonia MO )
 )
MARK GRIFFIN, )
1009 Villa View Way )
Hampton, Georgia  30228 )
 )
 )

Case No:

Case: 1:11-cv-01733
Assigned To : Sullivan, Emmet G.
Assign. Date : 9/26/2011
Description: Civil Rights - Non Employ.

CLASS ACTION
FRAUD
RICO
INTENTIONAL INFLICTION OF
MENTAL AND EMOTIONAL DISTRESS
AMERICANS WITH DISABILITIES ACT
CIVIL CONSPIRACY
PRIMA FACIE TORT
BAD FAITH
BREACH OF COVENANT GOOD FAITH
AND FAIR DEALING
DISCRIMINATION AND RETALIATORY
DISCHARGE
UNFAIR AND DECEPTIVE TRADE
PRACTICES
DAMAGES, PUNITIVE DAMAGES
AND INJUNCTIVE RELIEF

**Demand for Jury Trial**

1

WALLACE BYARS                               )
305 Fountainbrook Ln                        )
Fountain Inn, SC 29644                      )
                                            )
ANTONIO AMBROSE                             )
12220 Pellicano Rd                          )
Ex Paso, TX 79936                           )
                                            )
CODY MCANALLY                               )
564 E. Calle De Ocaso                       )
Suhuarita, AZ 85629                         )
                                            )
PATRICK J. BREWER                           )
965 Bennett Rd.                             )
Zurich, MT 59547                            )
                                            )
COENRAD THEUNISSEN                          )
Erasmus Cloof 0048                          )
Pretoria, South Africa                      )
                                            )
MALIK HADI                                  )
3604 Chatham Green Lane #2012               )
Arlington, TX                               )
                                            )
JAFAR JOSEPH BAYATAFSHAR                    )
12900 Gagne Dr.                             )
Fairfax, VA 22030                           )
                                            )
ROBERT BIDDLE                               )
1030 Waterside Landing Wy                   )
Summerville, SC 29485                       )
                                            )
MARGARETHA BEZUIDENHOUT                     )
35 Secot Str.                               )
Cassedale, Springs, 1559 South Africa       )
                                            )
HARBEE KREESHA                              )
1929 S Ridge Dr.                            )
Coralville, IA 52241                        )
                                            )
MOHSEN ALSALEH                              )
1528 Boxwood Trace NW                       )
Acworth, GA 30102                           )

2

GISELA MARIA FOURIE                              )
17 Keurboom Str. Wilropark                       )
Rdpt South Africa 1724                           )
                                                 )
MBUSI CELE                                       )
93 Callington Crescent Parklands                 )
Cape Town 7441 South Africa                      )
                                                 )
MARLENE GERICKE                                  )
Posbus 4113                                      )
George-oos, 6539 South Africa                    )
                                                 )
NICKY POOL                                       )
797 Kuyper Ave                                   )
Reitfontein Pretoria 0084 South Africa           )
                                                 )
MARK McLEAN                                      )
3530 Clearfield                                  )
San Antonio 78230                                )
                                                 )
ALLEN PORCH III                                  )
5534 Chatham Woods Dr.                           )
Columbus, GA 31907                               )
                                                 )
CATHARINA LOUW                                   )
Negende St. 3A Coligny                           )
Northwest Province South Africa                  )
                                                 )
SURITA SWART                                     )
Claas Booresdal                                  )
Lanseria South Africa                            )
                                                 )
CHRISTO ENGELBRECHT                              )
                                                 )
individually and on behalf of their             )
spouses and families, and on                     )
behalf of those similarly situated              )
persons,                                         )
                                                 )
              Plaintiffs,                        )
                                                 )
      v.                                          )

3

XE HOLDING , LLC AKA XE ) 
SERVICES, LLC, F/K/A )
BLACKWATER SECURITY )
CONSULTING AND BLACKWATER )
WORLDWIDE, )
CONTINENTAL CASUALTY CO., )
CNA GLOBAL INSURANCE, )
Dba CNA INSURANCE COMPANY, )
AMERICAN INTERNATIONAL GROUP, )
INC., AIG INSURANCE COMPANY, )
INSURANCE COMPANY OF )
THE STATE OF PENNSYLVANIA, )
CHARTIS INSURANCE COMPANY, )
AKA WORLDSOURCE, INC. )
ACE INSURANCE CO., ACE )
AMERICAN INSURANCE CO., )
ESIS, INC., ZURICH INSURANCE, )
TACTICOR INTERNATIONAL, )
DYNCORP INTERNATIONAL, LLC, )
DYNCORP OFFSHORE OF )
ARABIA, DYNCORP INTERNATIONAL )
FZ-LLC, NORTHRUP GRUMMAN, )
VINELL ARABIA, HALLIBURTON )
CORP, KELLOGG-BROWN & ROOT, )
LLC, KELLOGG BROWN & ROOT )
INTERNATIONAL, KBR TECHNICAL )
SERVICES, KBR, INC., KELLOGG )
BROWN & ROOT, S.de R.L.; OVERSEAS )
ADMINISTRATIVE SERVICES; )
SERVICE EMPLOYEES )
INTERNATIONAL CORP, )
BLACKWATER WORLDWIDE, )
BLACKWATER USA, BLACKWATER )
INDUSTRIES,  BLACKWATER, )
BLACKWATER SECURITY, )
CONSULTING, PRINCE GROUP, )
XE Xe Services, LLC ("Xe Services"), )
RONCO CONSULTING, )
WACKENHUT SERVICES )
INTERNATIONAL, PARSONS )
GROUP, ITT CORP., ITT SYSTEMS )
CORP., GLOBAL LINGUIST )

SOLUTIONS, LC,                              )
LEAR SIEGLER, INC.,                         )
US IINVESTIGATION SERVICES,                 )
USIS INTERNATIONAL, INC.,                   )
TITAN CORP, CSA, INC.,                      )
AECOM GOVERNMENT SERVICES,                  )
INC., ERINYS LTD., ERINYS                   )
INTERNATIONAL, LTD.,                        )
                                           )
            Defendants.                     )
_____)

## COMPLAINT  FOR DAMAGES
## AND DECLARATORY AND INJUNCTIVE RELIEF

### I. PRELIMINARY STATEMENT

Plaintiffs, individually and on behalf of all persons similarly situated, for their complaint allege:

1.      This is an action for damages in the amount of $2 Billion to remedy the injuries and destruction caused to the lives, finances and mental and physical well being of thousands of American families and others whose loved ones were injured while serving America under contracts with the United States, and to punish the companies who made massive profits while causing this harm to people unlawfully and maliciously and working a fraud on the American public who paid them.  It is brought under (1) the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 948a; (2) the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1861-65; (3) the common law of fraud and deceit; (4) the common law of bad faith denial of workers compensation insurance claims arising out of government contracts in support of wars conducted by the United States, and tortious breach of covenant of good faith and fair dealing; (5) the common law of outrage (Intentional Infliction of

Mental and Emotional Distress); (6) the Americans with Disabilities Act, 42 U.S.C. 12111; the

common law of prima facie tort; and (7) the Declaratory Judgment Act; 29 U.S.C. § 2201 and the

Court's equitable powers to grant preliminary and permanent injunctive relief in order to prevent

irreparable harm to Plaintiffs and to those similarly situated, and to require Defendants to comply

with their legal obligations here and around the world, as to all past, present and future

individuals who work in support of America's wars.

     2.     This complaint is filed due to actions and omissions of Defendants, in conspiracy

with others, and individually, to defeat the right of American Citizens and Foreign Nationals to

receive their lawful benefits and compensation under the Defense Base Act ("DBA"), 42 U.S.C.

42 U.S.C. § 1651 *et seq*, as it adopts the Longshore and Harbor Workers' Compensation Act

("LHWCA"), 33 U.S.C § 901 *et seq*., which constitutes an enterprise engaged in fraudulent and

or criminal acts to further their scheme to defeat the rights of individuals who have been injured

or suffered occupational diseases, and death, while on foreign soil in support of defense activities

under the DBA. This DBA system is administered according to statute by the United States

Department of Labor (DOL), in the administrative Office of Workers' Compensation Programs

(OWCP), subject to hearing and decision in contested cases by the Office of Administrative Law

Judges (OALJ) of the DOL, and administrative appeal to the Benefits Review Board. 33 U.S.C.

§§ 919, 921(b)(3). If a matter works its way through the OWCP, OALJ, and Board, only then

can a party appeal into the federal courts. The case law interpreting the Act requires that both

DOL, the courts, and the parties construe the DBA and LHWCA provisions "liberally to provide

benefits," and "Compensation shall be payable irrespective of fault as a cause for the injury."

6

33 U.S.C. § 904. The Longshore Act attaches a presumption to the allegations in support of the claim, in the absence of "substantial evidence to the contrary." 33 U.S.C. § 901.

3.    Congress enacted the DBA in 1941 and intended that it would be a simplified system that would provide a trade off for employees who could not sue their employer for pain and suffering, but would also not have to go through the lengthy delays of civil trials and the adversarial beating that often occurs when trying to obtain damages for injuries. As one Congressman explained: "It eliminates to a large extent the delay, suffering, hardship and expense incident to the long time in which it took to reach a case after it was submitted to the court…" Mr. Graham, 68 Cong. Rec. 5410 (69th Cong. 2d Sess.).

4.    When an employee is injured and needs medical and disability benefits, employers are obligated to pay compensation due under the Act—including compensation for permanent total disability, temporary total disability or permanent partial disability —regardless of whether an employee files an administrative claim, *see* 33 U.S.C. §§ 904(a), 914(a), and requires that such compensation "be paid periodically, promptly, and directly to the person entitled thereto," *id.* § 914(a).

5.    Unlike most state workers' compensation schemes, the case law developed around both Acts affords further relaxation of what is meant by causation of the injury due to the work, and has been repeatedly recognized to be covered if the employee is required to be on base 24 hours a day, even if the actual injury occurred off duty and even if it is unrelated to any job duties, so long as the risk of harm or injury was in any way increased by being at the job site. An employer or its insurance carrier who falsifies evidence or otherwise misrepresents in order to deny, reduce or terminate benefits, is guilty of a crime punishable by a fine of up to $10,000 or

7

five years in prison.  33 U.S.C. § 931(c).  The Act also makes it illegal for an employer to terminate employment of an employee or otherwise discriminate against that employee for exercise of rights under the DBA, 33 U.S.C. § 948a, and provides for civil remedies and penalties for such discrimination or termination including restoration of pay, benefits, and other rights of employment assuming the employee is otherwise qualified to perform the employment. The Act shifts the burden for payment of attorneys fees to the Employer in most cases of successful prosecution of disputed claims.

6.     Despite the liberality of the scheme, its no-fault status, and despite the prohibition on misrepresentation or false statement, defendants have routinely made false statements and misrepresentations through their agents, officers, attorneys, representatives, and insurance adjustors and managers, in order to terminate individuals making claims, reduce or deny benefits, inform the OWCP or OALJ of misrepresented facts or outright falsehoods concerning whether and to what extent they were aware of failure to pay benefits, whether they had wired monies to pay for medical expenses or disability benefits, and whether they were aware of doctors' refusals to treat injured employees due to nonpayment by Defendants.  Further Defendants have repeatedly falsified their intent to pay for medically necessary treatment for individuals, routinely falsified reasons for denying or terminating benefits, and misrepresented their refusal for long periods of time to pay medical or other benefit that Defendants have admitted they owe. Defendants through their representatives, adjustors, managers, and attorneys, frequently misrepresent facts they know or should know are untrue when confronted with lengthy claims for medical treatment for serious conditions, life threatening conditions, or psychiatric conditions that put Plaintiffs or others in danger of harm.

8

7.    The Defendants have failed to comply with the law and demonstrated a total disregard for harm they would inflict, and shown a malicious intent to harm individuals seeking benefits to which the law entitles them, punishing individuals making claims, or making obtaining medical benefits and disability pay so difficult to obtain as to effectively abrogate the right and deprive individuals and their families of their property.  They had willful intent to injure claimants and/or had a substantial certainty that injury was likely to occur to their persons, family, and finances and personal wellbeing, as stated more particularly in this Complaint.  In some cases, the right to access DBA insurance has been actively abrogated by efforts of government contractors and their carriers to deprive individuals of access to benefits, threatening, firing, or punishing or depriving them of any entry into the system or actively dissuading them from making any claims, threatening them if they ask about making claims, or engaging in conduct to prevent them from making claims through deception, coercion or other acts designed to thwart the DBA or the intent of the DBA.  These acts and omissions were prejudicial to the efficient and fair administration of justice, impeded the timely obtaining of benefits, or wholly disregarded rightful benefits to which these individuals were entitled, and acknowledged to be entitled by defendants, and further demonstrated disregard for principles of fairness, decency and regard for the immense harm to individuals, families, and their livelihood and welfare.

8.    These contractors and the insurance carriers, together with doctors and lawyers they hire, have engaged in what amounts to a criminal racketeering enterprise to bilk the taxpayer and departments of the United States government, the military, USAID, Army Corps of Engineers (USACE), Department of State (DoS) and USAID, by making war profits on the

backs of those trained by the US Military or other United States Citizens, or foreign nationals, while ignoring the obligations they have to properly handle injuries, claims, medical treatment, and expenses, transport, and the families of these individuals who have given them the opportunity to serve the United States and make billions of dollars.

9. Many of the American contractors who have been subjected to the harm described in this complaint served their country honorably in the military branches, and many of the persons in the class of foreign contractors also served their countries honorably before supporting America's two wars in Iraq and Afghanistan. Many of the jobs they were asked to perform directly benefited the military or were performed in concert with the American and allied military forces including direct actions in arms against hostile forces. Many of the persons described in this complaint were essentially soldiers harnessed by America through State Department, CIA, Army, and other military branch contracts let to contractors and subcontractors, base support, security, military training, securing of bases, firefighting, and other actions in support of men and materiel of the armed forces of the United States.

10. Many of the foreign nationals who worked for United States government contractors named herein, and for others not named, have been injured and deprived of a living but been given no benefits, no access to forms to obtain benefits, and no effective way to access benefits. Whole classes of persons have been cast aside and deprived of their rights under these government contracts, with knowledge of government officials in foreign bases, as well as with their active participation and consent, together with the knowledge, participation and consent of the contractors. Many of these individuals are Iraqis, Afghanis, or from other countries who

10

were without computers or sophistication, ability to read and write, or to access insurance

benefits continents away.

11.     These actions have caused or contributed to a continuing injury to the public

interest from profligate government contracts, great harm to these individuals and their families,

including suicides, loss of all assets, loss of credit, loss of families, loss of consortium, loss of

enjoyment, and major depression, PTSD and other effects that were intensified by the deliberate

wrongful acts of defendants in conspiracy with agents and contractors and their officers.

12.     Contractors and their insurance carriers named in this action have utilized fear,

threats, implied threats, and elaborate ruses to deprive whole classes of injuries and persons

injured from effectively obtaining any benefits, have employed devices and artifices to prevent

any medical treatment for PTSD, accusing persons of faking or of malingering, subjecting

persons to onerous and intimidating medical exams by so-called independent doctors, refusing to

recognize Traumatic Brain Injury known to be a problem for individuals who have been

subjected to concussive blasts, mortars, rockets, and bombs or other repeated trauma in Iraq and

Afghanistan, to screen or test for it, refusing to recognize PTSD or to screen or test for it, despite

knowingly placing individuals in unreasonable risks of harm from unexploded ordinance,

roadside bombs, improvised exploding devices, small arms fire, rocket attacks, mortar attacks,

and gruesome scenes of carnage.   Additionally, many contractors were subjected to sandfly bites

that resulted in cutaneous as well as visceral types of leishmaniasis infection, which can be life

threatening and last for an entire lifetime, but which have not been properly diagnosed or treated.

13.     Many of the individuals who are citizens of the United States who are named

plaintiffs and putative class representatives, as well as similarly situated citizens of the United

States, were terminated from their employment after being disabled by their injuries or occupational diseases covered under the DBA, and were refused medical insurance despite their being on known medical leave from employment due to these conditions. Others were retaliated against in a variety of ways relating to their employment and benefits and conditions or terms of employment. These disabling conditions affect major life activities such as working, walking, breathing, using hands and legs, back and other bodily conditions qualifying as disabilities within the meaning of the Americans with Disabilities Act.

  14. This suit seeks to vindicate the rights of Plaintiffs who are citizens of the United States, as well as Plaintiffs who are foreign nationals, and thousands of similarly situated persons, all of whom have or had rights to benefits under the DBA, and whose family members were entitled to protection of the DBA, benefits, and right to care and treatment, medical personnel or reimbursement for being care givers, mileage for taking injured individuals to medical care; to prevent lawlessness and utter lack of accountability on the part of the Defendants, to prevent continuing and irreparable harm, and to cause a temporary and preliminary injunction enforcing a federal tax lien on all properties and government contracts in the United States and internationally owned by Defendants or in which Defendants claim a beneficial interest, a mandatory injunction requiring all Defendants to immediately comply with all provisions of the DBA, and a restraining order preventing the Defendants from continuing in their illegal and injurious harm to persons whom they know to have been injured in a covered injury under a government contract with the United States of America on a foreign base in war time.

II. JURISDICTION AND VENUE

12

15.     This Court has subject matter jurisdiction over the asserted claims under 28

U.S.C. § 1331 (Federal Question), under 18 U.S.C. §§ 1961-64 (Civil RICO), 33 U.S.C. § 948a

(Discrimination under LHWCA), 42 U.S.C. §§ 1651-54 (DBA),and regulations implemented at

Parts 701-704 of Title 20 of the Code of Federal Regulations (CFR) and in the Federal

Acquisition Regulations (FARs) at 48 C.F.R. §§ 28.305, 52.228-3, and 52.228-4, and under 42

U.S.C. § 12112 (ADA) for discrimination in terms, benefits, and conditions of employment,

medical examinations, and hiring and firing, as well as under the Class Action Fairness Act, 28

U.S.C. § 1332, in that  the estimated damages involved in United States claims will exceed

$5,000,000 and the parties to this action are residents of different states because there are 10,000

or more individuals involved who have been maliciously treated due to their injuries, along with

family members who have been harmed directly, with each person having damages in excess of

$10,000 exclusive of penalties, interest, punitive damages, and attorneys fees.   The court has

supplemental jurisdiction over the federal common law or state law claims for fraud, bad faith

insurance practices, outrage, and deception in trade practices.  The Court has personal

jurisdiction over the Defendants because each and every defendant is present and transacts

business in the District of Columbia through DBA insurance and federal contracting for work in

Iraq, Afghanistan and other foreign countries with defense bases, with the Department of

Defense, the Department of State and other entities and subdivisions of the United States

government, some of the Defendants have their headquarters in the District of Columbia, and

Defendants generally do business in the District of Columbia through government contracting,

lobbying, and testimony before the U.S. Congress on DBA and other subjects.  Furthermore,

many of the acts and omissions by Defendants were made here or had effects in the District of

Columbia, including making of representations to Claimants and their Counsel in the District of

Columbia, attending hearings in the United States Department of Labor, Office of Workers

Compensation Programs, and Office of Administrative Law Judges, as well as Benefits Review

Board, located and managed in the District of Columbia, regarding Plaintiffs and those similarly

situated.  Many of the acts complained of had effects in the District of Columbia or were made

into the District of Columbia, including predicate acts, representations of Defendants to

committees of the United States Congress, as well as through representatives of Defendants in

the District of Columbia, through attorneys located in the District of Columbia, through mail,

wire, and banking that came to the District of Columbia.  Defendants intended or reasonably

foresaw that the acts would have effects in the District of Columbia.

      16.     Venue is proper in the United States District Court for the District of Columbia

under 28 U.S.C. § 1391(b) and (c).  All of the Defendants transact business in the District of

Columbia, maintain offices, or enter into government contracts and engaged in misrepresentation

and fraud to the DOL located in the District of Columbia, as well as misrepresented to the United

States Congress in answers to questions concerning the malfeasance in this complaint and

investigations into their repeated malfeasance regarding contractors who are injured and

mistreatment of them in Iraq and Afghanistan and elsewhere overseas, as well as in litigation

before the Department of Labor, OWCP or OALJ.  Many of the predicate acts of termination,

misrepresentation, mail and wire fraud, and other acts were done into the District of Columbia,

done in the District of Columbia or were made to representatives of Plaintiffs and those

similiarly situated in the District of Columbia, either in person or by telephone, fax or U.S. mail.

Plaintiffs believe and are informed, and thereon allege, that the banking transactions Defendants

relating to the claims in this case, of depositing money through the depository system and wire system both domestically and internationally also had effects in the District of Columbia. Defendants intended or reasonably foresaw that the acts would have effects in the District of Columbia.

### III.  PLAINTIFFS

17.    Plaintiffs described below are citizens of the United States who individually and on behalf of all individuals similarly situated who worked for defendants, work for defendants or will work for defendants on an American base or under contracts with the United States (or subcontracts with respect to such contracts) overseas, who have been denied benefits, subjected to the harm described herein, or been prevented through ruses and various fraudulent enterprises from accessing required benefits, and their families have likewise been damaged by these intentional and malicious actions.  Plaintiffs described below are foreign nationals from other countries who individually and on behalf of similarly situated individuals, covered by the DBA, been denied benefits, or mistreated intentionally and maliciously in a way that has deprived them of benefits, caused loss to them and their families as described below.

### IV.  DEFENDANTS

18.    Defendants are corporations who have been paid insurance premiums on contracts bid through the United States Department of Defense, Department of State, or other departments of the United States under government contracts.  Defendant corporations who perform said work are required to purchase DBA insurance for each person working under a United States Government Contract, which they add into the price of the contract and which is paid by the United States citizens through their taxes.  Each of these government contracts and subcontracts

is made with the United States of America or agency thereof and requires all Defendants to abide

by the laws of the United States under the DBA, and not to falsify their intentions of covering

injuries occurring on their bases, or in furtherance of the work related to the presence of such

contract employees on bases in Iraq, Afghanistan, or other places overseas.

19.     XE Services, LLC is owned by Xe Holdings LLC, and has its headquarters in the

Distict of Columbia.  It is formerly known as Blackwater Worldwide and related Blackwater

companies, is a private security contractor that provides security services to the United States

government in Iraq and Afghanistan and other countries.  XE Holdings LLC's registered agent is

CT Corporation Systems.  CT's address is 1015 15th Street N.W., Washington, D.C. 20005.

20.     Continental Casualty Company is a subsidiary of CNA Financial Corporation and

controls CNA Global Insurance and CNA Insurance Company.  It is an insurance company that

writes Defense Base Act (DBA) insurance and has contracts with the United States for DBA

insurance through the Army Corps of Engineers and subcontracts with government contractors to

provide DBA insurance for services overseas.  Continental Casualty Company's registered agent

is Corporation Service Company.  Corporation Service Co.'s address is 1090 Vermont Avenue

N.W., Washington, D.C. 20005.

21.     American International Group, Inc. (AIG)  is an insurance corporation with

various other companies it owns and controls, such as Worldsource Insurance, Chartis Insurance

Company, and Insurance Company of the State of Pennsylvania, which writes DBA insurance

under subcontracts with government contractors for contracts with the United States overseas.

AIG's registered agent is Corporation Service Company.  Corporation Service Co.'s address is

1090 Vermont Avenue, Suite 430, Washington, D.C. 20005.

16

22.    Ace Insurance Company and Ace American Insurance Company are owned by the Ace Group.  They also own and control ESIS, Inc..  Ace writes DBA insurance under subcontracts for government contractors with the United States overseas.  It can be served at its corporate offices 1133 Avenue of the Americas, New York, NY 10036.

23.    DynCorp is a government services contractor, providing services in Iraq, Afghanistan, Kuwait, and other countries.  DynCorp's registered agent is CT Corporation System.  CT's address is 1015 15th Street N.W. Suite 1000, Washington, D.C. 20005.  DynCorp created offshore entity DynCorp International FZ to employ individuals under contracts between DynCorp and the United States Department of Defense and the Department of State.

24.    Vinell Arabia is a wholly owned subsidiary of Northrop Grumman, an aerospace and defense technology company that enters into government contracts with the United States for services on bases overseas. Northrop Grumman's registered agent is CT Corporation System. CT's address is 1015 15th Street N.W., Washington, D.C. 20005.

25.    Halliburton Energy Services Inc. is a company with extensive government contracts in Afghanistan and Iraq that employs individuals who are covered by insurance under the Defense Base Act.  Halliburton's registered agent is CT Corporation System.  CT's address is 1015 15th Street N.W., Washington, D.C. 20005.  It owned KBR Technical Services, Inc., a company with extensive government contracts in Afghanistan and Iraq that employs individuals who are covered by insurance under the Defense Base Act. KBR's registered agent is Capitol Corporate Services, Inc., 1090 Vermont Avenue N.W., Washington, D.C. 20005, as it owned Kellogg Brown & Root LLC, a company with extensive government contracts in Afghanistan and Iraq that employs individuals who are covered by insurance under the Defense Base Act.

Kellogg Brown & Root's registered agent is Capitol Corporate Services, Inc., 1090 Vermont Avenue N.W., Washington, D.C. 20005. They owned an off shore company called Service Employees International, Inc, used as a shell to employ individuals in all of its government contracts with the United States with the above entities.

26.    Ronco Consulting Corporation is a commercial mine action, ordinance disposal, and security company, owned by G4S. Ronco's registered agent is Corporation Service Company. Corporation Service Company's address is 1090 Vermont Avenue, Suite 430, Washington, D.C. 20005. Ronco has its headquarters in the District of Columbia and has extensive contracts with the United States Government including with the State Department and USAID in the District of Columbia.

27.    Wackenhut Services Incorporated is a security firm owned by G4S, which bought Ronco Consulting, and engages in various services under contracts with the United States government overseas. Wackenhut's registered agent is Prentice Hall Corporation System, Inc. Prentice Hall's address is 1090 Vermont Avenue, Washington, D.C. 20005.

28.    Parsons Group includes Parsons Infrastructure and Technology Group provides engineering and construction services, and performs contracting services with the United States Government in Iraq and Afghanistan.

29.    ITT Corporation is a defense contractor which owns ITT Systems Corp, which provides security services and base operations under contracts with the United States abroad. ITT Corporation's registered agent is CT Corporation System. CT's address is 1015 15th Street N.W., Washington, D.C. 20005.

30.     U.S. Investigations Services, LLC has government contracts to conduct background investigations.  U.S. Investigations Services' registered agent is Corporation Service Company.  Corporation Service Company's address is 1090 Vermont Avenue, Suite 430, Washington, D.C. 20005.

31.     CSA Ltd is an off-shore company incorporated in the Cayman Islands to hire and service a government contract called Base Operations Support (K/BOSS) for provision of logistics, supplies, force protection, IT and other services in support of the Defense Department in Kuwait.  CSA Inc. stands for Combat Support Associates is a joint venture between three large companies who perform a variety of government contract services, AECOM Government Services (or AGS, formerly Holmes & Narver Services, Inc.), Research Analysis and Maintenance, Inc. (RAM), and SMI, International and employed 25-50,000 employees, 6,000 in Kuwait.  AGS is the managing partner.  CSA was formed to bid on and obtain and perform under this multi-billion dollar government contract with the United States.  CSA is a California Corporation with offices in Orange County, California and Texas.  It can be served at  999 W TOWN AND COUNTRY RD, ORANGE,  CA  92868-4713 , and Defendant AECOM Government Services, the managing partner of CSA can be served at its world headquarters at 555 South Flower Street, Suite 3700, Los Angeles, CA 90071-2300.

32.     Titan Corp. performs linguistic and communications services for the United States government overseas, and is owned by L-3 Communications Holdings, Inc..  Titan may be served at its headquarters at 3033 Science Park Road San Diego, California 92121-1199.

33.     Tacticor, LLC provides services to insurance companies investigating War Hazards and Defense Base Act claims abroad.  It gathers records, acts as medical manager, and

19

investigates employees who claim injuries. It may be served at its United States address, Suite

203, Bank of Hawaii Building, Mariana Heights Business Park, Puerto Rico, Saipan, Mariana

Island, 96950 USA.

34.    Erinys Ltd., part of Erinys International Ltd., provides protection and other

services, and contracts with the United States in Iraq. It may be served in the District of

Columbia or by serving Erinys UK Ltd at Erinys European Regional Office, Basepoint Business

Centre, Caxton Close, Andover, Hants., SP10 3FG. England.

35.    Zurich in North America is a part of Zurich Financial Services Group (Zurich), an

insurance-based financial services provider with a global network of subsidiaries and offices in

North America and Europe as well as in Asia Pacific, Latin America and other markets. It is

headquartered in Zurich, Switzerland and employs approximately 60,000 people serving

customers in more than 180 countries, including more than 9,500 employees in North America.

It may be served by serving Zurich North America, 1400 American Lane, Schaumburg, IL

60196.

36.    United States Investigative Services, (USIS), provides services to theUnited

States government through contracts in the United States and abroad for investigation of

backgrounds, security  and may be served at its corporate headquarters at 7799 Leesburg Pike,

Suite 400 South, Falls Church, VA.

37.    Lear Siegler Services, Inc. is a government contractor that enters into contracts

with the United States to provide operations, maintenance, and other services on bases in the

United States and overseas, and is a subsidiary of EG&G Technical Services, Inc. and URS Corp

and and may be served at its corporate headquarters at 175 Admiral Cochrane Dr., Annapolis,

MD 21401-7316.

### V. FACTUAL & LEGAL ALLEGATIONS COMMON TO ALL PARTIES

38.     Under the Defense Base Act, the Defendant contractors are required to secure and

maintain workers' compensation insurance under the Act while carrying on employment within

the Act's coverage.  Such insurance is required to cover all liabilities of the employer under the

Act, including periodic disability compensation and medical expenses (including related

expenses for medical transport and personnel, nursing care, medical supplies and medication).

33 U.S.C. 904(a).  Under contracting regulations, DFARs and FARs, the Defendant contractors

may bid their contracts with the cost of the required DBA insurance built into the contract, thus

requiring the taxpayer to underwrite the cost of this insurance.  Therefore, the Contractor is not

actually paying for this insurance but is only obligated to build it into the contract price.  The

insurance is expensive because the Act provides relatively generous benefits and the work is

often dangerous (although premiums are not supposed to be "loaded" for "war-risk hazards," for

which (so long as the premium has not been so "loaded") the insurance carrier is entitled to

reimbursement from the United States for all benefits paid, under the War Hazards

Compensation Act, 42 U.S.C. § 1704).  The companies who bid on these contracts with

government contractors are, thus essentially, subcontractors under government contracts, paid by

taxpayer funds to provide the benefits mandated by law.

39.     In addition, the insurance carrier may seek reimbursement for their payouts on

claims from the federal government under the War Hazards Compensation Act, 42 U.S.C. §§

1701 *et seq.*, when the underlying injury occurred due to war hazards such as enemy fire,

terrorist attacks, bombings etc.  Carriers are able not only to obtain reimbursement for their

payment of disability and medical expenses and attorneys fees, as well as 15% of their

"unallocated expenses" on top of what they paid out.  20 C.F.R. § 61.104.  While this might

provide an incentive for carriers and their counsel to litigate needlessly and drag out their claims

in the hopes of defeating claims, deterring claimants or their attorney.  It further underscores the

malice of the carriers who, in many cases in which the injuries occurred due to hazards of war,

have every reason to pay claims timely because they will enjoy their premiums from the taxpayer

and not be out of pocket at all.

     40.     In spite of these incentives, in many cases Defendants have refused to pay claims

and treat claimants lawfully and properly, instead choosing to harm them through intentional acts

that will be described hereafter.

### Monopolies by Insurance Carriers Resulting in Large Returns

     41.     Defendant CNA Global Insurance and AIG, and their subsidiaries named in this

complaint, enjoy a virtual monopoly on DBA insurance business.  For instance, CNA bid for and

obtained the business on all government contracts through the Army Corps of Engineers,

Department of Defense Contracts to provide DBA insurance on all bases and projects in

Afghanistan, Iraq or other parts of the world where Army Corps has projects requiring the hiring

of Defendant contractors, not all of whom are named in this complaint.

     42.     AIG, who has received over 40 billion dollars in taxpayer funds to stay afloat as

an insurance company, has enjoyed hundreds of millions in DBA premiums since 2001, when

the United States went to war in Afghanistan.  It utilizes a variety of names of companies under

which it either writes the DBA insurance or performs payments and management of the claims,

such as Chartis, World Source, Insurance Company of the State of Pennsylvania, and other names.

43.    Since September 2001, there has been a nearly ten-fold increase in injuries and claims under the DBA due to Operation Iraqi Freedom (OIF) and Operation Enduring Freedom in Afghanistan (OEF). As of 2009 in a Congressional Research Service report, "there have been 49,472 DBA cases, including 1,584 cases involving the deaths of contractors in Iraq and Afghanistan. Nearly $200 million in cash and medical benefits were paid to DBA claimants in 2008. Congress has become increasingly concerned with the costs involved in the DBA program because the federal government usually reimburses its contractors for their DBA premiums. The Department of State (DOS) and the U.S. Agency for International Development (USAID) have seen some cost savings since adopting single-source models for their DBA insurance in which contractors for each agency are required to purchase insurance from a single company selected by the agency. The U.S. Army Corps of Engineers (USACE) is currently testing such a model for its DBA system. For the rest of the Department of Defense (DOD), however, including the Army's large Logistics Civil Augmentation Program (LOGCAP) contract, individual contractors are free to select their own DBA insurers and negotiate their own rates, and one contractor, KBR, has been criticized by DOD auditors for failing to demonstrate that it sought to control DBA premium costs when selecting an insurer." See *The Defense Base Act (DBA): The Federally Mandated Workers' Compensation System for Overseas Government Contractors*, (United States Congressional Research Service, July 22, 2009, http://www.fas.org/sgp/crs/natsec/RL34670.pdf).

44.    According to that same report, from 2001-2009, 79% of the claims were handled by Defendant AIG, with ACE and CNA accounting for about 10% each. *Id.* at p.8. The report

23

notes: "Nearly 40% of all injury and death cases covered by the DBA during this period involved employees working for Service Employers International Inc., an indirect subsidiary of KBR, a military and public works contractor. Service Employers International Inc. was the employer of record for 19,772 total cases including 103 death cases since September 2001." *Id.* at 3.

45.     On July 9, 2009, the Committee on Oversight and Government Reform of the United States House of Representatives held an extensive hearing on the abuses of these government contractors by Defendant insurance carriers AIG and CNA, as well as others, entitled, *After Injury the Battle Begins: Evaluating Workers' Compensation for Civilian Contractors in War Zones*, July 9, 2009.[1]  The committee found:

> For the period 2002-2008, AIG averaged an annual profit rate of 35.7% from its DBA business, and CNA an annual profit rate of 50% from its DBA business with private contractors. These rates of profit are significantly higher than the profits typically earned by conventional workers' compensation insurers.

It found that defendant CNA made $58,000,000 net from DBA premiums for a total 52% profit, while AIG made $500,000,000 net, for a total of 38% profit.  ACE made a 27% profit on DBA premiums, and Chubb a 38% profit on DBA premiums.  George R. Fay, CNA executive and retired Army Major General, testified at the hearing that his company only made a 14.9% profit for those years, and only a 9% profit on its premiums in 2009.  However, as was pointed out in the hearing, this was false because Mr. Fay was speaking of the $6.1 billion empire of property and casualty insurance that CNA and its subsidiary or affiliated companies write, not the

---

[1] http://oversight.house.gov/index.php?option=com_content&view=article&id=3986:hearing-on-after-injury-the-battle-begins-evaluating-workers-compensation-for-civilian-contractors-in-war-zones-&catid=66:hearings&Itemid=31

percentage profit on DBA insurance.  Mr. Fay had been with defendant Chubb Insurance that

also writes DBA insurance.

46.    In addition to that misrepresentation, the committee found this astonishing set of

facts:

> "Over 35,000 contractors have been killed or seriously wounded in Iraq and Afghanistan
> since 2002. In 2007, the Department of Labor received over 10,000 new reports of injury
> and death under the DBA. The public interest news organization, Pro Publica, analyzed
> Labor Department data and found that insurers had denied about 44% of all claims
> involving injuries involving more than four days of lost work. Insurance companies claim
> this number is a result of DOL rules that force companies to deny claims first and then
> investigate later. These insurance carriers, however, are unable to provide data on their
> denial and litigation rates because, they unbelievably assert, they don't track them.
> In this subcommittee's investigation, we have heard story after story of injured workers
> coming home minus a limb or traumatized by war zone experiences seared into their
> psyche, only to face the fight of their lives with their companies' insurance carrier. AIG's
> record is of particular concern given the enormous federal subsidies it receives. It is
> already well known that AIG awarded hundreds of millions in bonuses to top executives
> who have led the company over the abyss. What this hearing will establish is that the
> same company has refused to pay the prescribed benefits to an injured contractor without
> first putting them through a protracted fight? CNA, which is a much smaller player in the
> Department of Defense DBA market, nevertheless distinguishes itself for the lengths to
> which it will go to deny injured contractors' benefits and deny the existence of the
> phenomenon. Incredibly, a CNA representative represented to my staff that the company
> had never received a complaint from an injured contractor. We checked up on this, only
> to find, to the contrary, that there are claimants currently appealing denials of benefits by
> CNA, and that the story of Timothy Newman, who will testify today that CNA denied
> him a prosthetic limb until a judge overruled CNA, is not unique. For that
> misrepresentation alone, I found it necessary to invite CNA to testify here today."[2]

AIG's senior counsel, Charles Shrader testified that it is the requirements of the DBA itself and

the regulations of the Department of Labor that require his company to deny and controvert so

many claims, and the definitions of average weekly wage make AIG underpay people, and delay

compensation and medical payments.

---

[2] http://oversight.house.gov/images/stories/documents/20090619121424.pdf

47.     As one injured contractor, John Woodson, testified, after he was catastrophically injured in Iraq when a roadside bomb took off one of his limbs and put out an eye, he awoke in Texas out of a medically induced coma.  He had been earning a good salary in Iraq and now his family needed disability pay to live on and needed additional medical benefits.  AIG had assured him his disability pay would be immediately started but AIG could not seem to figure out how to start it.  They began by telling him that they would take care of everything and told him an amount of disability pay he would be receiving.  When he did finally get some money in his account, it was not the amount represented to him or the amount called for under the law.  He tried to speak with people at AIG and get this rectified.  AIG's response was not to comply with the law or to address his issues but instead told him they would hire an attorney and he could deal with the attorney.  From there, his case went into limbo, and he is lost in a complex maze he could never have imagined.[3]  As well, the testimony of Timothy Newman and Kevin Smith reflect similar stories of lost limbs, indifference of the carriers and employers to their plight, a complex maze and adversarial beatings, calling into question their veracity, and so on.  Mr. Newman testified to having to wait nearly two years for his prosthetic limb after his leg was blown off working for DynCorp.  CNA did not seem to want to pay for this.  He also witnessed others being denied prosthesis or even amputations as "not medically necessary."  And Mr. Smith described a harrowing crucible of being denied treatment prescribed by his doctors for sleep studies and other necessary care, which had the effect of prolonging his recovery and intensifying his suffering.  They also stopped his disability pay twice for no reason.  This traumatized him

and his family as if it were a second injury worse than the first. They refused to pay for surgeries, refused to pay for doctors who had saved his leg, even though these were AIG approved treatments and visits, and nearly lost his doctors as a result. He had to fight for every bill to be paid, and tried to accuse him of being overpaid and owing the insurance company. Even when ordered by a judge to provide treatment for his PTSD, AIG refused to comply.[4] While the carriers and employers have tried to blame the system as being byzantine and complicated, this is another misrepresentation from the defendants. The system is itself quite simple if the employer and carrier want to pay what is due. It is set up to cause benefits to flow early and freely. What is worse, these stories are not anomalies but happen over and over to injured contractors every day.

48.     With respect to foreign civilian contractors, the Deputy Secretary of Labor, Seth Harris, testified to the problems of non-reporting or treatment injuries to foreign workers in Iraq or Afghanistan, and the lack of any system defendant employers or insurance carriers have in place to make certain these workers who are sometimes illiterate and unable to understand workers compensation systems, have easy access to a representative in country and a translator in order to assure them medical treatment and disability payments to replace wages. These individuals are often impoverished and without technology or a way to access any benefits. Mr. Harris further testified to the problem of Post Traumatic Stress Disorder (PTSD) and the need for employers and carriers to have heightened sensitivity to the need to

---

[3] http://oversight.house.gov/images/stories/documents/20090618124239.pdf
[4] See http://oversight.house.gov/images/stories/documents/20090618124331.pdf and http://oversight.house.gov/images/stories/documents/20090618135510.pdf.

treat this very dangerous condition, and the high rates of PTSD seen from Iraq and

Afghanistan due to the grisly conditions encountered by civilian contractors on a daily basis.

49.     Mr. Charles Shrader, the senior officer for claims at AIG testified to

problems of capturing injuries in these foreign war zones and the difficulty in timely assessing

these injuries, especially of persons who do not speak English.[5] Mr. Shrader further testified that

his company was encountering all sorts of severe injuries, but insisted AIG was doing something

to help the problems, rather than deny claims, boasting of AIG's record in helping injured

workers:

> With decades of unsurpassed service under its belt, AIG has created a center of
> excellence for the care of injured workers that is unmatched by any of our competitors.
> Since 2005, our AIG travel assist division has undertaken 2,000 medical evaluations of
> severely injured workers, using both commercial airlines and air ambulances, in
> circumstances where timely, skilled medical treatment has been critical to their recovery.
> Evacuated workers have extensive injuries ranging from severe burns, dismemberments,
> head trauma and catastrophic wounds to heart attacks and other illnesses aggravated by
> the stress of working under war zone conditions.

50.     Far from solving these problems, AIG has compounded these problems as

have CNA and ACE, and the other defendants, by denying these claims and making sure that

many refuse to bring claims having seen the utter hell that others have entered who come into the

DBA claim jaws of these employers and carriers.  They are eaten alive.  They are hung out to dry

for years, they are beaten up morally, physically, psychologically and financially, and finally

some get settlements.  For many it is a system of such futility and personal degradation, they

would rather go untreated.  Foreign workers are actually paid to not enter the system, and some

United States citizens are discouraged from making any DBA claim through deliberate efforts to

---

[5] http://oversight.house.gov/images/stories/documents/20090618124620.pdf

transport them home or get them away from Iraq or Afghanistan and tell them to use their health

insurance carriers.  These insurance carriers and employers are privileged with the largesse of

large contracts from the United States, but feel no responsibility to comply with their legal

obligations and contractual obligations.  These defendant carriers and employers have

shamelessly persisted in their unlawful tactics and reaped more ill gotten gains through

misrepresentation and intentional harm toward thousands more contractors, while making large

profits.  AIG, for instance, recently settled a class action $450 million for underreporting

premiums in a Workers Compensation insurance pool.[6]

51.    This 2009 hearing followed on another hearing the same committee held on May

15, 2008 reflecting that the defendant contracting companies were making billions of dollars

from the government, and the insurance carriers had made $600 million in profits from the

injured.  The committee found:

> "The LOGCAP troop support contract — the largest single contract in Iraq —illustrates
> what's going wrong. As a series of charts will illustrate, KBR paid an insurance
> company, AIG, $284 million for worker's compensation coverage. Since KBR's contract
> is a cost-plus contact, this $284 million premium plus a mark-up for KBR of up to $8
> million gets billed to the taxpayer, bringing the total costs to the taxpayer to $292 million.
>
> Out of this amount, just $73 million actually goes to injured contractors, and AIG and
> KBR pocket over $100 million as profit.

---

[6] "$450M Deal in AIG Workers' Comp Suit Wins Initial OK," *Law360.com*,
http://www.law360.com/classaction/articles/260321?utm_source=newsletter&utm_medium=email&utm_campaign=
classaction.

This is disgraceful. The taxpayer is paying nearly $300 million to deliver less than $75 million in benefits to injured contractors. Rube Goldberg could not design a more inefficient way to help employees wounded or injured in Iraq.

The Defense Department has argued that the fact that Iraq is a war zone justifies the high costs of the insurance program. But under the Defense Base Act, the taxpayer — not the insurance companies — has to pay the costs when a contractor is wounded in action. The insurance companies only pay for the types of injuries that could occur at any worksite.

What makes the situation even worse is the people this program is supposed to benefit — the injured employees working for contractors — have to fight the insurance companies to get their benefits. Delays and denials in paying claims are the rule."

See Report of Committee on Oversight and Government Reform, *DBA Insurance Costs*, May 15, 2008.[7]

52.    The General Accountability Office testified to the same committee on May 15, 2009 on the ways in which various contracts are let to defendant insurance carriers.[8] For instance, the LOGCAP program that provides defendants Halliburton, KBR, and SEII with billions in government contracts for supplies, trucking, food services, water treatment, and other services in Iraq and Afghanistan, allowed for the carriers to bid individually, whereas USACE had a single carrier, CNA, write all of its DBA insurance for all of its contractors under a blanket policy. It is estimated that the United States pays $100 Billion annually to private military contractors, and that a substantial portion of that has been paid to the defendants named in this action. The defendant contractors have pulled in billions of dollars in the last decade due to these wars in Afghanistan and Iraq, using this contract labor source of workers, for security,

---

[7] http://oversight.house.gov/index.php?option=com_content&view=article&id=3484&catid=42:hearings&Itemid=2
[8] See GAO report at http://www.gao.gov/new.items/d08772t.pdf.

30

combat training, and the supporting services necessary to conduct the wars.[9]  These injured

contractors have formed an invisible army working to support and even fight the wars for the

United States.  Some of the contractors such as KBR or DynCorp had as much as $5 billion in

contracts each with the United States in 2008 alone. Some of the contractor Defendants have

been sued by the U.S. Department of Justice under the False Claims Act for billing the

government billions of dollars while falsely certifying their hours or licensing.  See, e.g., reports

that Defendant KBR falsely certified bills under the LOGCAP program.[10]  As found by the

Inspector General for Afghanistan reconstruction, insurer CNA has an exclusive contract with

United States Army Corps of Engineers (USACE) to provide all DBA insurance on contracts in

Afghanistan, yet it has been permitted to charge exorbitant rates, failed to reimburse the

government some $58 million the contractors should have remitted back, and has been allowed

to charge for laborers who may not have worked on contracts or contracts were modified such

that  CNA should have recalculated and given credits or reimbursements to contractors.[11]


### Illegal and Fraudulent Actions of Defense Contractors along with Insurance Carriers to Harm Workers Who Protect America

53.     What the committee encountered is what the plaintiffs and the thousands of

civilian contractors whom they represent who have been damaged by the defendants improper

actions have discovered – that the contractors and the insurance carriers work in tandem to make

---

[9] See Congressional Research Service report, "Private Security Contractors in Iraq:Background, Legal Status, and Other Issues (August 25, 2008), at http://www.fas.org/sgp/crs/natsec/RL32419.pdf.
[10] http://www.justice.gov/opa/pr/2011/February/11-civ-214.html and http://www.reuters.com/article/2010/04/02/us-kbr-lawsuit-idUSTRE63103W20100402

life very difficult on civilian contractors who are injured.  The injury that they sustain overseas is just the beginning of the harm.

54.     Employers are required to post notice forms that are given out exclusively by the DOL upon insurance authorization not available to the general public. The notice must contain the name and address of the employer representative to whom notice of injury is given and the name of the insurance carrier. 33 U.S.C. § 934.  Failure to post the name of the person that employees are supposed to contact in case of injury is sufficient reason to excuse a late filing by claimant. 20 C.F.R. § 702.216.  In most cases, Defendants did not post such notices in English or Arabic, the two most common languages spoken and read by contractors working for Defendants.   Defendant Contractors treat civilian workers overseas with hostility when they make reports of injuries.  They do not inform them of their rights under the DBA or encourage them to obtain proper treatment, but instead threaten workers into not making claims, by telling them through their superiors that many people want their good jobs back home and are lined up if they do not want the jobs.  They are often met with phrases that instill fear of job loss if they claim lost time injuries, such as "chicken or beef," referring to the meal offering on the flight back home when they lose their jobs.  As a result, many do not make claims of injuries until the pain becomes too great for them to continue working.  This in turn discourages timely reporting of injuries.

55.     The DBA and DOL regulations require an employer to notify the DOL when an injury occurs, but Defendant contractors often do not so report the injuries.  Later if a worker

---

[11] See Report: "Weaknesses in Weaknesses in the USACE Defense Base Act Insurance Program Led to as Much as $58.5 Million in Refunds Not Returned to the U.S. Government and Other Problems,"at http://www.sigar.mil/pdf/audits/SIGAR%20Audit-11-15.pdf.

does end up needing treatment, surgery or time off work due to the injury, the employer and

defendant insurance companies use it against them that they did not fill out an accident report,

even though the emloyers discouraged persons from filling out any accident reports.  It was in

fact highly discouraged, and workers lived and live in fear for their jobs if they report a lost time

accident.

56    In addition to this culture of management both discouraging reports of injuries by

employees and failing to file reports with the DOL, the culture created by defendant contractors

is one of denial of conditions, retaliation for having injuries, especially of a psychological nature,

and refusal to properly address conditions as they occur.

57.    Many of defendant contractors and insurance carriers decline or refuse to allow

whole classes of foreign nationals from accessing the DBA and instead bypass it through illegal

schemes to pay off families pittances, or to pay off village tribesman or chieftains to assure

continuing sources of fresh and cheap labor, thus perpetuating a system of fraud on the United

States in the contracting process, fraud on the local populations, fraud on nationals of England,

Australia, South Africa, Indonesia, Peru, India, Uganda and many other countries whose

populations are lured to Iraq, Afghanistan, Saudi Arabia, Kuwait, and other locations where the

United States has bases or lets contracts to which the DBA applies.  CNA Insurance was recently

put under investigation by the Inspector General of the Department of Labor for committing

fraud in a Department of Labor investigation into CNA's refusal to pay for the death of Iraqi

33

translators working for contracting companies for which CNA has been paid premiums for DBA insurance.[12]

58.    While the DBA and Longshore Act are administered by the Department of Labor in their Office of Workers' Compensation Programs, and Office of Administrative Judges, and the Board of Review, it is sometimes very difficult for Claimants to get relief, have hearings, or their attorneys to obtain fees when they are disputed.   Claimants are often lost in a system that is sometimes indifferent to their plight, and the Department of Labor will sometimes enable the employers and carriers to get away with egregious violations of law.  Some Department of Labor judge and examiners have been heard to complain that something needs to be done about the abuses by the employers and carriers, but many officials are afraid of taking any action in a bureaucratic system of government administration nationwide that is complex and slow and punishes those who complain.  This causes further exploitation by carriers, employers, and their attorneys who face minuscule penalties, which are often not even leveled or enforced at the administrative level.


**Repeated and Systematic Fraud and Misrepresentation by Employers and Insurance**

**Carriers under DBA**

59.    Defendants have engaged in a systematic effort to underreport, misrepresent and fraudulently and in bad faith deny claims.  Defendant employers and carriers, acting through their employees, agents, adjustors and attorneys commit the following fraud and

---

[12] "US Insurer Faces Criminal Probe Over Iraqis' Unpaid Death Benefits," *Los Angeles Times,* T. Christian Miller, May 24, 2011, at http://articles.latimes.com/2011/may/24/nation/la-na-iraq-claims-20110524.

misrepresentations directly to the Department of Labor in official claims and investigations, as more particularly set forth in individual case allegations below:

- Misrepresent the Average Weekly Wage, by underreporting wages, or purposely miscalculating earnings or contract amounts

- Underpaying amounts to injured workers

- Consenting to pay full amount of disability pay to injured workers and deliberately underpaying them

- Accusing injured workers of being overpaid as an excuse to reduce or terminate benefits, and when proved wrong not reimbursing the worker and the family

- Stopping payment on checks for disability or medical or other expenses

- Refusing to give appropriate information in the possession of the employer to the carrier or the DOL to show the accident was work related, and to show appropriate wage earnings of the employee

- Sending employees home for medical reasons, then working with the carrier to deny benefits under the DBA

- Trying to manufacture evidence of malingering on the part of the employee

- Telling employees not to file claims as they will lose their jobs

- Telling employees they are covered and beginning benefits,then later telling them there is no coverage because of technical failures of the employee to file forms even though the employer and carrier are fully aware of and have accepted the claims

35

- Refusing medical treatment to employees injured on the job, and refusing prompt transport needed for effective treatment resulting in further harm to employees

- Refusing to inform employees or their families about the DBA or how to access benefits

- Refusing to follow orders of courts to provide medical treatment and disability pay, while pretending to do so or claiming it will happen at some indefinite future date

- Refusing to follow recommendations of the DOL OWCP directors' offices for provision of benefits and medical care

- Repeatedly lying about wire transfers having occurred

- Repeated lying about whether medical payments have been paid

- Delaying payments for lengthy periods of time

- Suborning perjury to get witnesses to testify it is not dangerous in Iraq or Afghanistan

- Pretending they have no records of a claim

- Pretending they have never received invoices or claims for reimbursement

- Pretending they have never received bills for doctors, hospitals or diagnostic testing

- Pretending they have paid mileage to medical appointments when they have not

- Pretending they have authorized medical providers to provide treatment or other services or medicines at their expense when they have not

- Stating to DOL Examiners and Directors of OWCP that they have paid medical bills, Temporary Total Disability (TTD), or other payments by wire or check, when they know they have not and have repeatedly been requested to pay

- Stating in writing and on telephone conferences with DOL Examiners and/or Directors of OWCP offices, that they have already paid or sent wire transfers, when they have not

- Stating in writing and on telephone conferences with DOL Examiners and/or Directors of OWCP offices, that they will pay by wire or check for outstanding medical bills, TTD or other amounts, when they do not intend to pay and end up not paying for such treatment or past due authorized treatment for months on end

- Refusing medical treatment to claimants but demanding that they go to "Independent" (defense) Medical exams (DMEs)

- Misrepresenting to Claimants that they have no right to choose their own physician, steering claimants to physicians, psychiatrists and psychologists that are on the payroll of the employer and insurance carrier

- Trying to influence the treating physicians of the claimants to return them to work or find they have reached maximum medical improvement (MMI)

- Using adjustors or nurse case managers to make medical judgments of injured workers taking too many drugs, or of not needing surgical or other procedures, and interfering in medical treatment of the injured worker in violation of law

- Using trickery and artifice to deny injured workers choice of physician and substituting a choice by the Insurance Company without disclosure or waiver of rights by the injured worker

- Accepting claims as valid, and accepting the obligation to pay for medical treatment, and mileage, and then delaying reimbursement and payment of claims, mileage, medical payments and disability payments in a way that increases the cost of care, interferes with treatment, and causes undue stress and difficulty on the physician patient relationship as well as the personal lives of claimants and their families

- Refusing family therapy recommended by treating physicians and psychologists to members of families of catastrophically injured workers who suffer from psychological problems from dealing with the injuries, caring for persons with PTSD and TBI, and the ensuing interpersonal problems that these create as well as the financial strain due to defendants' malfeasance

**Systematic Intentional Misconduct and Harm Toward Injured Persons and their Families**

60.    In addition to the above fraud and misrepresentation, and delay and denial and run around, defendants hire attorneys who represent the insurance carrier and the employer jointly in the captions of the proceedings.  The attorneys for defendants work with the adjusters for the defendant insurance carriers and communicate jointly at times with the DOL and with claimants, and their attorneys.

38

61.     The intentional misconduct, ruses, schemes, games, and devices used toward the workers and their families by the employer and insurance carrier includes but is not limited to the following:

- Outright denial of claims, or blanket denial of types of claims

- Attending informal hearings and, without benefit of any medical records or other records, stating through attorneys and adjusters that the claim is denied because the person may be faking their injuries, stating a preconceived belief without factual basis that the person is malingering, and then setting about to prove this preconceived position

- Denial of claims that result from work related injuries where the person's preexisting weakness, condition or prior injuries in any way relate to the resulting harm, when the defendants know that such conditions are just as compensable under the DBA as a fresh injury, and that the resulting disability is compensable if any aspect of the covered work contributed to the resulting disability

- Denying compensation for deaths to surviving family members when defendants know that such deaths result from the worker being in the "zone of special danger," i.e., the death resulted from some aspect of being overseas and was made more likely by being required to be on base 24/7 or simply being required to live or eat on base, even if such death is the direct result of an accident that has nothing to do with the employment

- Ignore recommendations and diagnoses of doctors hired by employer and insurance carrier when those diagnoses and recommendations would result in injured workers being paid for their injuries and medical bills

- Inject significant delays in cases by pretending to want to settle and then walking away from settlements over the smallest objection

- Accepting claims and then repeatedly delaying payment on medical expenses

- Accepting claims and medical treatment as compensable, then unreasonably delaying payment of disability checks to workers and their families who depend on them

- Stopping payments, then refiguring disability pay and telling injured workers they owe money back to the insurance company

- Claiming to have wired money that never comes

- Wiring money to an account but not informing doctors that it is there despite repeated attempts to rectify the missing money

- Using complexities of international wire transfers and multiplication of wire transfers, and delays in transfers, to create delay and prevent injured workers or their families from receiving medications and benefits, and being subjected needlessly to many banking fees that reduce the net benefit and put injured individuals and families at risk

- Using doctors for defense medical exams (DMEs) to deny claims and terminate benefits or medical procedures after seeing injured workers for five minutes or less

- Creating inconvenient venues and adversarial DMEs for injured workers to travel long distances

- Use of doctors who have preconceived beliefs that injured workers do not have PTSD

- Use of Dr. John Griffith to defeat PTSD claims and accuse injured workers of "malingering," and stating that many claimants are malingerers and that PTSD is an inappropriate diagnosis, accusing injured workers of being at fault in roadside bomb incidents as if they "brought it all on themselves" and other abuses

- Other DME doctors used to intimidate, harass, and falsify conditions, hostility, lengthy commutes, etc, refusal to reimburse, refusal to treat, pretending to treat and pay, while requiring DME docs to verify what they won't authorize or pay for as submitted by claimants' choice of physicians

- Use of attorneys who state that we will "run him through the numbers" when referring the injured worker to Dr. Griffith to have them declared malingerers.

- Repeatedly assuring claimants that medical expenses had been paid but refusing to pay same

- Refusing appropriate in home nursing care or reasonable payment for services by spouses or family of injured workers

41

- Repeatedly refusing to pay for old medical or nursing invoices that carriers claim they will or have paid

- Requiring claimants or spouses or friends to fax or mail medical bills, collection notices, or medical appointment mileage multiple times, claiming not to have received

- Repeatedly lying to doctors' offices about whether payment had been made

- Causing claimants to lose their relationships with doctors and other medical personnel and pharmacies who refuse to work with claimants or their nurse or medical managers because of non payment and elaborate ruses they use

- Unjustifiable delays in payment, sometimes for years

- Stating that medical appointments and treatments, or tests and medications, are approved, then refusing to pay, denying having made the authorization or continuing to assert it is authorized but never paying the doctors as required or communicating with doctors sufficient to make reasonable assurances that payments were made or will be made

- Forcing injured workers to hire attorneys in order to obtain benefits the employer and carrier know are due and owing, creating great delay and adversarial difficulty and needless waste and anxiety

- Use of third party administrators who have no background in medicine to make medical judgments, have access to sensitive medical records, create additional confusion on medical care, reimbursements or medical appointments

42

- Use of third party administrators to bully, threaten, intimidate, trespass on land, in homes, photographing injured workers and families, intruding on medical appointments, inserting themselves between doctors and patient, pretending to have paid or forwarded invoices for payment, and many other devices that routinely cause harm, confusion and negative consequences for workers and their families

- Use of third party administrators to threaten to physically harm or abscond with injured workers, or have them committed, in order to make injured workers or their families docile or compliant with the nonpayment of medical bills and disability pay

- Use of third party administrators to lie to injured employees about whether they have benefits, or benefits are being or will be withdrawn, whether they can see doctors, and what their conditions are

- Use of third party administrators with potential violent criminal history to further terrorize injured contractors

**Detrimental Reliance and Injury inflicted by Insurance Carriers and Employers**

62.     Plaintiff is informed and believes and thereon alleges that the defendants intend to create reliance on the part of injured workers and their families in order to further harm them, including physically, psychologically, in their family relationships, and in their financial and personal integrity, as follows:

- Approve medication for serious illnesses and then stop payments for such medications, resulting in injured workers being worse off than if they never

43

started the medications, creating dependency and reliance and significant trauma in injured workers and their families

- Use of adjusters or case managers of insurance companies to bully, threaten, intimidate, intrude on medical appointments, inserting themselves between doctors and patient, driving wedges in medical relationships that were created in reliance on approval of the choice of physician by the injured worker

- Use of third party administrators to make offers of settlement that are later withdrawn or denied altogether, creating financial reliance and confusion, and resulting in threats by banks and others to have them removed from homes, lose their property and be sued in court

- Misrepresenting intention to settle cases and amounts of settlements for disability for injuries and medical expenses, in order to postpone hearing, decision, and enforcement of claimants' rights

- Switching adjustors or third party administrators

- Acting abusively and arrogantly with injured parties and their spouses

- Use of ruses and schemes to show workers the benefits are coming and the claim is accepted by the carrier, only to have the benefits ripped out from underneath them at times that are devastating to injured parties and their families

- Creating reliance on adjusters and agents and employees of the defendants, then using that reliance and inferior position on the part of injured workers and their families to deny benefits based on technical legal arguments and improper defenses

44

- Playing mind games with injured parties and their families concerning payments to medical providers, documentation, payments for mileage, receipt of e mails or faxes

- Misrepresenting settlement authority to injured workers or their attorneys

- Setting depositions and trials, then calling them off suddenly, delaying cases for years on thin grounds

- Creating reliance on payment of old invoices, which causes injured workers and their families not to take actions to protect themselves from process, sheriff sales, foreclosures, and blackballing by medical providers, which in fact has the effect of causing many injured workers to lose their homes, cars, furniture,  be foreclosed on and blackballed

- Creating reliance on adjusters and case managers who enter into financial relationships with providers of medical care, medical equipment, wheel chairs, prostheses, hospitals, private medical facilities, only to refuse payment resulting in the loss of business, reputation, and foreclosure, as well as blackballing of such nurses and medical case managers from the medical community

- Creating reliance by providing or offering special employment to injured workers, then refusing to so employ them or terminating them in order to prevent their enjoyment of the benefits of such employment or special employment

- Inviting persons to travel or incur expenses to meet with employers and carriers to resolve problems only to refuse to pay for such expenses once incurred

45

- Paying by check for wheelchairs or disability pay, then stopping payment of checks causing repossession, fees, and other consequences that are harmful, disturbing, traumatizing and damaging to the health and wellbeing of injured workers and their families

- Paying nominal sums to injured foreign workers or killed foreign workers, which sums are not compliant with the DBA and are paid outside the DBA to avoid liability

- Paying no sums to U.S. and foreign workers for their injuries, sending them home, without informing them of their right to access DBA, medical treatment and disability pay

- Firing employees who are injured on the job and make claims

- Retaliate against employees who make claims and others who treat them or testify on their behalf, create reports on their behalf or cooperate with the DBA process

- Using attorneys to harass injured workers by not returning calls of injured workers or their attorneys, delaying payment of bills, deny receiving invoices, repeat falsehoods to the Department of Labor, delay reimbursements, and make access to benefits so difficult as to effectively deny whole categories of benefits to injured workers

### PTSD and TBI Purposely Overlooked and Ignored

63.     Over the last several years, it has become increasingly clear that individuals who have been exposed to multiple concussive blasts, shelling, mortars, explosions, vibrations, carnage, injury and death, suffer from a variety of psychological problems, disorders, including

46

PTSD, depression, anxiety disorders, and anger management disorders as well as other

psychological problems, and TBI and mTBI (mild traumatic brain injury) in growing numbers.

The VA as well as other agencies have come out with reports, and the press has been rife with

stories of problems in screening and detecting TBI or PTSD.[13]  Individuals with severe

psychological problems may also have serious cognitive and organic brain problems from the

effects of blasts, including lesions and micro tears in the brain.  These in turn affect behavior,

affect, ability to function in relationships or in work.  Testing of TBI and PTSD is specialized

and requires sometimes expensive diagnostics as well as physicians who have experience in war

related psychological and traumatic injury neurology.

     64.     By failing to screen for TBI and PTSD, many injured soldiers and civilian

contractors have had worsened conditions or cannot be easily treated or diagnosed.  Recent

revelations at Walter Reed Medical Center have brought to the attention of the public and the

government the need to screen for PTSD and recognize the cases so as to avoid great harm to

individuals and families, as well as society.  A culture of denial of these claims has grown up

because of the multiple cases of TBI and PTSD arising out of the Iraq and Afghanistan wars.

     65.     While the military has recently begun to recognize the need to diagnose and more

aggressively treat these cases,[14] the civilian contractor is still treated as the military counterpart

---

[13] See, e.g., http://www.mirecc.va.gov/docs/visn6/TBI-handout-providers.pdf.  According to the VA, "In the past 8 years, TBI has emerged as a common form of injury in service men and women serving in Operation Enduring Freedom (OEF) and Operation Iraqi Freedom (OIF). Although penetrating TBI is typically identified and cared for immediately, mTBI may be missed, particularly in the presence of other more obvious injuries. Due to numerous deployments and the nature of enemy tactics, troops are at risk for sustaining more than one mild brain injury or concussion in a short timeframe." http://www.healthquality.va.gov/mtbi/concussion_mtbi_full_1_0.pdf.

[14] http://www.ptsd.va.gov/public/index.asp.  New rules have come out for the VA to assess disability in cases of PTSD, making it much more friendly to veterans.  See http://www.va.gov/PTSD_QA.pdf.

was eight years ago. The defendants react negatively to any claim of PTSD or TBI. Denial of claims and aggressive tactics to discredit the claimants, including driving them into homelessness, have become common.

66.     The defendants have acted toward these individuals with great callousness and done untold harm through their aggressive denial of claims of PTSD and TBI, including threatening and mocking individuals who have been involved in numerous incidents of death and maiming, seen their friends or co workers killed, been witness to mass suicide bombings and had their own worlds turned upside down. Defendants have denied claimants treatment and medication even when their own hired gun doctors admit the individuals need treatment and medication for their conditions from working in Iraq or Afghanistan. Defendants have further knowingly subjected individuals with PTSD and TBI to suicide, or risk of suicide, and created great psychological harm to their family members who develop symptoms known as "contact PTSD" from the increased distress related to their care and the actions of defendants.

67.     Defendant DynCorp has started screening individuals for PTSD or other psychological disorders or TBI, and even hired a psychologist on staff in Iraq to examine individuals on a random basis, and on leaving Iraq or Afghanistan. However, this policy of interviewing people for PTSD is sporadic, sometimes not done for certain individuals, and has resulted in numerous individuals being left to fend for themselves and, if lucky, to be diagnosed and treated at some later date by someone not paid by the carrier or employer.

68.     In some cases, due to DynCorp and other contractor deliberate neglect, individuals with severe PTSD and other injuries are either let go or allowed to return home

48

untreated after years of exposure in combat zones, and some have committed suicide, causing

great damage to their families and the ability of the family to earn a living.

69.    In or about 2009, Department of Labor instituted a policy of giving a priority to

PTSD and TBI cases where they are alleged, and have stated it is their policy to provide an

expedited hearing within 60 days or requesting it for PTSD cases.  However, in practice,

claimants encounter bureaucratic challenges that Defendants have exploited, denying them

hearings for the simplest screenings, interacting with Department of Labor officials to imply that

they are considering benefits, adding to the delays and futility of trying to access care or

diagnosis, much less treatment.  While Defendants pretend to consider benefits and diagnostic

testing, sometimes for years, they subject claimants to hiring of Defense Medical Examiners and

demand invasive testing and inconvenient exposure to hostile doctors who neither treat Plaintiffs

nor have their best interests at heart, sometimes calling them malingerers or fakers or looking for

ways of technically defeating PTSD diagnoses, and denying any benefits whatsoever even when

such Defense Medical Examiners believe the Plaintiff's experience in Iraq or Afghanistan caused

psychological adjustment problems requiring treatment and medication.

### Leishmaniasis Overlooked and Ignored

70.    Due to America's ventures in Afghanistan and Iraq, a little known condition in the

United States has come front and center.  Leishmaniasis is a parasitic blood borne infection that

comes from a sandfly bite.  It is found in parts of the tropics, subtropics and southern Europe.  It

is caused by infection with *Leishmania* parasites, which are spread by the bite of infected sand

flies. There are several different forms of leishmaniasis in people. The most common forms are

cutaneous leishmaniasis, which causes skin sores, and visceral leishmaniasis, which affects some

of the internal organs of the body (for example, spleen, liver, and bone marrow). It can be life

threatening, and at its worst is a flesh eating protozoan infection that never leaves the body, is

transmitted to family members and can cause internal organs of the infected person to be

destroyed.[15] There are various strains of leishmaniasis including Viscerotropic and other strains.

Leishmaniasis has been associated with symptoms known as Gulf War Syndrome. Delay in the

testing for this parasite causes inability to properly diagnose because lesions are not active and

do not permit live cultures, which defendant carriers and employers use to deny any treatment or

testing at all.

71.     Defendants do not screen for this disease which first shows up as leisions on the

skin, or black spots. While the military has warned of the need to take precautions to avoid

infection, defendant contractors have done little or nothing to heed those warnings. When

civilian contractors are infected, defendants refuse treatment, or retaliate against infected

individuals by denying full treatment, or the side effects of the treatment, terminating individuals

from employment, and terminating DBA benefits.


VI.  FACTUAL & LEGAL ALLEGATIONS RELATING TO AMERICAN CONTRACTORS

(representatives for similarly situated American Contractors, for damages exclusive of any

amounts compensable under the DBA)

**Ronald Bell**

72.     Ronald Bell had worked as a truck driver and sheriff's deputy in Texas. He went

---

[15] See http://www.cdc.gov/ncidod/dpd/parasites/leishmania/default.htm.

to work for Halliburton, KBR, SEII, in 2004, and worked as a combat truck driver for KBR. During his time in Iraq, traveling to and from military bases and compounds, he was attacked on numerous occasions by rockets, mortars, roadside bombs, IEDs, and small arms fire. He was involved in at least seven roadside bomb blasts, had several friends die in Iraq, and felt threatened with his life on numerous occasions, witnessed gruesome scenes, and learned of deaths of fellow drivers reported to him in camp. He saw carnage and mayhem on the roads.

73.    In or around 2008, Mr. Bell was stuck on the head by a heavy bolt that broke free from an axle on a truck he was working on for KBR in Iraq. This blow caused Mr. Bell to lose consciousness and bleed profusely from the head.

74.    On August 14, 2009, he injured his knee in camp while dismounting from his bunk bed where KBR had him sleeping. He felt his knee pop and could not walk. He sought treatment and was sent home to Texas at the end of August, 2009, to receive and did receive surgery on his left knee for medial meniscus tear.

75.    On his return to the United States, KBR and its insurance carrier, AIG, immediately began to discriminate against him, withholding his personal goods, threatening to sell them, terminating his medical benefits, and failing to send him COBRA notices timely, and causing great hardship to him and his wife.

76.    As a result of his job with KBR in Iraq, Mr. Bell encountered numerous life and death situations, concussion and IED types of explosions, witnessed loss of life, and had to go through combat conditions with gunfire and potential for loss of life and extremes of survival. This has left him with severe injuries in addition to his knee injury on the job. He has experienced PTSD symptoms for some time, including flashbacks, nightmares, reliving of the

severe incidents in which he was involved or witnessed firsthand, and enhanced startle response as well as heightened anxiety and difficulty sleeping, increased anger response and shortened fuse, difficulty concentrating or coping and focusing on tasks. All of which makes it more likely he has also experienced blast injuries, or Traumatic Brain Injury (TBI).

77.     Through his attorney, on December 17, 2009, Mr. Bell informed KBR of his PTSD and TBI and demanded treatment for PTSD and testing for TBI. He began seeing a psychologist who diagnosed him as having classic PTSD as a result of his encounters in Iraq for KBR.

78.     Within ten days of receiving that demand at KBR headquarters, on January 6, 2010, two men in suits arrived at Mr. Bell's home in a White Escalade. They parked on his property, approached him on his porch, and identified themselves as being from defendant KBR (Halliburton) from Houston where the company's headquarters are located. They told him he needed to drop his "lawsuit or else."

79.     Mr. Bell said they would need to talk to his attorney. They told him no attorneys needed to be involved, that he needed to drop his lawsuit against KBR or else. Mr. Bell felt intimidated and threatened by these men and believed some physical harm might befall him and his family. He told them he needed to go inside to get his attorney on the line, but could not, and when he came back outside his dog, a pit bull, followed him out, and the men got in their Escalade and left. Mr. Bell called the sheriff's department of Lubbock who came and took a full report for assault and threats by the two employees of KBR. This report was supplied to KBR's legal division by counsel for Mr. Bell. KBR never denied this occurred but instead wrote to Mr.

Bell's attorney to identify a lengthy alternative dispute resolution policy which it supplied to Mr. Bell's counsel.

80.     Since then Mr. Bell has had a second operation on his knee and has had extensive physical therapy. He cannot walk on the knee without it giving out. In April, his orthopedic surgeon recommended he have a total knee replacement. AIG subsequently accused Mr. Bell through its case manager of being addicted to pain medication, that there was nothing wrong with him but "arthritis" and pressured Mr. Bell's treating orthopedic surgeon with finding he had reached "maximum medical improvement" (MMI) and should be rated and released. This MMI finding is necessary for AIG to cut off benefits.

81.     AIG refused to pay for the knee replacement and sent him to a hired doctor to produce an DME report, that stated he did not need a knee replacement. AIG cut off his benefits and refused any further knee therapy or benefits for PTSD or any medication or therapy.

82.     Mr. Bell brought the matter for informal conference before the Department of Labor who ordered a separate independent exam by DOL's doctor who determined that he did in fact need a knee replacement. The DOL recommended as well that AIG and KBR provide for him to be treated at their expense for PTSD and appropriate medication and testing. To date, KBR and AIG have not complied.

83.     The company has refused any payment for testing or treatment of PTSD or TBI, refused to pay for medications for sleeping and anti-psychotic and anti-anxiety medication, and cut off his TTD disability benefits, subjecting him and his wife to potential loss of their home.

84.     While he was being treated on medical leave, and while the company was telling

him he would be reinstated after his disability when his injuries ceased, the company terminated

his employment.  Under the written agreement, when he experiences a disability from an on the

job injury, which KBR acknowledges on the knee, he is entitled to retain his insurance and other

benefits with the company unless and until it is medically determined that he is unfit to return to

duty once he is treated and reaches maximum medical improvement.  Even then, under the

Americans' with Disabilities Act, the company is obligated to make reasonable accommodations

in adjusting his job or placing him in available jobs that fit his limitations.  Nevertheless, KBR

and AIG never offered to accommodate him, and tried to and has interfered with his medical

treatment and has refused him any treatment for PTSD and TBI and instead has threatened him

to drop that claim and caused great harm to him, including assaulting his integrity, accusing him

of drug addiction, subjecting him to financial problems and loss of his home, and pressuring his

doctor to find him at MMI.

85.     For ten months he has been without any pay or treatment for his knee or PTSD,

depression, and possible brain injury, and has been threatened with loss of his home where he

and his wife live, been unable to pay for medications or therapy.  This worsened his condition

with regard to his knee, pain, and his PTSD worsened with no treatment.

86.     During this time, Mr. Bell had no insurance and no benefits under the DBA and

was forced to go to the emergency room in Lubbock in order to deal with his pain, anxiety,

PTSD and brain injury problems.  He has incurred medical bills that he cannot pay and is being

pursued in collection.  He was forced to pay out of pocket for neuropsychiatric evaluation that

determined he has severe PTSD, depression, and traumatic brain injury and loss of

consciousness.  He has also had to incur out of pocket expense for medications which he can

only purchase irregularly, and to see his psychologist, Dr. Richard Wall, infrequently because he cannot afford sessions. The total out of pocket medical bills, travel and medication is approximately $30,000.

87.    Following his deposition in April 2011 in Dallas, Texas, AIG and KBR through their counsel stated they would recommend paying his temporary total disability compensation (TTD) but failed to do so for two months, and then notified Mr. Bell they were starting his TTD pay, had paid or were going to pay, and it took some six weeks to actually pay Mr. Bell anything. AIG authorized him to go back to his orthopedic surgeon who recommended total knee replacement in the Spring of 2010, but which AIG refused despite a second opinion being ordered by the Department of Labor. As of August, 2011, they still refused any treatment or medication for the PTSD, depression, and any testing for TBI despite the blow to Mr. Bell's head on the job in Iraq, and his loss of consciousness other symptoms of memory loss and difficulty of concentration showing evidence of neurologic damage and possible TBI.

88.    As a result of KBR and AIG's actions, retaliation, withdrawal of TTD payments, accusations of drug addiction, and other improper actions, they have inflicted injuries on Mr. Bell and his wife, Cynthia Bell, worsening his psychological, physical and emotional and financial conditions, and harming their marriage. These actions were done to harm Mr. Bell and his wife, or done with reckless disregard for the harm their actions would take, after being warned repeatedly of such. Mr. Bell does not seek any amounts compensable under the DBA in this action.

## Merlin and Marcie Clark

89.    Merlin Clark is a former US Navy Explosive Ordnance Disposal and Demining

(EOD) expert, with a background in this for his last eight years in the Navy. Mr. Clark worked

for Ronco Consulting, which is now owned by Wackenhut Services International (WSI), under

contracts in Bosnia and elsewhere since 1999.  As a supervisory Senior EOD employee for

Ronco, Mr. Clark was selected to initially provide field management of and later provide overall

management of the unexploded ordnance/bomb disposal activities after the invasion of Iraq for

RONCO under contract to the United States Department of State.  He was an experienced and

respected EOD expert who was selected for State Department Humanitarian work in post-war

zones such as Bosnia, Kosovo, Eritrea and Iraq.  RONCO mobilized the Chief of Party for the

Mozambican clearance force, a Mr. Leslie Brown, as the Task Leader with the understanding

that Mr. Brown would demobilize after 45 days and Mr. Clark would assume the duties of Task

Leader and Mr. Clark's position as field manager would be backfilled by another qualified

(individual that has successfully completed EOD training in a first world military) and

experienced EOD professional from the then current RONCO cadre.  Just prior to Mr. Brown's

departure from Iraq, Mr. Clark contacted his supervisor, Mr. Lawrence Saiers (RONCO's Vice

President for Strategic Planning), about the upcoming vacancy for a field manager.  Mr. Clark

submitted a list of RONCO individuals qualified to fill this position.  RONCO ignored the

request and operational requirement for a EOD qualified replacement and instead sent a

demining advisor whose limited operational field experience consisted of observing demining

activities performed by the Djiboutian military for 2 years, and who had no EOD training or

background.  As explained to Mr. Clark by Mr. Saiers, this move was to expand the (unqualified)

individuals' field experience.  Mr. Clark then requested a third (qualified) individual to assist in

the field (as his Number 2) but this was denied and he was told to "make it work".   Mr. Clark

protested that due to the size of the clearance force, the hazards of the munitions encountered and size of the task sites that another qualified EOD person was critical to project safety and this was ignored by RONCO.  At this point, Mr. Clark had 56 Mozambique nationals, 1 American Dog Handler Trainer and 1 unqualified field manager under his direct supervision as Task Leader. Prior to this, the crew was split between Mr. Clark and Mr. Brown (also EOD qualified) which had proven to be an adequate level of supervision for safe clearance operations.

64.     On July 7, 2003, claimant was overseeing the clearance and disposal of (US) M42 submunitions that had been launched against an unknown target at a location 12 kilometers North of Baghdad.  The clearance team worked the site for 2-3 days and was finally made aware that this area had been classified as a "Red Zone" by the US Military due to an incident where, days before, two armed US Army Soldiers had been abducted and killed decapitated by local Sunnis.  Mr. Clark met with the US State Department representative, Mr. Harry McCloy, and requested that security for the clearance activity be provided by the US Military and this request was passed on to Command Joint Task Force (CJTF) 77 (in charge of Iraq at that time) and the request was granted.  The promised security detail did not show at the predetermined meeting point during the following 2 days on the site and the team returned to the camp and attended training.  Mr. Clark spent the morning frantically trying to locate the security detail and oversee the clearance activity at the same time.  Because of Ronco's failure in providing a second qualified EOD person, Mr. Clark was very limited in the duties he could assign to the unqualified Number 2 man and this, combined with his concern with the safety of his men over the deteriorating security situation resulted in a tremendous amount of stress on Mr. Clark due to 2 prior incidents; Mr. Clark and 6 Mozambicans were fired upon on June 28th, 2003 by the US

57

Army while conducting authorized demolitions and on June 30th, 2003 when Mr. Clark and his

Number 2 were nearly shot at close range by a semiconscious U.S. Army soldier gate guard

because they drove past a sign in Arabic saying to stop at a checkpoint at Camp Dogwood,

Mr. Clark was not totally focused on the task at hand when he began gathering the unexploded

M42 submunitions on this day.  At one point he picked up a submunition, tripped on the hard

baked rowed earth in the farm field and dropped the munition which detonated on impact.  He

was violently thrown up and back by the pressure wave from the explosion, then down to the

ground landing on his head, neck, and back on the hard and dried rows.  When he regained

consciousness he looked down and saw his left foot at an odd angle.  The bomb had crippled him

and he began to apply pressure to stop the profuse bleeding until he could be brought back to

base by medevac helicopter.

90.    It took an hour for a medevac to pick up Mr. Clark and fly him to Camp Dogwood

Field Hospital.  He was immediately sent to Landstuhl due to the critical nature of his wounds.

While there he was administered highly neurotoxic antibiotics at very high doses for MDR

Acinetobacter baumannii.  He was left there for nearly a week without medical evacuation being

provided by Ronco or CNA, and neither did Ronco explain to Mr. Clark or his wife, Marcie

Hascall Clark, anything about the DBA or its benefits.  Mrs. Clark became involved early on in

her husband's care and treatment and became a caretaker for the last eight years.

91.    Having been abandoned by the Employer/Carrier the military medevaced him to

Walter Reed Army Medical Center.  At Walter Reed treatment continued for MDR

Acinetobacter baumannii.  He received continued debridement of the wounds and MDR

Acinetobacter baumannii was cultured from his wounds.

92.     The blast had destroyed Mr. Clark's left shin, the circulation to his foot was critically diminished.   His Tibia was left intact but broken, but the Fibula was left with a huge hole and bone fragments and nerves and tendons were destroyed.  In order to keep his foot, and reestablish circulation, the surgery team had to establish a vascular pulse.  The surgeon at Walter Reed, Dr. Jorgenson, took a large flap of muscle from Mr. Clark's back, a Lat Flap.  This muscle was connected to the knee by microsurgery and wrapped around to the leg and foot.  His right arm had a 99% severed ulnar nerve.

93.     Part of the flap did not take, necrosis set in.  This was due to Mr. Clark not being transported within the first seven day window, being abandoned at Landstuhl Air Base for about a week.  Brigadier General John Wilkinson, a Ronco VP at the time, had to intervene at Walter Reed when Mr. Clark arrived as no one had made arrangements for him to be there.  This delay caused a great deal of stress and medical complications for Mr. Clark and Mrs. Clark.  The left leg was the most pressing and life threatening injury initially.  All energies went into dealing with the leg, saving the foot and leg, and reestablishing blood flow and pulse.

94.     Mr. Clark had multiple traumas from the blast, including to his head, hearing, hands, right arm, back, neck, and very serious complications from the life threatening MDR Acinetobacter baumannii and the highly neurotoxic drugs used to treat it.  These neurotoxic drugs were used in the highest possible doses effectively bathing Mr. Clark's freshly compressed brain cells creating a hostile environment for healing

95.     Leishmaniasis, a protozoan blood born parasite from the bite of a sandfly in Iraq, known to be an opportunistic pathogen endemic to Iraq, attacked the reconstruction of the leg but it was not addressed by any of Mr. Clark's doctors until months later, well after the initial attack.

Leishmaniasis is a life-long infection, and much like malaria, it can be treated but there is no cure. Leishmaniasis can remain dormant in an otherwise healthy person for up to 20 years before recurring. Mr. Clark's leishmaniasis remains active after eight years all around the reconstruction of his lower left leg.

96.     Shortly after he was released from the hospital a second, and even more neurotoxic drug was added to his treatment. This drug is only legal to use for 14 days but was prescribed for six weeks. He had a serious ototoxic reaction to this second drug which caused permanent damage to his eighth octal nerve resulting in permanent balance and coordination problems. He also was evaluated and found to have hearing loss, dizziness, and tinnitus from the blast. He underwent extensive physical therapy, both in his home as well as on an out-patient basis.

97.     His leg brace and leg injuries, including the severe nerve damage caused a loss of ability to run, to walk properly, to have balance and coordination, and to lift his foot. He has had to wear a leg brace for years and will have continuing orthopedic and orthotic needs for life. He had drop foot for which he needed operations, and it still gives him problems. He has severe back and neck problems, ulnar nerve damage in his right arm, and difficulty performing basic tasks as a result. He is right hand dominant and has trouble gripping and holding things. Basic life, much less work, is much more challenging for him. He has issues with travel, due to edema in his leg, back and neck pain,, range of motion, and stress. He is at increased risk for thrombosis, clots, heart attack, and peripheral vascular disease due to the reconstruction of his leg and other multiple operations.

98.     This event has had a profound effect on his work and personal life, and that of his

family.  The medical and psychological treatment and travel alone consume massive amounts of

time over the last seven years for which they have never been compensated.

99.     In addition, as a result of this trauma, Mr. Clark suffered a traumatic brain injury

(TBI), diagnosed by Dr. Gary Weiss and by Dr. Walter Afield, an expert in neuropsychiatric

trauma.  He has had a scan of his brain showing a traumatic brain injury.   Mr. Clark also

developed psychological symptoms of stress, depression, reliving of the incidents, PTSD and

related problems.  Mr. Clark has nightmares and intrusive recollections about the traumatic

event, as well as withdrawal and avoidance issues.  This has also been intensified as he has had

to live and relive it constantly through the medical and psychological and psychiatric treatment

and because of the elongated recovery process, infections and issues that have gone untreated.

He has a grossly disfigured leg.  He has extensive scarring on his arm and back, and continuing

pain throughout his body from his multiple injuries and operations.  He will likely have to have

additional operations during his life due to the progressive problems with his leg and back and

neck.  He has hearing loss from the explosion and ototoxic drug reaction, leishmaniasis infection,

and life care needs for the rest of his life.

100.    Mr. Clark was offered an office administrative job with Ronco and went back to

work in November, 2004.  He worked in Ronco's offices in Washington, DC, and from his home

in Melbourne, Florida.  He was making less than half of what he would have been making in Iraq

had he not been injured and unable to continue in his usual occupation.  His new administrative

job was to write proposals for contracts.

101.    These physical and psychological problems have caused Mr. Clark to have

permanent memory loss, concentration and other mental processing problems.  This created

undue stress and difficulties at work because Ronco demanded that he travel and work beyond

his doctor's restrictions.

102.    Over the course of the last seven years, CNA and Ronco have repeatedly

misrepresented and lied to the Department of Labor officials concerning paying for medical

treatment for Mr. Clark's numerous and life threatening medical conditions.  They have utterly

refused to pay for medications, psychological and psychiatric treatment prescribed by his

psychologist and neuropsychiatrist, back and neck treatments prescribed by their neurologist,

orthotic devices as prescribed his the orthopedic physician, treat TBI as diagnosed by his

neurologist, hearing aids as prescribed by his otolaryngologist,  or test for or treat his

leishmaniasis.

103.    Whenever the Clarks through their counsel have brought up these lies and

misrepresentations, CNA has stated that it has in fact approved the medical treatment, but to this

day they have never paid for such though their own doctors they have sent Mr. Clark to have

admitted he needs medications, psychological treatment and therapy, pain medication, and

treatment for his various injuries.

104.    For example, at the Informal Conferences with DOL, the counsel for CNA and

Ronco  represented the following which were untrue and known to be untrue when represented

to DOL–

- They had paid for certain medical expenses when they had not

- They had authorized treatment and supplies for Mr. Clark's many injuries when they had
  not

62

- They had paid all compensation due and owing to date when they had not

- They had provided all compensation for medical travel and mileage when they had not

- They had authorized payment for psychological therapy when they had not

105.    Following each Informal Conference, Ronco and CNA would not follow through and instead would do everything in their power to make sure Mr. Clark went through difficulties on the job and with regard to medical care.  They shorted and discontinued his disability pay on numerous occasions without providing paperwork to the Department of Labor.  They have refused to pay for out of pocket expenses.

106.    Previously in 2008, CNA offered to settle the disability and medical claims of Mr. Clark.  They gave particular numbers and figures, and the Clarks were prepared to get CNA out of their life and settle.  When the settlement stipulations were produced by CNA's attorney, however, the figures were completely different and had the Clarks owing CNA, and Mr. Clarks medical for life was not included.

107.    CNA has made it so difficult to obtain any prescriptions or medical treatment, that the Clarks have had to pay for it out of pocket, and have expended thousands of dollars of their own money for travel, co-pays with Blue Cross Blue Shield, or have foregone many treatments and therapies Mr. Clark needed because of the lack of funds.  All the while, CNA would tell and continues to tell Judges and officials of the Department of Labor that it has authorized medical treatment and payment for prescriptions, orthopedic devices, hearing aids, etc.  Yet Mr. Clark has no hearing aids, no orthopedic devices, compression stockings, or other items CNA claims it has authorized.  Ronco has worked closely with CNA, and they have blamed Mr. Clark and Mrs. Clark for all of their misrepresentations, fraud, and harassment.

108.    Since the beginning, CNA has used a variety of misrepresentations, devices, and ruses, to prevent proper payment to Mr. Clark and Mrs. Clark for his treatment and her care of her husband.  They have interfered with their doctors' treatment, created havoc with nurses, provided nurses that were not qualified , failed to approve arranged surgeries without notice, sent the Clarks on long expeditions for DMEs that are abusive and harassing, only to find out the doctors will not see them for reasons of not bringing films or medical records which were not the responsibility of the Clarks to bring.

109.    Representations made above occurred in July, August, and September through CNA and Ronco counsel to counsel for the Clarks in Washington, D.C. and the predicate acts of misrepresentation, fraud, mail and wire fraud through fax, telephone and mail, were sent from CNA's representatives to the Clarks' counsel in Washington, D.C. repeatedly from July through October, 2010.  On August 19, 2010, CNA and Ronco's counsel appeared in Washington, D.C. for a settlement hearing before Judge Woods of the Office of Administratve Law Judges.  During that conference, CNA and Ronco through their counsel repeated the misrepresentations concerning lack of payment, claiming they had paid all authorized medicals, they had authorized medical treatment for Mr. Clark for his orthopedic, neurologic, psychological, hearing, leishmaniasis, and other problems, which in fact they never had, and they continued to make said misrepresentations in Washington, D.C., while the Clarks were listening on the telephone.

110.    To date, Ronco and CNA have conspired together to fire Mr. Clark after he finally settled his disability claims.  At the settlement conference with the Administrative Law Judge in August, 2010, Ronco and CNA's attorney represented that Mr. Clark was a very valued employee.  They insisted that his continued earnings in a job they created for Mr. Clark after the

64

explosion and injuries in Iraq, establish his retained earning capacity.  Ronco and CNA

communicated back and forth regarding waiting until a settlement was reached to fire him.  Prior

to the stipulated agreement being signed, on September 1, 2010 Ronco had Mr. Clark fly to

Washington DC where he was notified that he was laid off effective September 30, 2011 due to

his disabilities, but through e mail were advised that it might affect the settlement of the case.

By September 30, 2010 Mr. Clarks work telephone was disconnected, his clients were turned

over, and he returned Ronco's property as requested.  Mr. Clark contacted Ronco the following

Monday October 4th in regards to his final paycheck, expense reimbursement, severance

package, vacation pay, and 401K which he was denied. On October 8, 2010 CNA finally signed

the previously agreed to stipulations.  Mr. Clark was forced to hire an attorney to try collect these

benefits. Ronco refused to pay the severance unless Mr. Clark signed a ridiculously broad

confidentiality agreement that he could not in good conscience sign.

     111.    Mrs. Clark was forced to give up most of her professional income from Interior

Design to care for her husband and deal with the myriad headaches and problems created by

Ronco and CNA due to their illegal and intentional misconduct, misrepresentations, and refusal

to provide what the law requires under the DBA.

     112.    Merlin Clark filed a claim with the Equal Employment Opportunity Commission

less than 180 days following his termination for Ronco's violations of the Americans with

Disabilities Act in failing to reasonably accommodate his known disabilities affecting major life

activities, and for discrimination under the ADA for terminating him due to his disability and

pursuit of settlement of his DBA claims.  The EEOC issued a Right to Sue letter on June 28,

2011 which was received by Mr. Clark on June 29, 2011.

113.    The actions of Ronco and CNA have harmed not only Mr. Clark and set him back in his care and treatment, they have made it very difficult for him to be treated due to windows for testing and treatment for leishmaniasis, TBI, psychological injuries, PTSD, back injuries, and neck injuries.  Delays from the beginning due to Ronco, and later continuing with CNA, have caused increased stress, difficulties in their family life, and caused damages to Mrs. Clark and their daughter.  Ronco and CNA did these actions knowing the harm that was and would be caused to Mr. Clark and to his family.

114.    The actions of Ronco and CNA Insurance above had a profoundly detrimental impact on Merlin Clark, Marcie Hascall Clark, and their minor daughter, causing financial hardship, worsening of Merlin's physical and psychological conditions, destroying the ability of Mrs. Clark to work, caused expenditure of hundreds of hours in being care taker and dealing with the misconduct and mistakes of Ronco and CNA.  The disruption of the relationships in the family have resulted in a need for treatment for all members of the family.

115.    Plaintiff is informed and believes and thereon alleges that the defendants Ronco and CNA have intentionally tried to prevent other civilian contractor employees of Ronco and Wackenhut Services International from making claims under the DBA, to have them obtain medical treatment and not reporting these injuries to the including causing them to be taken out of country back to the United States and Thailand from foreign bases without notifying the Department of Labor as required by law.

### Patrick Joseph Brewer

116.    Patrick Joseph Brewer is a 3 time combat veteran of the U S Army and the Army

66

Special Forces (Operation Desert Storm, 82nd Airborne Division and operations Iraqi Freedom and Enduring Freedom in Afghanistan with Special Forces. He was awarded many combat medals including the Bronze Star and Bronze Star with (V) device. He joined the Army in 1984 and served at Ft. Bragg from 1987 until his honorable discharge in 2004. During his time at Ft. Bragg he also did two years as the Non Commissioned Officer in Charge of Phase Three of the Army Special Forces Qualification Course.

117.    He worked for USIS International, Inc (USIS) as a mentor/trainer of Iraqi National Guard and Police in Iraq for special operations, counter terrorism and basic skills for combat. He went on combat missions with them and the U.S. military, and saw a great deal of action, was involved in multiple firefights in Iraq from June 2005 until October 2008.

118.    During his four years in Iraq, he saw carnage, bombings, was involved in many ambushes, saw friends and trainees killed.

119.    On April 9, 2008, he was injured when lifting heavy ammunition boxes, passing them to Iraqi ERU members, causing a stretch injury, tendonitis in his bicep and an AC ligament strain to his left shoulder.

120.    After receiving treatment in Iraq, he went home to the United States to receive further shoulder treatment in October 2008. He has been disabled from working since due to his left shoulder injury, sleep problems, PTSD and depression.

121.    In October, November and December 2008 on various dates, Mr. Brewer spooke with USIS and with representatives of AIG, who spoke angrily to him suggesting he was faking his shoulder injury. They misrepresented to him on several occasions that they would process

his claim of injury, which was witnessed in Iraq by USIS personnel and a USIS accident form was filled out. USIS and AIG utilized wire and mail to perpetrate their fraud and never communicated anything to a medical provider for Mr. Brewer, never paid for medical treatment or evaluation or pain or anti-inflammatory medication, and left Mr. Brewer to fend for himself in spite of numerous representations in Iraq and on his return through mail and wire that they would take care of processing his DBA injury claim.

122.    In spite of reporting his left shoulder injury to USIS and AIG, they refused to provide him medical treatment or pay him any disability even after he hired an attorney, and so Mr. Brewer was forced to pay for his own medical treatment for his should and PTSD and depression and sleep problems.

123.    He has had arthroscopic surgery on his shoulder and seen a specialist in PTSD who has determined him to be totally and completely disabled from working due to these conditions. He has spent in excess of $20,000 on medical expenses and the employer and carrier continue to refuse him treatment or disability pay.

124.    Recently AIG and USIS agreed to pay his back disability for the shoulder only from November of 2008 until they deemed him maximally improved from the shoulder surgery he had to pay for, around August of 2010, but refused to pay back pay from that time to the present. They are also paying his disability benefits for his mTBI and PTSD and depression, but not medical benefits for that or medication, and have not reimbursed him for his payment for shoulder surgery and physical therapy.

125.    As a result of this indifference to their obligations, USIS and AIG have caused

68

Mr. Brewer untold difficulty and increased his pain and suffering, delayed his diagnosis and treatment and increased his medical and psychiatric symptoms.

## CJ Mercadante

126.    Plaintiff Mercadante  had a long and distinguished career as an Army Ranger engaged in Special Operations in the United States Army.  Much of his work was classified in Iraq and Afghanistan dealt with numerous agencies on several levels such as the  Central Intelligence Agency (CIA) and U.S. State Department as well as the U.S. Department of Defense, including dangerous combat missions in Iraq, Afghanistan and elsewhere from 1988 to 1996 when he was honorably discharged in 1996 at the rank of Staff Sergeant.  He was once again recalled to Active Military Duty August 2002 where he was assigned to U.S. Special Operations Command at Ft. Bragg, NC.  He worked as an instructor at the John F. Kennedy Special Warfare Center; he was training young Special Forces Candidates, Small Unit Tactics and Guerilla Warfare.  He was once again honorably discharged in March 2004.

127.    He performed Special Operations including acting as a scout/sniper in Operation Desert Shield & Storm, and earned the following awards, accolades and combat medals among many others: Ranger Tab, Parachutist Badge, Combat Infantrymen's Badge, Bronze German Armed Forces Parachutist Badge (Foreign Award), 2 Army Commendation Medals, Meritorious Unit Commendation, 3 Army Good Conduct Medals, 2 National Defense Service Medals, Southwest Asia Service Medal with 2 Bronze Service Stars, Overseas Service Ribbon, Kuwait Liberation Medal, Expert Marksman Pistol Badge, Expert Marksman Rifle Badge, Special

Operations Language Trained, Commendation for saving the life of a civilian on the Parks Highway Alaska 1995.

129.    In January 2004 he went to work for DynCorp as a Security Protective Specialist (Body Guard) in a program called the World Personal Protective Service operated for the U.S. Department of State, Department of Diplomatic Security.  He was trained in northern Virginia in the "High Threat Protective Service Course (known as WPPS 1 & 2) and in West Virginia in the "Security Driver Training" course, prior to his deployment in February 2004.  He was issued a U.S. Diplomatic Passport which clearly stated, "the bearer of this passport is abroad on a diplomatic assignment for the United States Government".  Upon arriving in Afghanistan he was assigned to the U.S. Embassy in Kabul.  During this assignment his primary function was to protect the U.S. Ambassador to Afghanistan as a member of the Embassy Protective Detail.  He was also responsible for the safety of all Embassy personnel not to mention all U.S. Citizens within Afghanistan.  He was responsible for the safety and protection of numerous personal within USAID, CIA, DOS, DOD, US Marshal Service, DEA, FBI, DOJ, Dept of HHS, DOT, Secret Service, and numerous U.S. Dignitaries who visited that country.  He also conducted several joint operations with the US Military, US Secret Service, DEA and FBI.  He was the senior advance agent responsible for reconnoitering and determining the safety of perspective venue locations and conducting counter surveillance operations as well as apprehensions of suspect terrorists due to the active threats of assassination against the U.S. Ambassador. He was instrumental in conducting risk assessments and reconnoitering of venues while working jointly with the U.S. Secret Service planning for visits of V.P. Cheney. He was a member of the Counter

Assault Team supporting President George W. Bush's visit.  He was instrumental in conducting

risk assessments and reconnoitering polling sites for Afghanistan's first Democratic Election.

He was involved in planning and reconnoitering target sites jointly with the U.S. Drug

Enforcement Administration (DEA).  On occasion he was personally assigned as the U.S.

Ambassadors limo driver.  Mr. Mercadante suffered numerous physical injuries while working in

Afghanistan, as he was involved in hundreds of automobile accidents while conducting

motorcade operations.  On one mission alone, the vehicle he was in was hit 17 times by vehicles

which compromised the safety of all occupants within the motorcade.  The armored Suburban

vehicles had no seat belts or airbags.   The motorcade vehicles he traveled in were equipped with

classified security equipment that contained an emission.  This emission and its effects are

unknown due to being classified and may cause medical issues just as overexposure to an x-ray

machine.  He was also exposed to numerous environmental threats and was forced to reside in

quarters provided by the U.S. Embassy and DynCorp which was infested with Black Mold. He

suffered frequent respiratory problems as a result.  DynCorp never filed a DBA claim on Mr.

Mercadante's behalf.  The first time Mr. Mercadante was made aware of the DBA system was

only after beginning work for Blackwater.  Upon being re-assigned to Blackwater, Mr.

Mercadante complained about continued respiratory problems as a result of this service in

Afghanistan.  Blackwater filed a claim with the DOL for him and it was denied by the carrier.

While working for DynCorp, Mr. Mercadante and others were frequently treated by medical

professionals that were equivalent to military medics or paramedics.  None had a medical

license.  These unlicensed Dyncorp representatives issued medication without consulting a

71

medical physician.  At one point many of the members of the US Embassy's protection team as

they were called were being medicated for the effects of PTSD.  The common drug they were

provided was Zoloft.  They were never removed from full duty while being medicated and

continued to work protecting the US Ambassador and other important American figures.  The

medics who provided this care were operating without a medical license and prescribing and

providing medication without a license as well.  The US Embassy in Kabul had no medical staff

assigned; apparently this was never planned for.  As a result DynCorp medics were the only form

of immediate medical care.  They even treated the US Ambassador, provided him with

medication for illnesses on numerous occasions.  It is clear that this lack of planning on behalf on

not only DynCorp but the US Government to provide qualified medical doctors and staff fostered

an environment where the DynCorp protective team that included Mr. Mercadante as well as the

staff at the US Embassy had no choice for medical care other than resorting to these unqualified

and unlicensed personnel who routinely prescribed medication. The medication they provided

was obtained during visits to Bagram Airbase by the US Military. DynCorp Medics would obtain

medication at Bagram Airfield routinely from former military co-workers still currently serving

in the US Military.  Medication was obtained from the military in quantity not prescribed to any

specific person in tern, DynCorp medics would issue this medication to DynCorp employees

unlicensed, unqualified, and did as they saw fit. In addition a DynCorp medic fraudulently filled

out medical documents on US Embassy letterhead claiming he was the Chief of Medical

Services for the US Embassy when in fact he was a DynCorp medic.  That same medic detailed

in a medical record history on US Embassy letterhead that he was treating Mr. Mercadante since

72

12 November 2005 with Zoloft due to the effects of PTSD in addition provided Mr. Mercadante

with injections of Kenalog and Marcaine for pain. He also provided anti-inflammatory

medication for his pre-existing back condition. This medic who represented DynCorp, was

illegally practicing medicine under US law and was clearly practicing medicine without a

medical license. In February 2006 DynCorp lost this contract and it was re-awarded to Defendant

Blackwater Security Consulting (now known as Xe Services, LLC).

128.     In February 2006 Mr. Mercadante seamlessly transitioned from DynCorp to

Blackwater since it was the same contract and employer, the U.S. Department of State,

Department of Diplomatic Security, World Personal Protective Service. He had security

clearances through Blackwater by both with the Central Intelligence Agency and the Department

of State. He also possessed a clearance from the Department of Defense from his prior military

service. For this assignment he was assigned as a sniper due to his prior military training. He

was certified at Blackwater's compound in Moyock, NC. as a sniper or the more politically

correct term currently used, Designated Defensive Marksman, and he received "High Threat

Protective Service Course (known as WPPS 2) a course he had already attended with DynCorp

two months prior. During his time with Blackwater, he had duties such as sniper, protective

detail member, and operations with United States forces. On the 23rd of April 2006 Blackwater

provided Mr. Mercadante along with other employees with a pre-deployment medical screening.

The screening was conducted by Patients First at 705 N. Battlefield Blvd Chesapeake, VA. His

records were reviewed to ensure his immunizations were up to date, he was administered a HIV

screening and was meet by a medical doctor. During that screening Mr. Mercadante made the

doctor aware of his pre-existing injuries which were noted on their documents.  He also made

them aware that he had been treated for PTSD while in Afghanistan and was provided Zoloft on

a daily basis by the DynCorp medic.  The doctor asked, "how are you feeling now".  Mr.

Mercadante informed him great.  No further questions were asked and he was cleared to deploy.

No psychological evaluation was conducted during this screening.  When hired previously with

DynCorp Mr. Mercadante was required to do a written evaluation, which took several hours,

along with a detailed interview and examination by a psychiatrist.  This did not occur with

Blackwater.

     129.    He was on protective detail for VIPs and celebrities who traveled to Iraq or

Afghanistan both for Blackwater & DynCorp during his 4 years working for the World Personal

Protective Service operated by the U.S. Department of State, Department of Diplomatic Security,

he provided protection, security or over-watch for: President George W. Bush, First Lady Laura

Bush, Vice President Cheney, US Ambassador / Presidential Envoy Zalmay Khalilzad, US

Ambassador Neumann, UN Ambassador and actress Angelina Jolie, Secretary of Defense

Donald Rumsfeld, Secretary of State Colin Powell, Secretary of State Condaleeza Rice, US

Attorney General Alberto Gonzales, US Attorney General John Ashcroft, US Secretary of

Transportation Norman Mineta, Chairman Joint Chiefs of Staff, General Peter Pace, Chairman

Joint Chiefs of Staff General Richard Myers, Secretary of State Richard Armitage, Senator Jeff

Sessions, Senator, Lisa Murkowski, Senator John Macain, Senator Barbara Boxer, Senator Joe

Lieberman, Senator Hillary Clinton, among many other senators and members of congress, CIA

Director Michael Hayden, FBI Director Robert Mueller, DEA Director Karen Tandy, US Drug

Czar Reggie Walton, USAID Director to Afghanistan James Bever , General John Abizaid

(USCENTCOM Commander, US Army), , then Governor Kathleen Sebelius, Governor Haley

Barbour, TV/Radio Personality Rush Limbaugh, President Hamid Karzai (Afghanistan), UN

Ambassador to Afghanistan Jean Reneault, and Former President of Afghanistan Rabbani, along

with many other notable individuals.

131.    During his time with Defendant Blackwater, he sustained multiple injuries to his

back, shoulder, brain (traumatic brain injury or TBI), Post Traumatic Stress Disorder,

Gastrointestinal disorders, GERD, neck injuries, headaches, sleeping disorders, depression,

hearing loss, fractured coccyx, and lower extremity injuries.  As a result of his injuries sustained

in Iraq and Afghanistan, Mercadante has been rendered permanently and totally disabled and can

never work again.  These injuries occurred on numerous occasions between February 2004 and

February 2008.  The incidents are as follows: approximately 200 plus auto accidents, numerous

head traumas during motorcade operations, blast injuries on several occasions, injuries moving

heavy equipment, constant wearing of heavy body armor, lying in contorted positions for hours

on end.  Car bombings, rocket, motor attacks & small arms fire.

132.    All of the injuries he sustained are covered by the DBA, but when he tried to

assert his right to treatment and disability, he was met with intense hostility, including being

locked in a room by Blackwater Management against his will to prevent him from speaking with

the Regional Security Officer who is the Agent for the U.S. Department of State Diplomatic

Security Service and is in charge of all activates and assignments for Blackwater within Iraq, Mr.

Mercadante was also being denied medical care, threatened with never working and most of all

his reputation was being ruined. Mr. Mercadante's life was also threatened by a member of

Blackwater's Management on 13 February 2008 on US Embassy property. The above events all

occurred from 13-17 February 2008. Mr. Mercadante and others for Blackwater were issued US

Government orders, signed by the US Department of State. Contained in these orders, it noted

that, "(N) Contractor Privileges: Requests this contractor be granted, subject to availability,

access to or the privileges defined below while deployed in Iraq. Section 11: Medical/Dental

Service." "(2) Emergency medical support will be determined by the appropriate support

commander. (b) There bearer of this letter is an employee of Blackwater," Blackwater employees

were not provided dental or medical care due animosity and jealousy by the military commander

at the military hospital located next to the US Embassy. Rather than addressing these issues with

the US Department of State who could have corrected this issue Blackwater management opted

to deny its employees appropriate medical care simply because they did not want to "rock the

boat" and jeopardize any future contracts. During the periods between May thru August 2006

Blackwater assigned Mr. Mercadante as a sniper to the Regional US Embassy in Kirkuk, Iraq.

Blackwater provided no medical care at that location. KBR had the contract with the US

Government for medical care at that location. Blackwater members to include Mr. Mercadante

received any and all medical care at this facility by KBR. KBR had a Physicians Assistant, NO

medical doctor, assigned to this location. This Physicians Assistant routinely prescribed

medication without the direction of a medical doctor. Blackwater admitted in email

correspondence dated 27 April 2007 to all Blackwater employee's, "We have recently seen a

rash of medical issues that are not being treated correctly, or being addressed with due

diligence."

133.    When he sought treatment from the DBA insurance carrier for Blackwater,

Continental Casualty Company (hereafter "CNA"), he was met with intense hostility from the

beginning, which has never ceased in the last several years.  He was refused treatment on

numerous occasions in spite of being in great pain and need of evaluation, treatment and

medication as well as surgery, and psychiatric testing and medication.  CNA to this day has only

provided medical records for Mr. Mercadante for 14-16 February 2008.  All prior medical

incidents while assigned to US Regional Embassy in Kirkuk or at the US Embassy in Baghdad

have never been provided. Mr. Mercadante's lawyer has requested copies of these records thru

the DOL and CNA.  Many of these records will display and prove work related injuries.

Conveniently, CNA claims Blackwater will not provide them with any medical records. Nor

have they provided any medical records from KBR.   CNA has fought him tooth and nail

claiming they have no records displaying there was a work injury, thus denying treatment.  Mr.

Mercadante of his own accord, has been able to provide some medical documents since he

commonly keeps copies of records if available.  Some of these records that CNA and Blackwater

failed to produce is the only reason Mr. Mercadante receives care for some of his injuries today.

He has received NO records from KBR.

134.    On one occasion, he spoke with CNA's adjuster, Sammin Papa who told him,

"We are not in business to pay claims but to make money."

77

135.    After his shoulder surgery in 2007, he needed to rehabilitate the shoulder through physical activity with weights at a gym.  He requested reimbursement for a gym membership. He was told by the CNA adjuster that "CNA never pays for a gym membership." He discovered later this was untrue.  In 2010 CNA has paid for a gym membership. This began a series of misrepresentations to him, then his attorney, then to the Department of Labor officials before whom he was required to go to resolve the multifarious disputes that CNA and Blackwater threw up as obstacles to his getting better from his multiple injuries that permanently disabled him.

136.    Over the next few years, he was subjected to elaborate run around, where he would be approved for medical treatments, then denied, doctors would be told they were approved, and then on the date of the appointment, when he would show up, it would be canceled, or it would not be canceled after Mr. Mercadante was told it was canceled by the carrier.  After this, CNA really began to put on the gloves and make his life a living hell.  They continued to pretend to offer treatment but made it so difficult to get paid that doctors would not work with him.

137.    He was permanently disabled effective February 14, 2008 when he awoke and could not move due to multiple explosions, injuries, and incidents of falling, as well as being involved in numerous situations involving death and threats of death for Blackwater.  He saw Blackwater's doctor, Smith, who determined he needed immediate medevac from Iraq, chain of command began to harass him, including giving him negative and fraudulent counseling from leadership of Blackwater in Iraq, and came into his room and awoke him every 20 minutes in spite of doctor's orders for sleep. After requesting to speak with the RSO at the Diplomatic

78

Security Office in the US Embassy his government Identifications to include his passport was taken by Blackwater Management as to deny him access to the US Embassy. Before his departure from Iraq on February 16, 2008, leadership of Blackwater put him in the "Head shed" where he was cussed at and harassed and then escorted to ensure he would not speak to any State Department personnel or media. At that point he was given his medication back along with his identification. These events are on audiotape.

138.    Upon his return to the U.S. he contacted Blackwater (Kristy Cole) and spoke with her boss, Bryan Salek. On February 19, 2008, he spoke to Bryan Salek, and over the next few months through conversations requested a letter of apology from Blackwater for filing a false report on his injuries and what occurred in Iraq.

139.    On October 31, 2008 after months of claiming there was no wrongdoing, Mr. Mercadante received correspondence signed by Blackwater's legal counsel Andrew Howell apologizing for "mistreatment or mistakes that may have occurred." This only occurred after Mr. Mercadante provided Blackwater with one of many audio tapes that contradicted all of Blackwater's previous positions, and showed that documents, activities, and claims made about Mr. Mercadante by members of Blackwater management were false. The audio tapes also displayed the harassing nature and combative attitude toward him while injured.

140.    On February 19, 2008, he received his first email and/or contact from Samin Papa who informed him she was the new claims adjuster with CNA. He called Samin Papa after receiving her email. During our conversation he asked about the PTSD, and she said they don't have any claim and it's not CNA's problem unless there is a claim. He informed her he had the

medical documents from Baghdad.  She gave him her fax number I sent it.  Later he called and confirmed it was received.

141.    He went to the Emergency Room at the Durham Veterans Administration due to severe effects of the PTSD on February 19, 2008. Over the next couple of months he was diagnosed with PTSD and TBI.

142.    He called and spoke to Samin Papa on May 19, 2008 concerning his shoulder which was a previous injury with C.N.A and he had surgery on 03 Oct 2007 and was bothering him again.  He asked to see his doctor and Samin informed him he had to pay for that himself. He was cleared to go back to work and must have hurt it again.  Eventually he had to go to Kristy Cole and raise objections to get Blackwater to intervene with CNA to obtain treatment for the shoulder condition that was already approved, and finally CNA relented and provided treatment.

143.    Acting through Samin Papa, after Mr. Mercadante moved to Florida to be near his mother and family to assist in his care and treatment because of the overwhelming problems of his physical and psychological conditions, CNA called and spoke to his 72 year old mother and threatened to take away his benefits if he didn't call Ms. Papa.  His mother informed her Mr. Mercadante was sleeping.  His mother was referring to his son who is also has the same first name who was sleeping.

144.    In June, 2008, he then received a call from Samin Papa of CNA, in which she stated: "You are home sleeping and doing nothing to get better we are going to cut off your benefits."  He replied, "Let me tell you first of all I am not in Florida, that was my  13 year old son my mother was talking about, second I never gave you her phone number and why are you

calling harassing her she is elderly and that's messed up. I am currently in Georgia in a hotel

trying to get to Florida; do you want the hotel info?" Samin, "No". "It's taken me 3 days just to

get here. How can I get better when you won't even approve medical care for me, you still

haven't approved any health care for my PTSD, but it's ok I thank you for that because know I

found I have a TBI as well, you screwed up."

145.    Mr. Mercadante was denied medical care for more than 1 year by CNA, as a

result his diagnoses were delayed, resulting in his inability to obtain financial entitlements such

as Social Security Disability and Veterans Benefits all of which would have provided him a

significant income he has lost due to his injury. CNA and Blackwater mischaracterized and As a

result of these intentional delays by the carrier and the limited income for more than one year

Mr. Mercadante's residence was foreclosed upon and his credit was ruined. He and his family to

include two young children were now homeless and destitute.

146.    Mr. Mercadante realized he must hire a lawyer and he did so. After he hired the

lawyer, CNA continued to interfere with his care and refused treatments routinely.    They tried

to get a Dr. McRae to state that the stomach and reflux (GERD) problems he was having were

not related to his PTSD or other injuries with Blackwater. The doctor refused to say this. As a

result of C.N.A still not paying Dr. McRae in full to this date from two years ago he has refused

to see Mr. Mercadante for any further treatment. C.N.A had informed the DOL on more than one

occasion that C.N.A had paid Dr. McRae's office in full when in fact it was it never occurred.

147.    Over the next couple of years, CNA engaged in a pattern of conduct to deny

81

claims, refuse medical treatment, and prescriptions by highly qualified psychiatrists,

psychologists, orthopedic doctors, and internists. They have refused to this day to perform the

sleep apnea study or provide medical treatment for his endocrine problems which result from his

TBI and PTSD. These are life threatening conditions. Yet CNA has refused treatment while

misrepresenting its intention to do so at conferences with Department of Labor under the DBA.

148.    Blackwater told its employees during this time that if they spoke to Mr.

Mercadante, they would be fired. This was retaliation for his claim of injuries on the job.

149.    Mr. Mercadante began experiencing blackouts and other major medical episodes

due to the non-treatment of his conditions by CNA. In January 2009 while driving his son to

school Mr. Mercadante had a blackout resulting in an auto accident. This accident place himself

his young son and innocent bystanders at risk. This was clearly due to non-treatment of his

conditions by CNA. CNA did not address this issue but once again Mr. Mercadante was forced

to seek treatment at the expense of the tax payer at the Department of Veterans Affairs. The

result was CNA avoiding medical bills and causing tax payer expense where they were clearly

liable.

150.    At the DOL informal conference in February 2009, CNA's attorney

misrepresented numerous items to the official DOL Claims Examiner. These misrepresentations

included stating that CNA had provided immediate treatment for PTSD upon his return from

Iraq, but later had to admit it had delayed approval of PTSD treatment by seven and a half

months. CNA also misrepresented that it had previously approved his neurologist's treatment,

but upon further proof and faxes, CNA had to admit through its attorney that this approval

occurred the day before that informal conference.  These were documented in letters and e mails.

151.    Mr. Mercadante received a prescription for a Temper-pedic mattress.  The carrier

instructed him to obtain three quotes so that they can purchase the mattress at the best price.  Mr.

Mercadante with a family member traveled at their own time and effort to three locations and

provided his DBA attorney with the quotes.  After all that effort he discovered CNA never

intended on using this information as they used their own distributer.  The prescription for a

Temper-pedic mattress had been supposedly approved, CNA refused to allow him to receive it

unless he gave up his home address.  He was informed by the warehouse that the Adjuster,

"Samin" specifically instructed them not to release the mattress unless he provided his home

address. He was unwilling to do so because of the threats and the nature of his prior work, and

despite his willingness to pick up the mattress himself, CNA continued to withhold it, until his

attorney had a week of fighting with CNA and its attorneys before it was agreed the Temper-

pedic mattress would be delivered to his attorney's office.

152.    Mr. Mercadante has been entitled to medical care for his hearing.  CNA informed

the DOL that they had provided hearing aids and that he had received them.  Mr. Mercadante did

not receive those hearing aids until a month later. These issues created undue stress and difficulty

for Mr. Mercadante.

153.    Over the ensuing months CNA refused treatment prescribed for various lumbar,

cervical and other conditions that CNA stated in a letter were authorized to be treated, yet when

Dr. William Hammesfahr who was the authorized treating physician for TBI recommended

treatments, and blood tests to rule out blood pressure and other issues related to the Blackwater injuries, CNA refused to pay for these tests.

154.    In December 2010 Mr. Mercadante began to experience symptoms of his TBI, syncopal episodes a condition that has occurred previously.  Realizing this condition was serious Mr. Mercadante as instructed by his treating physicians to immediately go to the local Emergency Room.  He was diagnoised with Syncopy due to a pre-existing condition.  Mr. Mercadante was seen at the same ER in 18 August 2009 and received the same diagnosis.  C.N.A paid for that visit but now denied responsibility for the 08 December 2010 visit.  During an informal conference held by the DOL on this issue in April 2011 CNA defense counsel misrepresented Mr. Mercadante's condition during that December ER visit. The DOL ruled that this visit was not due to a work injury based off the fraudulent testimony of CNA defense lawyer.  As a result of the ruling the hospital billed Mr. Mercadante's secondary insurance, Medicare.  The result was that Medicare paid the bill but then later recouped the payment from the hospital once they discovered this ER visit was for a legitimate work related injury, not to mention C.N.A had accepted responsibility and paid for the exact same condition and diagnosis previously. Medicare refuses to pay because it is CNA's responsibility.  CNA has not paid this bill to date.  Mr. Mercadante continues to receive harassing collection calls.  The hospitals collection staff have informed Mr. Mercadante and his lawyer that CNA adjuster Katie White had claimed this has been paid.  Unfortunately the Hospital confirms they never received payment. Mr. Mercadante's lawyer filed dispute with the DOL for their assistance and

immediate interaction on this matter. To date there has been no response by the DOL to resolve this outstanding issue that is now 10 months in arrears.

155.    CNA reneged on its letter of authorization for TBI testing and treatment and revoked its authorization only after receiving results of a PET Scan that showed Mr. Mercadante was suffering from "moderate to severe brain injury". This delay and harassment caused great difficulty and distress for Mr. Mercadante. CNA contacted all of his doctors and informed them not to treat him for TBI. This created rifts with him and his doctors some of whom refused to treat him anymore.

156.    CNA also refused him treatment for his rectal bleeding and GERD and reflux issues, which are well known results of PTSD and TBI. Dr. Walter Afield, his Neuropsychiatrist, found that the sleep problems were definitely related to his TBI and PTSD as well as other back injuries. He was later diagnosed with a dislocated tail bone (coccyx) and has medical reports from Blackwater clearly stating of pain from this but to this day CNA continues to deny care.

157.    Mr. Mercadante was prescribed a sleep study by Dr. Afield, CNA failed to address this issue. He was forced to seek treatment once again on his own. The Department of Veterans Affairs administered this study at their expense to the tax payer, a double dipping strategy by CNA costing the tax payer which created a win for CNA, they get paid by the tax payer and the tax payer pays for the treatment. The results of the Department of Veterans Affairs Sleep Study were that Mr. Mercadante had chronic obstructive sleep apnea "severe" and his blood oxygen level was as low as 65%. Upon providing these findings to Dr. Afield he

related this to his Blackwater injuries. He had daytime sleeplessness, loud snoring, morning headaches, unexplained weight gain, irritability, frequent heartburn and heave night sweats. This is a life threatening condition. He was told his sleep apnea was severe and one of the worst they had seen for a man his age (then 40). Obstructive Sleep apnea results from brain injury.

158.     Dr. Hammesfarh attempted to run labs to determine Mr. Mercadante's hormone levels in 2009 specifically for Low-Testosterone and other issues related to TBI. These labs were denied by CNA. Dr. Cole recommended an endocrinologist in 2009 when Mr. Mercadante experienced a reaction from treatment. Dr. Afield recommended an endocrinologist in 2010 for Mr. Mercadante as low-testosterone is found to be common in TBI patients. CNA has continued to ignore his medical providers and left him with no care. Mr. Mercadante has since at his own expense and the expense to the tax payer once again been treated and diagnosed with low Vitamin D and Low Testosterone and is receiving supplements and testosterone therapy when he was forced to use his Medicare insurance for an issue CNA was clearly responsible for. Two years later at his own expense Mr. Mercadante was placed on Testosterone Therapy as a result of deficiencies caused by the TBI. CNA just recently approved this care in July 2011 after 2 1/2 years of fighting and suffering with this condition.

159.     As a result of nonpayment by CNA and Blackwater, Dr. Hammesfahr refused to treat Mr. Mercadante and threw him out of his office and told Mr. Mercadante that the insurance company "wants you destitute and under a bridge waiting to die." The hormone and other sleep apnea therapy prescribed by Dr. Hammesfahr and denied by CNA took two more years to obtain

through extensive time and emotional expenditure by him and his attorneys, unnecessarily fighting CNA and obtaining new doctors.

160.    Other doctors for Mr. Mercadante have informed him that CNA has interfered with his treatment and that "CNA does not like you."  For instance, his orthopedist, Dr. William Cole, explained to him he and his staff could not go on spending inordinate amounts of time to get simple approval, which happened as late as July 2011.  Dr. Cole requested care for the DBA covered and CNA approved back injury.  CNA kept denying it for over a month, which resulted in Mr. Mercadante having to go to the emergency room for treatment and driving up the cost of care and causing great physical and emotional distress.

161.    Mr. Mercadante has received his care for TBI and PTSD from Dr. Walter Afield for the past few years now.  CNA has intentionally attempted to cause rift between Doctor and patient by authorizing and de-authorizing Dr. Afields office.  CNA has failed to pay or delayed paying and made the entire process extremely harassing to both parties.  Dr. Afield noted in his 22 April 2009 Notes referring to his care that, "Unfortunately, it has been once again denied, him.  I must say in 49 years of practice that I have had in medicine, this is really rather outrageous and I can see why the man is so upset."  Dr. Afield went on to note, "I feel I am obligated to inform somebody that what they are doing is killing him.  This is just not the way you treat your people and it is certainly not the way you treat people coming back from Iraq."

162.    To this day, CNA continue to harass and delay care for the life threatening conditions TBI, obstructive sleep apnea, and his continuing problems, Testosterone Therapy. CNA had signed a stipulation agreement in October 2009 that they have violated on numerous

occasions. Some issues within this stipulation CNA had agreed to pay for medications, pay Mr. Mercadante via direct deposit which CNA has violated on dozens of occasions. CNA began to send him physical checks after a mediation in September 2010 did not go the way they liked. CNA sent him several bi-weekly paychecks by mail rather than direct deposit and CNA has placed a "Stop Payment" on some of those checks. The checks he could cash he was charged a fee do.

163.    CNA has mislead the DOL and been deducting $500 per check claiming he was overpaid $9,200 when in fact that payment was a partial payment for monies owed for attendant care. CNA has informed the DOL that his case has been changed from Temporary Total Disability (TTD) to Permanent Total disability (PTD), yet he continued to receive only the lower TTD benefits for several months.    They have made overtures to settle his case because they can obtain reimbursement for most of the injuries under the War Hazards Compensation Act, and yet they have refused to settle his case.

164.    As a result of the actions of CNA and Blackwater, Mr. Mercadante's son suffers from psychological problems from having to deal with the PTSD, added stress from Blackwater and CNA's fraud and misconduct, aforementioned. Mr. Mercadante brings this action on his own behalf and that of his minor son who has been harmed due to the actions of CNA and Blackwater.

165.    Most recently Mr. Mercadante was contacted directly by Defense counsel for Blackwater and CNA via his cell phone which lasted more than 1 minute and exacerbation of his PTSD and anxiety conditions.

88

166.     Over the course of the last three years, Mr. Mercadante  has been subject to abuse, harassment, members of his family have been harassed and threatened, had disability checks stopped and started, had medical bills unpaid and games from refusal by CNA to pay doctors while claiming they have paid them, and most recently CNA legal counsel contacted Mr. Mercadante directly via his cell phone which was very harassing, these events have greatly intensified the problems with his care and treatment and delays in treatment.  They have repeatedly tried to question treatment of doctors, interfered with his recovery and caused his conditions to worsen through their adversarial conduct and fraud.

### Wallace Byars

167.     Wallace Byars worked as a police officer in South Carolina and went to Iraq to work on the DynCorp CIVPOL contract to perform security in Iraq.  While in Iraq, he was in the hotel when there was a car bombing of the Al Sadeer Hotel, which resulted in the death and injury to hundreds of people including fellow workers.

168.     The blast was large and resulted in windows being blown out, individuals being thrown up against walls, and bleeding from their ears.  Mr. Byars had hearing damage as a result of the blast and also began to experience flashbacks, difficulty sleeping, gastrointestinal disorders, rectal pain and a skin rash.

169.     Mr. Byars was involved in additional roadside bomb incidents where bombs exploded in his vicinity causing him to feel blast concussions, create brain damage, and further psychological effects.

170.     On a regular basis Mr. Byars experienced difficulty in adjusting, sleeping,

89

flashbacks, anger, concentration, memory, and he informed his superiors at DynCorp that he could not handle the bombs, mortars, howitzers, and other attacks, and eventually had to leave Iraq at the end of his year contract in 2006.

171.    In his debriefing from DynCorp in the United States, Mr. Byars also informed DynCorp of his psychological and other problems which appeared in a written report.

172.    Through DynCorp and CNA, Mr. Byars obtained psychological and psychiatric treatment, hearing treatment, and TTD benefits.  He was treating at the University of South Carolina Medical Center.  His doctors made a referral for him to be tested for TBI and to have qualified neurologists look at his brain and test him due to the problems he was continuing to have with adjustment, memory, forgetting burners being on, loss of concentration, feeling like he was in a daze all the time.

173.    As a result of his experiences in Iraq among other things, Mr. Byars and his wife were divorced.  They had three children.  Mr. Byars had a good relationship with his minor children.

174.    Mr. Byars could not adjust due to his hearing, PTSD, Depression, anger, anxiety, and TBI.  He got in numerous bar fights and would get cuts and bruises all over his face, and in one case was hit over the head by a bar patron.

175.    In 2009, Mr. Byars was not better, but CNA and DynCorp cut off his medical and TTD benefits, and he was unable to see anybody for TBI or neurological testing, or to obtain medication.  He had three children, but he had no money to maintain a home, and lost his apartment, then became homeless.  CNA was notified numerous times that it needed to pay his

90

benefits and reinstate him. The Department of Labor made that same recommendation in writing.

176.    Mr. Byars became more and more desperate, had to sell his personal property in order to live, and had to move from where his children were in South Carolina due to being homeless because he had the only option available to live with relatives in New Jersey who were willing to take him off the street.

177.    Following his deposition, CNA and DynCorp reinstated Mr. Byars TTD benefits, and agreed to pay for him to see a psychologist and psychiatrist in Philadelphia in or about September of 2010. Since that time, Mr. Byars has been in regular therapy, medications, and has been diagnosed by a neurologist as having brain damage, neurological deficits, and TBI.

178.    During this time, CNA has refused to pay for medications and bills of his psychologist and psychiatrist, has refused to allow him to see a doctor for his continuing rectal problems, and refused for several months to authorize or pay for the neurologist or MRI of his brain, despite promising they would several months before in 2010.

179.    CNA and DynCorp through its attorneys represented to the Department of Labor in writing on more than one occasion that the neurologist and MRI were in fact authorized, and tried to make Mr. Byars look as if he was not telling the truth or was incorrect.

180.    CNA attached a written authorization showing the neurologist and MRI were in fact authorized and nothing was holding up the MRI of Mr. Byars' brain. This was in January and February of 2011. Yet when Mr. Byars tried to get his MRI, it was again refused as unauthorized by CNA.

181.    When this was brought to the attention of the Department of Labor in writing, that

CNA had lied to the Department of Labor, and that the procedure had not been authorized even

though it was authorized in writing, CNA did not deny it, but then paid for the MRI.  They still

have not paid the Neurologist of Mr. Byars despite claiming it was authorized on numerous

occasions.

182.    As a direct result of their fraud, artifices, and withdrawal of benefits while Mr.

Byars still was disabled and suffered grievously from his injuries, and repeated threats to

withdraw benefits, CNA and DynCorp have inflicted untold harm, physically and

psychologically and financially on Mr. Byars, including interfering with the relationship he had

with his children by making him homeless and unable to visit them regularly or have them live

with him.

### Steven Thompsen

183.    Steven Thompsen had been in the army as a truck driver and then drove trucks in

the private sector and lived in North Carolina.  He was hired and worked for Halliburton, KBR,

SEII, in from May to December of 2004, as a combat truck driver for KBR in 2004.  During his

time in Iraq, traveling to and from military bases and compounds, he was attacked on numerous

occasions by rockets, mortars, roadside bombs, IEDs, and small arms fire.  He had to go on

recovery missions where bodies were burning, and he had friends die in Iraq.

184.    Due to these events, he felt threatened with his life on numerous occasions,

witnessed gruesome scenes, and learned of deaths of fellow drivers reported to him in camp. He saw carnage and mayhem on the roads.   He started to relive these scenes, have trouble sleeping, and could no longer drive a truck.

185.    On his return to the United States in December 2004, he tried but could not drive a truck. He first sought counseling in 2005, and went on April 19, 2005 to see a Dr. Lilly. Following this, he was diagnosed by psychologists and the Veterans Administration with PTSD, sleep disorder, and related problems. He was experiencing nightmares, difficulty sleeping, intrusive thoughts of death and mayhem in Iraq, and anger and irritability.

186.    KBR and AIG denied his claim that he filed after hiring an attorney. During the litigation of the claim, KBR and AIG hired Dr. John Griffith of Texas to perform tests and provide an defense exam opinion about Mr. Thompsen's PTSD.

187.    Dr. Steven Rubenzer, a Psychologist hired by KBR and AIG, had found that the tests on Mr. Thompsen were not inconsistent with his having PTSD or psychological problems from his time in Iraq. After this, Dr. Griffith wrote an e mail to Dr. Rubenzer on November 9, 2006, and asked him to "redo" your report, and suggested language for him to add to show that Mr. Thompsen was exaggerating symptoms and malingering. He suggested that Dr. Rubenzer change his opinion based on the Minnesota Multiphasic Personality Inventory diagnostic test (MMPI-2), and a scale called the Fake Bad Scale (FBS) and determined that Mr. Thompsen was malingering and faking his PTSD. He relied also on a report of Dr. Lilly from North Carolina that was erroneously dated April 11, 2004 rather than the correct year when he saw him, which

was 2005, to conclude that his psychological complaints predated his time in Iraq.  Dr. Rubenzer accommodated him.

188.    KBR and AIG had Dr. Griffith testify for the hearing in the matter of Mr. Thompsen's DBA injuries, that he was malingering and faking, that the trip to Dr. Lilly proved that, and the Administrative Judge gave great weight to that letter od Dr. Lilly.  Mr. Thompsen testified that the doctor's office got the year wrong.  Subsequent to the hearing, Mr. Thompsen produced a letter from Dr. Lilly's office stating that this medical office note was dated incorrectly, that Mr. Thompsen saw him April 11, 2005, after his return from Iraq. Notwithstanding this clear error, KBR and AIG made no effort to pay his benefits or attempt to set aside this assault on Mr. Thompsen.  To this day, they have paid nothing.

189.    Dr. Griffith blamed Mr. Thompsen for his problems, stating that it resulted from his divorce prior to going to Iraq.  This man was not the treating physician of Mr. Thompsen.

190.    Dr. Griffith also misrepresented how active his practice was in that case, as well as many additional facts.  Dr. Griffith has since been discredited in several DBA cases and in district court cases in Florida and elsewhere.  Judges have found him not to be credible or qualified to render the opinions he renders about motivations of witnesses and what is really causing their troubles.  He is used frequently by AIG and KBR to find malingering.  He is quoted in the LA Times as saying that most of the people claiming PTSD do not have it.  In one case that rejected his qualifications as expert and found his testimony against a KBR claimant like Mr. Thompsen, the judge held:

> In regard to Dr. Griffith, to put it bluntly, he was a terrible witness. He was sarcastic, arrogant, argumentative and flippant, and often refused to answer the questions put to

94

him. On his own, he assumed facts for which there was no support in the record, and then offered his opinion based on these assumed facts. For example, he assumed that the Claimant was at fault in the incident where his truck was shot at (e.g., TRG 142-48), that Claimant was worried that he would have to pay $17,000 to repair the truck (e.g., TRG 35), and that Claimant was depressed due to his three divorces (TRG 48-49, 312). He provided different answers to substantially similar questions throughout his testimony. As an example, his testimony regarding whether Claimant is malingering or exaggerating changed constantly, to the point that his opinion regarding this question is incomprehensible. See, e.g., TRG 49-53, 309-10, 317. Further, he believes that anyone in Claimant's shoes would be trying to collect compensation rather than work, since he believes "no one feels like working". E.g., TRG 442.8 He also believes that if the Claimant actually was suffering from PTSD, the carrier would not be opposing the claim. TRG 161. Moreover, his medical judgment is clouded by his belief that PTSD is a highly overused diagnosis. TRG 317.

…

His bias against Claimants; his irrationality; and his unwillingness to provide a straight answer to a question; are exhibited throughout his testimony. Dr. Griffith's opinion in this case is not credible and has no probative value.

191.    The attorneys for AIG and KBR wrote an e mail to Dr. Griffith in another case saying, "Your DME will be a couple of days before that so the thing to do is run him through the drill and send it for scoring as usual."

192.    As a result of KBR and AIG running Mr. Thompsen through the drill, he had no income and lost his house.  He has had great difficulty living.  Since being denied benefits at hearing, Mr. Thompsen has been diagnosed with Traumatic Brain Injury (TBI).  A new claim has been filed, and Mr. Thompsen is trying to have the finding of malingering modified and to receive benefits for his injuries from the roadside explosions he was involved in.

### Harbee Kreesha

193.    Harbee Kreesha is an American Citizen who was born and raised in Jordan and went to work as a translator for Defendant GLS, on classified projects attached to the US military and intelligence services in Iraq, in conjunction with Iraqi intelligence.  He worked for

GLS for six months in 2009, from June until December of 2009, going on missions and translating for interrogations of high value targets of Al Qaeda or other terrorist organizations in Iraq, hostage negotiations, weapons caches from informants, and other missions.

194.    On many missions, he and the convoys in which he was traveling were attacked by insurgents or terrorists, or when he arrived at the mission sites around Baghdad, he would be attacked by arms fire, roadside bombs, mortar fire and other means of attack.  He witnessed numerous injures, mayhem and death, including death of Americans and Iraqis with whom he had worked closely.  He was required to participate in interrogations in which physical torture and killing were perpetrated in the presence of U.S. military and intelligence officials.

195.    These experiences altered Mr. Kreesha's personality and traumatized him, resulting in PTSD, depression, anxiety, extreme anger and violent ideations, causing him to become involved in many physical fracases, fights, and disabling him from work.

196.    On or about December, 2009, Mr. Kreesha was bitten by a sandfly and contracted Leishmaniasis and experienced lesions on his calf and hand, vomiting, dizziness and stomach problems.  He was flown to Germany for Amphotericin B treatment in Germany that was started in Bahgdad and finished in Iowa on his return to the United States.

197.    When Amphotericin did not stop the Leishmaniasis infection and lesions, his doctors and Centers for Disease Control (CDC) recommended he receive a course of Pentostam intravenously.  Pentostam was administered at the University of Iowa Medical Center in Iowa City, Iowa by Dr. Loreen Herwaldt.

198.    Mr. Kreesha was treated, paid for by Zurich Insurance.  The University of Iowa

medical center hospital and Dr. Herwaldt diagnosed him with additional problems stemming from the leishmaniasis, including nerve damage to his leg, stomach and intestinal problems, neuropathy, veinous damage, lymph damage and blood clots, edema, pain, and reopening of the calf lesion and seeping, reinfection or activation of the leishmaniasis causing difficulty in walking, swelling in his leg, wearing of a leg brace or use of crutches, which continues to this day. He also has to wear a compression stocking due to chronic swelling in his left calf that affects his walking and inability to move around or stand for long periods.

199.    His doctor at University of Iowa and his wife noticed angry and strange behavior that led the doctor to refer him to a psychiatrist at the University of Iowa who diagnosed him with PTSD and depression. He was also referred to a psychologist and has been treating for PTSD and depression due to his experiences in Iraq. All of this occurred in June or July of 2010. Mr. Kreesha has had several encounters with others that resulted in physical fighting due to his PTSD and Depression.

200.    Mr. Kreesha used part of his TTD compensation from Zurich and GLS to provide for his sick mother in Jordan. She became hospitalized with kidney failure and needed a kidney transplant. Mr. Kreesha informed his case worker at Zurich Insurance he had to travel to Jordan to help his mother and possibly provide a kidney. He was given no indication this would be a problem. Suddenly, Zurich Insurance stopped paying Mr. Kreesha's medical bills and TTD, stating that it was because he left for Jordan and if he could travel to Jordan, he could work.

201.    As a result of this stoppage of TTD, Mr. Kreesha and his family were harmed, he

97

could no longer provide for his mother in Jordan and was caused great emotional and psychological distress, to him and his wife.

202.    Later during proceedings before the Department of Labor, Zurich and GLS took the position that they stopped his benefits because Mr. Kreesha had disappeared and they could not contact him. This was utterly false, and Zurich had been informed by Mr. Kreesha and his attorney more than once over a two month span, that Mr. Kreesha had explained why he was leaving the country, and his ability to travel in no way cured him of his leishmaniasis or his PTSD and depression, and his violent and angry outbursts.

203.    GLS fired him in July 19, 2010 by letter for not returning from leave. Mr. Kreesha filed a complaint with the EEOC for discrimination under the Americans with Disabilities Act (ADA) and obtained a right to sue letter on August 28, 2011. Mr. Kreesha continued to be a qualified translator and could have worked as a translator for GLS in a modified or United States based job.

204.    As a result of what Zurich and GLS did, Mr. Kreesha became very violent and wanted to kill the representatives of GLS and Zurich and planned to do such during his deposition scheduled for April of 2011. Mr. Kreesha's doctors believed the threat was credible and warned counsel for Mr. Kreesha not to be present in the room with him for deposition.

205.    The deposition of Mr. Kreesha was taken by Zurich and GLS attorneys from New York City on July 27, 2011. During that deposition, counsel for CNA and GLS taunted Kreesha about his personal threats conveyed in confidence to his doctors concerning the attorneys for GLS and CNA due to their withholding of compensation and treatment for no good reason. The

attorneys asked Kreesha why he wanted to do harm to them in a taunting and ridiculing fashion. Following the deposition, Zurich and GLS cut off any benefits relating to the PTSD and depression and decided to seek second opinions by "peer review" selected by the insurance company. They cut off his payment for any medical bills, including ones they did not dispute for leishmaniasis and related reactions and conditions, and they cut off his medications for his psychiatric conditions, causing great setbacks and distress, and causing him to be unable to see his psychologist or psychiatrist for the appointments set.

206.    The actions of GLS and Zurich have caused increase of symptoms of Mr. Kreesha, harmed him physically and emotionally, and slowed down his recovery, and caused financial hardship to him and his family.

### Mohson Alsaleh

207.    Mohsen "Mason" Alsaleh is an American Citizen who was born and raised in Jordan and went to work as a translator in Iraq for the US Department of Defense from 2006 to 2010. He worked for Defendant GLS in Iraq from June 2008 until January 2010, on various projects attached to the US military in Iraq, going on missions translating and interpreting for US military personnel.

208.    On many missions, or when he arrived at mission sites around Baghdad, Anbar Province and Mosul, he and the convoys in which he was traveling were attacked by or witnessed mortar fire, snipers, road side bombs and suicide bombers. He worked with the E.O.D. team looking for explosive devices and disposing of them. He patrolled with military

personnel among the Iraqi civilian population in various towns.  He witnessed numerous injuries,

death, and mutilated bodies.

209.    On or about September, 2009, Mr. Alsaleh, along with a fellow GLS employee

and a soldier were bit by a sand fly and contracted Leishmaniasis.  Mr. Alsaleh, experienced

lesions on his neck and elbow.

210.    In September of 2009 he sought medical help for the lesions, not knowing what

they were.  A US military medic gave him ointment for the treatment of spider bite.  The soldier

who had a similar lesion was sent directly to a base for surgery and the lesion was cut out of his

arm, stopping any chance of the parasite invading his body.  Mr. Alsaleh's lesions grew and

worsened through October. Mr. Alsaleh could not seek help through assigned GLS medical

personnel because there were none.  GLS had eliminated the position. GLS personnel were

supposed to have the right to seek medical help and treatment from US military medical staff and

facilities written into their military orders.  GLS had failed to do this for Mr. Alsaleh.   Mr.

Alsaleh was experiencing stomach aches, vomiting, and dizziness.  In October 2009, while on a

mission, an Iraqi doctor noticed the lesion on Mr. Alsaleh's neck, recognized it as Leishmaniasis

and told Mr. Alsaleh, this was very serious and he needed medical help right away.  In early

November 2009 Mr. Alsaleh contacted GLS to tell them the seriousness of his condition.  GLS

denied Mr. Alsaleh medical help.  Mr. Alsaleh approached US military officers for help. Around

Dec. 1, angry with the lack of support Mr. Alsaleh was receiving the US military intervened and

brought Mr. Alsaleh to an Army Doctor.  Mr. Alsaleh was prescribed and treated with

Fluconozole for approximately 28 days while still in Iraq and working.   The following reactions

to the fluconozole occurred: frequent urination, collapse, pressure in chest, shortness of breath and the lesions continued to worsen. During this time the US military brought his case to a Dr. Moody who specializes in Leishmaniasis at a base in Baghdad. Dr. Moody demanded to see Mr. Alsaleh. GLS was notified and Mr. Alsaleh was medevaced to Baghdad by the US military on December 23, 2009. Dr. Moody biopsied the sites and tried to arrange for medevacing Mr. Alsaleh to the states, to Walter Reed because his condition was serious. GLS was not helping and did not contact Mr. Alsaleh during the week he was in Baghdad. .The doctors were unable to get the necessary paperwork to fly Mr. Alsaleh out because of the administrative errors in Mr. Alsaleh's military orders. Dr. Moody and the medic kept GLS informed via e-mail. The doctor told Mr. Alsaleh to continue the fluconozole for an additional week. Mr. Alsaleh returned to his base site in Northern Iraq to continue his fluconozole treatment and await the outcome of the biopsies from Germany and the administrative corrections to his military orders regarding medical help. The second week in January Mr. Alsaleh sent pictures of his worsening lesions to Dr. Moody in Baghdad. Dr. Moody determined he must be medevaced to the United States immediately. Somewhere around mid January 2011 Mr. Alsaleh was notified by GLS that he was to return to the United States for treatment.

211.     Upon his return to the United States, in the 4th week of January, he was contacted by Zurich insurance company and was told Zurich would be handling his case. Mr. Alsaleh saw an infectious disease doctor who had little experience with Leishmaniasis, (one case in the past 17 years at the time), and put him on a course of Pentostam to address the Leishmaniasis infection. GLS did not want him going to Walter Reed or any other Leishmaniasis experienced

Medical facility in the Northern United States because of the cost of housing and transportation.

Mr. Alsaleh experienced inadequate care during the Pentostam treatment.  The treatment was

delayed for over month, the doctor went on vacation during his treatment, the Zurich case worker

did not arrange for treatment sites as promised.

212.    A doctor noticed that Mr. Alsaleh was showing an irregular reading on his EKG,

showing cardiac issues.  The doctors and Zurich ignored this.  When Mr. Alsaleh complained

about his treatment and the competence of the Zurich case worker he was told that Zurich did not

want to replace her because it would look bad on her record.  He was also told that he must go

through her with any communication he had with Zurich. Mr. Alsaleh's Pentostam treatment was

stopped half-way through because Mr. Alsaleh had an allergic reaction to it.  Therefore he was

not treated.  After going on Pentostam. Mr. Alsaleh developed many other problems, related to

the Pentostam and Fluconozole, and possibly in part due to his exposure to pigeon droppings and

burn pits while in Iraq.  These conditions included cardiac issues, chest pain and pressure, lung

issues, shortness of breath and collapse, sleep disorder, can't fall asleep, can't stay asleep,

urological issues, frequent urination, fatigue, exhaustion, aches and pain throughout his body and

recurring Leishmaniasis lesions.

213.    As a result of his Leishmaniasis, he has a blood borne parasite for life, and was

Treated with Pentostam and Fluconozole.  He had reactions to these drugs, and as a result of that

and in combination with his Leishmaniasis and any lung issues from breathing in toxic

substances in Iraq, has had shortness of breath, trouble sleeping, frequent urination, fatigue, and

anxiety.

214.    From January, 2010 until September 2010, he received TTD disability checks

every week in the amount of $1,224.66.  In May of 2010 he was told by his doctor there was

nothing else she could do for him and that his recurring symptoms and overall feeling of poor

health had no direct link to Leishmaniasis.  For treatment of his residual symptoms he would

have to use his own insurance and see other doctors.  Mr. Alsaleh complained to the case worker

about this and she said she would have to discuss it with her boss.  Mr. Alsaleh never heard from

Zurich again.  In May of 2010 Mr. Alsaleh sought medical help from another Infectious disease

doctor, who sent him to a cardiologist and then a lung doctor.  Mr. Alsaleh paid for all medical

treatment with his own insurance.  The last Doctor he saw suggested PTSD and ordered a sleep

study.  Then Mr. Alsaleh's medical insurance ran out because GLS fired him in July of 2010 for

not returning to work from Medical leave.  During the First week of September 2010 Zurich

Insurance abruptly cut off his TTD benefits and refused to pay for any more medical treatment to

address his continuing symptoms. Since that time, Zurich has refused him any benefits.  Thus his

family has no means to provide for themselves and to pay the expensive health insurance

(COBRA).  Zurich Insurance made representations to Washington, D.C. attorneys for Mr.

Alsaleh in the District of Columbia, using mail and fax and telephonic transmissions, denying

claims and committing other acts of fraud and bad faith, in 2010, as aforesaid.

215.    He was fired by GLS on July 19, 2010 for not returning from leave due to his

Leishmaniasis and complications.  He applied for a job with GLS in December 2010 and was

told he was a great candidate because of his experience and glowing recommendations.  He later

was told his file had a "do not pursue, do not rehire" note on it.  The GLS recruiter found this

odd and wanted to know from Mr. Alsaleh if he knew anything about that. After that conversation the GLS recruiter would not answer Mr. Alsaleh's attempts to contact him. He filed a complaint with EEOC for violations of the Americans with Disabilities Act in January 2011 and has requested a Right to Sue letter. He received a Right to Sue letter on September 22, 2011 from EEOC. Mr. Alsaleh continued to be a qualified translator and could have worked as a translator for GLS in a modified or United States based job.

216. Mr. Alsaleh's experiences of being in a combat zone and seeing extraordinary suffering of victims of war traumatized him, resulting in undiagnosed traumatic psychological depression, anxiety, and sleeplessness.

217. The actions of GLS and Zurich have caused increase of symptoms of Mr. Alsaleh, harmed him physically and emotionally, and slowed down his recovery, and caused financial hardship to him and his family. None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

**Jack Jones**

218. Jack Jones worked as a mechanic for Lear Sigler, Inc., under a subcontract of a contract of Defendant KBR/Halliburton in support of Air Force base supporting the United States combat troops, and providing mechanical work on their armored carriers and trucks from 2006 to 2009.

219. Jones worked 6 days a week, 16 hours a day, and the work included changing 400 pound tires, lifting tires, and driving a forklift whose suspension had broken. He was subjected to repetitive jarring and pounding. Prior to going to Iraq with Lear Sigler, Jones had no history

of hypertension, hernia or back problems, and no psychological conditions. He passed his pre-deployment physical with no indication of any medical or psychological issues.

220.    In his time working in Iraq, the base where he worked was subjected to repeated rocket and mortar attacks from hostile forces. One 70 mm rocket came within an inch of his head, grazing his hair.

221.    As a result of his experiences in Iraq and the harsh working conditions, Jones developed an umbilical hernia, a thoracic back injury, high blood pressure from the stress and threats of war, and PTSD from the combined effect of the combat conditions, attacks, and threats to his personal physical integrity.

222.    In the summer of 2009, Jones went to the KBR medic for his hernia and back problems and was told he had a hernia but was given no treatment. Over time, the hernia opened up further. The KBR medic noted his high blood pressure and sent him home due to the blood pressure and the umbilical hernia.

223.    AIG/Chartis, acting through representative Tracey True, assured Mr. Jones that he would be treated and have his umbilical hernia covered, and see a doctor for his back. AIG denied any relationship between his work and the hypertension.

224.    AIG set up his hernia surgery for October 2009, and authorized him to see the surgeon and also to see an orthopedic doctor for his back.

225.    Without giving any reason, AIG suddenly declined to pay for his umbilical surgery, canceled his surgery, refused to pay temporary disability, and refused to even pay for the surgeon's bill. Lear Sigler fired Mr. Jones and left him without health insurance due to his

inability to pay for it because of Lear Sigler and AIG not accepting his injuries and hypertension as work related. The orthopedic doctor could not locate any condition from his MRI in the thoracic spine but prescribed a regimen of physical therapy, which AIG declined.

226.    Jones hired a lawyer to assist him in getting benefits, but while the process ground slowly, the umbilical hernia worsened, and Mr. Jones' life was threatened. He was literally coming apart at the seams. He was also coming apart psychologically, was having flashbacks, nightmares, severe anger, inability to get along with others including his wife, and many other classic signs of PTSD. AIG declined to accept the PTSD and would not pay for an evaluation or medication.

227.    Department of Labor official recommended coverage for the umbilical hernia, and finally AIG and Lear Sigler were forced to pay for his operation to repair the hernia and paid his temporary total disability benefits. They cut him off after he recovered from his umbilical surgery, and to this day refuse any benefits for back, hypertension and PTSD and depression.

228.    Jones has been going to a free clinic for his PTSD and Depression and pays for medication for blood pressure when he can afford it. He has been without work and income for two years and cannot return to the type of work for which he was trained and worked his whole life - mechanic. The actions of AIG and Lear Sigler have harmed Mr. Jones and his family and disrupted his work life, due to non treatment, and now he is totally and permanently disabled and without benefits, medical insurance, and medical treatment. None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

**Antonio Ambrose**

106

229.    Antonio Ambrose worked for ITT Corporation Systems in Kuwait as a Supply

Technician in support of the war in Iraq.  His background was in supply logistics, following a

decade in the Army with an honorable discharge.  He had only a high school education and is

African American.  During his time in the Army, Ambrose had a low back injury which required

only Motrin and no time off work, and was diagnosed in 2004 with zero disability from the VA

after a full examination of his back.  He was rated as having a disability of PTSD due to his

combat experience in Iraq with the Army.

230.    After his discharge from the Army, Mr. Ambrose worked for ITT in Kuwait for

one and a half years.  He passed a pre-deployment physical with no limitations and no known

physical problems.

231.    His work involved 16 hour days, 6 days a week, loading and unloading trucks

with boxes of supplies, some boxes weighing 30 pounds.  He supervised third country  nationals

in the work, and himself performed repetitive loading and unloading of boxes, leaning, stooping,

bending and reaching with boxes to place them on shelves or remove them from shelves.

232.    He suffered two low back injuries while working for ITT.  The first occurred

while he was unloading boxes of supplies on March 3, 2007.  Following this, a doctor in Kuwait

did an MRI and diagnosed him with herniated disk and told him he would need an operation.

ITT resisted sending him home, but finally was convinced to send him home for treatment in

July of 2007.

233.    While in North Carolina, Defendant ACE insurance authorized him to see

orthopedic surgeons and to receive months of intense physical therapy. His MRI revealed a bulging disc at L5-S1 with radicular pain down his leg. He improved from the physical therapy and injections he received to the point in December of 2007, the orthopedic doctor released him to return to work in Kuwait to his old job with no restrictions and zero impairment and no permanent injury.

234.    He returned to full duty in Kuwait and resumed his same supply technician duties. On March 6, 2008 while loading boxes of overalls, he reinjured his low back in the same place it was injured one year before, causing immediate pain and shooting pains down his leg, only more intense than before.

235.    ITT sent him to the same doctor in Kuwait who reiterated his previous diagnosis of herniation and need for back surgery.

236.    Again, ITT refused to send Mr. Ambrose home for treatment. His supervisor informed him that Mr. Ambrose might be faking his injury and made him work light duty. Finally in July of 2008, Mr. Ambrose said he was returning to the United States to get treatment under the DBA. .He did return and ACE Insurance did pay for him to undergo physical therapy, additional MRIs, epidural injections, and medications for pain and inflammation.

237.    MRIs revealed the bulging disc and another finding of annular tear that had not been present or interpreted in previous studies. He was paid TTD disability benefits by ACE American.

238.    The orthopedic surgeon recommended Mr. Ambrose undergo two surgical procedures, one a discogram, an invasive diagnostic tool, and following that, surgery on his

back.  The surgeon explained the risks, the pain, and the possibility that the surgery might

actually not help resolve his severe back pain and disability, and might even make it worse.  He

elected not to have the surgery.  He was released by the doctor as having a permanent

impairment with permanent restrictions that made it impossible for Mr. Ambrose to return to his

former work.   The doctor rated his physical impairment due to his back injury and condition as

5 percent of the body as a whole.

239.    Following this rating, ACE Insurance continued him on TTD and paid for his

medications and to see an orthopedic surgeon in El Paso.  Mr. Ambrose moved to El Paso, Texas

and began to attend college to obtain a degree that might enable him to change careers and find

work in the future.

240.    While Mr. Ambrose was attempting to settle his case with ACE Insurance, ACE

cut off his benefits suddenly, contending it was not the responsible insurance carrier, and that

ITT had switched from ACE to AIG between the two injuries Mr. Ambrose suffered with ITT.

At no point did ACE or ITT ever assert the injury was not compensable under the DBA and

never asserted the Employer was not obligated to pay disability benefits and provide medical

care.

241.    Mr. Ambrose's attorney demanded that ITT and ACE continue paying benefits

and providing medical care while the insurance issue got worked out, but they refused.  AIG

became involved and they were asked to start paying benefits, but they refused.  Mr. Ambrose

took his case before the Department of Labor.

242.     At the informal conference before the Department of Labor official, AIG's

attorney, Mr. Jerry McKenney, stated he had received no medical records and did not know anything about the case, but that he assumed Mr. Ambrose was faking his back injury because Mr. McKenney had seen such faking before. The Department of Labor issued its recommendation that Mr. Ambrose receive continuous TTD payments and medical care, and that ACE and AIG sort out their differences on who would be the responsible carrier. Both carriers refused.

243.    The parties agreed to have a settlement judge hear the matter to try to resolve it. The settlement conference occurred in Washington, D.C. on September 2, 2010. Defendant ITT, ACE and AIG did not come to the conference in good faith, with authority to settle and offered only $10,000. The entire exercise was vexatious, was not reasonably calculated to settle the case but to further make the claim difficult for Mr. Ambrose. The case was thrust back into the adversarial process.

244.    After nine months of depositions and hearings with an Administrative Law Judge, the case was submitted to the ALJ for his determination in May of 2011, where it sits. No payments have been made to Mr. Ambrose since March of 2010, and no medical benefits provided. He is without work, disabled and going to school. In the post hearing briefs, AIG's attorney Mr. McKenney asserted that Mr Ambrose is loafing, taking street drugs, and living off his girlfriend's job and trying to get something for nothing.

245.    These unfortunate aspersions cast on Mr. Ambrose, the lack of care, the fight between the insurance companies with no adherence to the law requiring benefits be paid by the employer and carrier, have left Mr. Ambrose in difficult financial and medical straits and

110

immeasurably increased his suffering, physical and mental. He served his country and wanted nothing but to work, and he struggled back from a severe back injury and worked again, only to have his back be reinjured and worsened to the point of permanent disability. None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

### Allen Porch III

246.    Allen Porch is from Georgia and was a Force Protection Officer for Defendant CSA, Inc. (Combat Support Associates) at Camp Virginia in Kuwait supporting the war in Iraq under the K/BOSS contract.

247.    He entered into an agreement in September 2009 to work in Kuwait with CSA, Inc. a California Corporation. CSA Inc. formed an offshore company to employ thousands of persons each year like Mr. Porch. While working in Kuwait for CSA, the company withheld monies for California unemployment insurance.

248.    While working for CSA and living in Kuwait, Mr. Porch purchased thousands of dollars worth of electronics, big screen television, jewelry, music systems and so on, and had numerous personal items of a sentimental value. The value of his property exclusive of family photos and things of sentimental value, was approximately $15,000.

249.    On March 5, 2010, Mr. Porch tore ligaments in his left ankle on the job as a force protection officer.

He reported the injury to his supervisor. He saw a doctor in Kuwait who said he should be on light duty.

250.    His supervisor said CSA do not have light duty. In fact, this was false, as there

were other employees, women, who were given light duty jobs. His supervisor also tried to encourage him not to see a doctor, and was told that people who get hurt usually get fired.

251.     His ankle was not getting better, and his employer recommended he go back to the United States to be evaluated as to how long it would take to resolve his ankle injury. He filed a DBA claim, AIG handled it.

252.     Back in Georgia, he saw physicians who said he needed to be off for an extended course of physical therapy. During this time he was on TTD compensation through AIG. After a couple of months, he was told he was going to be fired because he did not return to work and his property would be confiscated.

253.     In September of 2010, he spoke with his supervisor and explained that he was on workers compensation leave, but his supervisor had his property taken from his apartment and it disappeared.

254.     AIG paid him his accrued sick pay and vacation that were owing at the termination of his employment and paid it over to CSA without Mr. Porch's permission.

255.     He still is off work and has not been returned to full duty and requires surgery on his ankle.

256.     Other similarly situated CSA employees had similar problems with being deprived of their jobs or employment rights due to claiming injury on the job. These actions by CSA and AIG have left Mr. Porch without his property, his job, his pay, and has caused him emotional distress. None of what he claims in this suit for himself or others similarly situated is for damages related to what he is claiming in the DBA claim.

112

### Fred Busse

257.    Mr. Busse worked for KBR/Halliburton (SEII) as a recovery mechanic and driver from January 3, 2007 until August of 2007.  He previously served 18 years in the United States Army, served in Operation Iraqi Freedom, and received an honorable discharge in 2005.

258.    In June, 2007 Mr. Busse suffered an injury to his cervical spine when the cab of his truck was crushed.  His neck was injured due to hitting an IED hole and was thrust into the top of the cab of his truck.  The vehicle of KBR had an air ride seat that was unsuitable for combat.  He also contracted leishmaniasis and staph infections along with his neck injury.

259.    Mr. Busse reported the incident to his supervisor and was seen at the Hadi clinic in Iraq and determined to have a herniation in his cervical spine at C5-C6 as a result of his incident a few weeks before.

260.    KBR and AIG denied any coverage for his on the job injuries and infections, occupational diseases and conditions.  KBR fired him.  He was forced to use health insurance and paid out of pocket for deductibles and co-pays to have his infections and neck treated.

261.    He had to take KBR and AIG to court twice to get his benefits, and despite orders of the Administrative Law Judge for the Department of Labor, refused to pay for his treatment.

262.    AIG put him through hell for the past 3 years, denying him treatment for his neck injury.  After two years of delays and refusal to treat, Mr. Busse obtained surgery through the VA. VA sent him to another specialist because failure to treat the neck caused further crushing of nerves that resulted in his right arm developing carpal tunnel syndrome.  He has had surgery for that.  His left arm has now developed carpal tunnel.

263.    KBR and AIG's attorney forged a HIPAA form to obtain medical records of Mr. Busse.  He had signed a HIPAA release form, but it had expired.  The attorneys for AIG and KBR changed the date and present the forged document for disclosure of medical records.  When confronted with it, the attorneys admitted it, but said that they would have only gotten him to fill out a new one and saved him the trouble.

264.    AIG and KBR have sent him to three different Defense medical exams for his neck and shoulder and arm.  When they did not like the opinion of a surgeon, they send him to another, and then another.

265.    AIG and KBR paid him with a check that the bank said was forged, and he has been accused and investigated for forgery and bank fraud, and has his bank account frozen for 30 days, which caused him to be unable to access his funds.

266.    Mr. Busse developed PTSD from his experiences in Iraq, but has never received any treatment for that, which has been diagnosed recently.

267.    Mr. Busse became so angry about the misconduct of AIG, he threatened their adjuster with bodily harm.  The next thing he knew, AIG had called law enforcement who called him during a hearing with the Administrative Law Judge.

268.    The illegal misconduct, fraud, and malice of AIG and KBR has caused great physical harm, psychological distress and financial difficulty for Mr. Busse.  None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

### Mark McLean

269.    Mr. McLean worked in a water treatment plant for KBR/SEII.  He was injured

when his plant was under mortar attack on April 7, 2007 as it frequently was.  He was running up stairs, tripped and fell and hurt his neck, back and knee.   KBR supervisors enforced a culture of non reporting of injuries, and told anyone who complained of pain that there were many people who wanted their jobs, and would say things like "chicken or beef … window or aisle" referring to their right to leave and take the plane home at KBR's expense with only a meal on the flight. Many employees refused to talk about injuries or pain.

270.    Mr. McLean complained contemporaneously of the pain in his knee to a KBR medic but only received Motrin for his pain, and was not offered a doctor.  He was sent back to work and continued to reinjure himself day in and day out.

271.    A year after his injury, he complained that he had drop foot and continuing problems from his fall.  He was sent to Kuwait for an MRI which revealed a knee meniscus tear as well as several herniations of discs in his back and neck.

272.    He was sent back to the United States for treatment.  An adjustor hired by AIG, Jerry Brooks, came to his home and interviewed him for two hours.  Mr. McLean provided him with dozens of Xerox copies of evidence of being injured in Iraq.  Before he interviewed Mr. McLean, he was in contact with Dr. Holmes's office and said he would pay for any treatment needed, and AIG set up surgery for his left knee within minutes of seeing Dr. Holmes.  Mr. McLean wanted to get a second opinion due to the speed with which the doctor opined that surgery was needed just to be sure.

273.    As soon as he exercised his right to seek a second opinion, neither this adjuster

Jerry West nor the AIG representative, Clay West, would return his phone calls. From this point on, AIG denied him treatment, so he obtained an attorney and was forced to take the case to hearing. AIG and KBR's attorney asserted that he was faking his injuries and asserted he had a prior neck injury from a hospital report from several years before involving an automobile accident. In fact, the report said no such thing but only alluded to chest pain from the contusions of the seat belt, a notation on the diagnosis of NEC, referring to a code for describing a condition that was not categorized otherwise.

274.    Despite having no basis for asserting this and other items in the records, AIG put them into evidence of Mr. McLean malingering. Following the hearing in Texas, the attorney representing AIG was seen by Mr. McLean's attorney giving a ride to the judge to the airport to fly home to Louisiana. According to Mr. McLean's attorney, AIG's attorney had been a former law clerk who worked on this judge's cases.

275.    Mr. McLean's attorney failed to file a post hearing brief, and the judge relied on AIG's false assertions of what records said and false recitations of evidence at trial and in depositions to find that while Mr. McLean did suffer a knee injury in the fall on the stairs, he was not credible in how he described that fall, and therefore he could not recover for his neck and back injuries, but could for his knee injury, but since he refused to go under the knife without a second opinion, he would uphold AIG's cutting him off of TTD as justified and not award Mr. McLean back pay for that TTD when he was seeking a second opinion.

276.    He had his knee surgery, and afterwards, AIG again cut off his benefits. His

116

surgeon determined that failure to treat the knee for three years caused overuse on the other leg, and found he needs surgery on that knee.  He also developed psychological injuries due to AIG's mistreatment of him and the failure to treat his back and neck conditions and knee conditions that have rendered him completely disabled.

277.    Mr. McLean filed an appeal with the Benefits Review Board of the Department of Labor.  Defendant KBR and AIG made the same misrepresentations of the record and falsification of evidence that were sent to and had detrimental effects in Washington, D.C., falsifying that Mr. McLean had testified inconsistently about the nature of the staircase on which he fell when such was not in the record, but based on a newspaper article in which a reporter characterized a story about the fall, not the actual testimony of claimant, and misrepresenting the medical evidence and what the records say about any prior injuries, which are contradicted by the very records on which they rely.

278.    Mr. McLean has filed new claims following the Benefits Review Board in Washington, D.C. denying his appeals of the denial of any benefits for his neck and back.  None of what he claims in this suit is for damages related to what he is claiming in the DBA claims, but for the damages created by AIG and KBR's misrepresentations, delay, bad faith, fraud, malice and refusal to treat and to have him characterized as a fraud before a public body based on falsification of records, and additional injuries caused to his body and psychological injuries due to delay in treatment and deliberate fraud in the claims process.

**Robert Biddle**

279.    Mr. Biddle was a security specialist and trainer for Blackwater Worldwide and

Blackwater Security, LLC.  He worked in Iraq.  Prior to working for Blackwater as a contractor, he spent 22 years in the Marines as a Gunnery Sergeant and was experienced in combat.  Prior to working with Blackwater, he was hired by celebrities in the United States for security protection.

280.     Mr. Biddle was injured in Iraq while working for Blackwater in 2007 when he was struck by a rocket explosion that threw seven feet into the air and to the ground, injuring his Right Shoulder and causing shrapnel wounds and numerous fractures throughout his body.  The incident knocked him unconscious.

281.     As a result of his experiences in Iraq with Blackwater, he suffers from TBI, PTSD, depression, and other psychological maladies.

282.     Mr. Biddle was permanently disabled by his physical injuries and psychological injuries that occurred while working for Blackwater.  Blackwater and CNA Insurance have deliberately withheld treatment from him, deliberately falsified his average weekly wage, which is $3,675 per week, but which they claim is far less.  CNA Insurance has deliberately paid him less than is his legal right to disability, claiming as offset all of the money he makes working for the Sheriff of Dorchester County, when the offset of wages against DBA disability does not begin until he makes enough to offset his average weekly wage of $3675 x .666.

283.     Blackwater and CNA have refused him TBI treatment, injections and psychological treatment for nearly a year despite requests and demands and have misrepresented his condition to the Department of Labor to avoid paying him or providing proper medical case, which has intensified his depression and PTSD, memory problems, neurological problems, and

has caused his nerve and shoulder problems to worsen.  None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

### Mark Griffin

284.     Mark Griffin worked as a Convoy Heavy Lead combat truck driver for SEII, a subsidiary of KBR from October 31, 2005 until November 1, 2006 based on a one year contract for an annual salary of $102,000 ($2,000 per week).  He left because of the stress and PTSD effects.  He could not stay a day longer.  He is currently 57 years of age.

285.     He worked in a war zone and was constantly involved with mortars, artillery, roadside IED bombs and arms fire, as he was supplying Marine bases with ammunition and other supplies.  He experienced repeated attacks by insurgents on his convoy, sometimes multiple IEDs on a given convoy run.  He also performed recovery missions and was subject to attack and fear for his life on those occasions.  He knew military personnel and others of SEII (KBR) who were injured or killed.

286.     He had to recover vehicles of dead or injured workers, and see people he worked with blown up, blood everywhere, people dying who were run over due to tired SEII drivers running over military vehicles.  He saw dead bodies in vehicles and had to pull injured people out of vehicles once in awhile.  His adrenaline flowed because of the war environment, noise, gunfire, mortars, and loud artillery going off around him.  The death and constant threat of death and maiming changed him for the worse.

287.     As a result of this, he suffers from PTSD, Depression and possibly neurologic Injuries, hearing problems and mTBI.

288.    During the last five years, KBR and AIG have subjected Mr. Griffin to fraud, bad faith, and abuse, claiming him as a malingerer and faker, subjecting him to a series of repeated IMEs and depositions to question his veracity and prove him a faker. Only when a judge ruled he had legitimate injuries to his hearing and PTSD and depression did KBR and AIG pay his benefits.

289.    They used Dr. John Griffith to subject him to improper testing and claims of malingering, followed Mr. Griffin around, and have surveilled him and his girlfriends and looked for dirt on him at every turn to this day. Attorneys for KBR and AIG still mock him and his injuries.

290.    Mr. Griffin's psychologist has referred Mr. Griffin for neurologic testing for mTBI due to all of the blasts he was subjected to in Iraq, and because of his signs of neurologic damage such as confusion, memory loss, and inability to concentrate. These needed tests are yet to be approved by AIG and Mr. Griffin is still waiting for various testing.

291.    Attorneys for KBR and AIG requested a settlement demand, which was provided to them May 3, 2011. They have yet to respond in any way to this despite repeated requests.

292.    The mistreatment and accusations against him by AIG and KBR for the last five years have intensified Mr. Griffin's conditions, subjected him to ridicule and increased expense, and made him feel as though he could not live his life and was always living in fear of KBR and AIG. This has denied him benefits of the law and has made his life difficult in the extreme. None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

**Jafar Joseph Bayatafshar**

293.     Joseph Bayatafshar was a Professional Engineer (PE) who worked in the District of Columbia.

294.     He received a "contingent offer of employment" from Parsons Group, Inc. and Parsons Corp. to work for them as a professional engineer in Iraq for the Coalition Provisional Authority.  He signed that on March 31, 2004 and accepted their offer and joined the Parsons team per the language of the letter and contract.

295.     The offer notes that he would be a Project Manager for Infrastructure and Technology and sets his rate, with hazard pay and overtime.  It states the start date is contingent according to the contract.  The recruiter and HR office informed him that based on the rate pay and the work that would be required 7 days a week, and that actual pay on an annual basis would be over $400,000.  This induced him to accept their offer.

296.     He  complied with and qualified under all three contingencies of the contract – (1) medical, (2) immigration work eligible, and (3) Parsons getting the contract in Iraq with the CPA which occurred around April of 2004.  In March, 2004 Parsons was waiting for notice to proceed and for the type of contract the United States government was going to award them. There were several possibilities, one USAID, and One US Army, for rebuilding water and wastewater infrastructure in towns in Iraq through the Coalition Provisional Authority.  None were signed at the time and for Parsons to say that it could not wait and hired another project manager is a false statement, since records of the recruiter show this is false.  Yet Parsons made

121

those misrepresentations by wire and mail to counsel for Mr. Bayatafshar having effects in the District of Columbia.

297.     He began March 29, 2004 with all the medical clearance.  They were readying to depart in May or early June to Iraq.  Parsons could not have hired someone else at the drop of a hat to replace Mr. Bayatafshar, yet they made such misrepresentations in the District of Columbia through counsel.  It takes time for a professional engineer to do all the clearance, tests, leave their job, say goodbye to family, etc.

298.    He  had no choice in refusing the medical tests or vaccinations prior to employment, specifically 10 different vaccinations in one hour period, including the Hepatitis B antigen, because Parsons arranged for 2 days visit to California, like a carwash: get in, get injection and x-ray, get stress test, paper work, meet senior VPS, do your insurance and fly back.

299.    He  was cleared to work in Iraq following the stress test and thallium stress test, and implantation of the stent.  Parsons informed him of his start date and arranged a ticket for him and said it would be in the mail.  They arranged for him to be processed at Ft. Belvoir, Virginia in June of 2004.

300.    While he  was awaiting the ticket to fly to Iraq, he received a call from the project manager, a man from Iraq originally who is an American citizen, who was based in San Francisco and was employed by Parsons.  He thought his name was "Tarq" or a name like that. He requested Mr. Bayatafshar perform work on the contract prior to departing for Iraq and informed him that he would be paid for the work when he arrived in Iraq.  He complied with his request and worked on the contract, preparing for infrastructure building and engineering issues,

122

expending about 20 hours of work time total. He was working for Parsons and was an employee. Tarq was the overall project manager and asked about task work, how to develop a cost basis, electrical power, water, pipeline, for an area that was bombed out. He discussed methodology with him, and the fact that the US Army had to escort them to the site, they had to do design, develop the task order, send it to London and United States, and they were going to be the eyes and ears of Parsons on site to build water and wastewater facilities, pipeline, pump station, repair power station with the help of Bechtel Corp. He asked about being paid for his consulting time of 20 hours, and Tarq told him he definitely would be paid, but he would have to get paid in Iraq. He never has been paid.

301.    He awaited his airplane ticket and did not hear anything. He knew he was an employee with Parsons, and therefore left his other employment that paid him $125,000 per annum and made ready to travel to Iraq as well as performed the preparatory work with the project manager under the contract that had been awarded to Parsons by CPA/USAID.

302.    Parsons breached its agreement and refused to send him to Iraq. Following this he was in constant contract through correspondence in 2005-06, with a person by the name of Sandy, he received a Kuwait contract to perform services as a PE for Parsons, he talked about his medical problems, and Parsons reimbursed him for some of them and encouraged him to stay with Parsons and they would find him a position.

303.    Therefore he continued to work with HR to be placed in other jobs, one in Kuwait, that he was made an offer on, and another in Dubai, UAE, which HE accepted, and they did not send him there either. They continued to work with him. At no time did they say they

would not employ him  and they did not deny that they needed to reimburse him for medical expenses, and did pay some but not all.  He was made an offer by the Parsons recruiter Sandy in 2006, and received another offer of employment, for a job in Kuwait which he also accepted, but they never delivered on that.

304.    Meanwhile, after he was an employee in 2004 and had been cleared to fly to Iraq, beginning in about June 8, 2004 he had reactions to medications that were required by the physicians after placing the stent in his veins.  This included fatigue, anxiety, loss of strength, inability to sleep, and over time depression.  Prior to March of 2004, he had been a sportsman, very healthy, and he exercised and had none of these medical conditions.

305.    After the March 2004 stress test in California by Parsons and vaccinations, on Parson's instruction, he came back to Virginia, and they required him to do a Thallium stress test.  They did a cardiac catheterization, said the artery was in good shape and that a bypass already built itself on its own around his occlusion.  They said if they provide a stent, and will give medical release, the stent will give you protection in Iraq in case you had arterial blockage. He was going to be embedded with US Army.  They said otherwise there was no medical reason to have the stent.  He  had only a minor heart irritation, but they said this was to to give you "redundancy,"  saying no symptom, just there is small blockage, 80% of small chamber, due to exercise, heart already mended condition, - by putting in a stent gives you better protection.  For us to give you medical release to go to Iraq for Parsons, we have to put a stent in the artery. Therefore he agreed in order to comply with the contingent offer of employment.

306.    Based on the employment requirement, he gave his consent and they put in the

stent at that time. After they put in the stent, he had adverse reactions. Now he has to take medication – anti-platelet, to make blood thinner to avoid clotting, and has to visit the doctor. Problems resulted because of the medication causing him not to be able to sleep late at night, causing him to have to see a cardiologist, and caused a lot of expenses and other damages to his health. He had to reduce exercise, had to go on special diet. He has continuously seen the cardiologist through 5 years, has had medical expenses of over $100,000, medications, 4-5 more Thallium tests since then. The medication causes low blood pressure, low energy, at 55 bpm. He also has developed severe anxiety and depression due to these conditions, and he has become completely disabled due to additional conditions recently diagnosed from the vaccinations, a Hepatitis condition.

307.     The Hepatitis issues developed over time, and he did not know what was causing his problems until Dr. Gonzales in May of 2010 tested him and explained why he had no strength. Dr. Gonzales, tested him for Hepatitis A-C and HIV because of how weak and sluggish he had become over several years, was unable to stand on his feet for long. The test results showed he was fine for everything except Hepatitis B. The doctor informed him the vaccination that Parsons required harmed him and he was infected with Hepatitis B which scarred and damaged his liver.

308.     He saw Dr. Sheifer (cardiologist) on 7/15/2010 in Fair Oaks, Virginia office, and he scheduled a nuclear study stress test end of July in Fair oaks hospital to evaluate the condition of stents put in 2004. He was in Fair Oaks hospital emergency room in 5/20/2010 due to cardiac chest pain. He  saw Dr. Bart a family doctor on 7/20/2010 for serious headache and

sleep problems associated with using zannax 0.25 mg, resulting from psychological problems due to these injuries.

309.    There are communication from March 29, 2004 until 2008 to Parsons concerning his problems.  He submitted invoices to Parsons in 2004, 2005, 2006 and even an invoice payment goes to 2006 by Parsons.  He has been in touch with human resources Director, Mr. Berry, and HR manager Mr. Morehead, and Recruiter and furthermore, in 2007 when he contacted Parsons many of these staff members were no longer working for Parsons he left the message with no response for several months.

310.    In 2008, Parsons employee Ms. Seal contacted him from the Colorado office of Parsons.  He had never previously dealt with that office.  They refused to pay anymore of his medical expenses or to employ him.  As a result of their fraud, misrepresentation, and unfair trade practices, Mr. Bayatafshar has lost over $2,000,000 in lost income since 2004 due to them, and now has permanent conditions that prevent him from working full time.  They led him on and invited him to stay on their rolls to obtain a different job, and led him to believe they would pay his medicals.  They now take the position he was never employed by Parson and therefore he was not an employee within the meaning of the DBA and therefore is not covered.

311.    The mistreatment and misrepresentations against him by AIG and Parsons as aforementioned, had effects in the District of Columbia where his DBA claim was filed and handled by his attorney.  Parsons' misrepresentations aforementioned utilized the telephone and wire and mail to communicate with Mr. Bayatafsahr from Parsons' offices in the District of Columbia and to his counsel in the District of Columbia.  Their fraud, bad faith, and ruses and

trickery to make him think they would cover his injuries and bills and employ him have resulted in worsening of his medical and psychological conditions, caused him to lose insurance and his savings, and made his life difficult in the extreme.  None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

### Cody McAnally

312.    Cody McAnally worked as a firefighter for Northrup Grumman (in their Vinell Arabia division) in Saudi Arabia on a defense contract with the United States from 200__ until 2009.

313.    Mr. McAnally was lifting a heavy wood crib during training on March 12, 2008, causing a low back injury including herniation, and aggravation of degenerative disc disease, hastening loss of fluid in his discs.  These conditions were revealed by MRI and medical exams in Saudi Arabia.

314.    He went back to work and aggravated and reinjured the back in 2009, and was given treatment in Saudi Arabia where it was determined his condition had considerably worsened in the year since his first injury on the job.  Northrup Grumman (Vinell Arabia) discharged him medically on in December 2009.

315.    Upon his return to the United States, Mr. McAnally sought medical treatment through Northrup Grumman and its DBA insurance carrier, AIG in January of 2010.  They refused to cover it stating he had not injured his back on the job.

316.    Through his attorney acting in Washington, D.C, Mr. McAnally filed a DBA

claim with the Department of Labor and held an informal conference on May 20, 2010, at which time attorneys for Northrup Grumman and AIG using a telephone denied liability for Mr. McAnally's injuries and treatment under the DBA without having reviewed any medical records. A memorandum of Informal Conference was issued by the Department of Labor recommending Northrup Grumman and AIG pay TTD benefits from December 1, 2009 to present and ongoing, as well as medical benefits. AIG spoke with counsel for Mr. McAnally, stating his client would not pay. This had effects in the District of Columbia where Mr. McAnally's attorney received the information that AIG and Northrup Grumman were denying the claim without basis.

317.     Since that time, Mr. McAnally was without any medical treatment or medications, and was in pain and had great difficulty financially and was in danger of losing his house.

318.     Finally, after a year, and Mr. McAnally's attorney filed for a hearing before the Administrative Law Judge, counsel for AIG and Northrup Grumman informed counsel for Mr. McAnally that they would pay his back pay for TTD and authorize him to see a physician.

319.     Mr. McAnally went back to his orthopedic surgeon, a Dr. Goorman. Dr. Goorman when he learned AIG was involved to pay the bills would not continue as his physician because of problems with getting payment.

320.     Mr. McAnally has suffered great financial and physical harm due to the delay of AIG and Northrup Grumman in accepting his claim. He has been without treatment, without work, and without vocational benefits. None of what he claims in this suit is for damages related to what he is claiming in the DBA claim.

## VI.  FACTUAL & LEGAL ALLEGATIONS RELATING TO THIRD PARTY NATIONAL CONTRACTORS

(representatives for similarly situated Third Party Nationals)

**Daniel Brink**

321.    Daniel Brink is a South African who went to work for DynCorp in Iraq on a security detail.  He was injured on December 22, 2005, when a powerful roadside (IED) bomb exploded by the vehicle in which Mr. Brink was acting as a Shark Team 3, Personal Security Detail for defendant DynCorp International in Iraq on its Civilian Policing Mission with the United States Department of State.  He had worked for DynCorp for about 1 year and 6 months. The contract commenced in August 2004.  He had been in four previous explosions.

322.    The vehicle next to his was exploded and caused him massive shrapnel and other massive injuries  as follows: Right leg above knee amputation; Left leg nerve damage between knee and ankle, drop foot;  Upper body, Left forearm, nerve damage, only working finger left is pinkie, left Hand, partially amputated, other fingers from the blast.  His hand was on 249 (larger caliber than Squad Assault Weapon) and was broken in four pieces, a meter away from actual blast site.

323.    His right forearm is broken in 4 places. The medical personnel used his big toe off foot amputated to build thumb on Right hand.  The only finger in tact is his pinkie on his Right hand; all other fingers are partially or wholly amputated; he hurt the back of his head with Kevlar helmet, scar.  He has Traumatic Brain injury; shrapnel wound that took out his left testicle, into his thigh; hip injury from this large piece of shrapnel as well; right testicle also

129

shriveled and he requires hormone injections for life; inability to rebuild muscle stomach; right side near belly button, entry wound into stomach, took out belly button, severed small intestine in 7 places, resection done in CASH Baghdad, then flown to St. George's Hospital England.  He had further operations on his stomach and intestines recently, and on his hands.  He is scheduled for urological surgery.

324.    He was hospitalized recently for severe PTSD and TBI.  He lost friends, nine, and had to recover body parts, one guy who was burnt to crisp, couldn't do anything, incoming fire.  He was in many combat situations.  He had to go to Kuwait for post mortem

325.    He was shot through and infected with shrapnel, he sweats a lot, does not sleep at night, need tablets to sleep, has a funny smell, like burning food, and has problems with his taste buds.  He had no taste for first 6 months with terrible nightmares.  He has difficulty concentrating, staying focused.  When he speaks with people he does not hear them, they drift away in memory.  He has been inactive due to his injuries.

326.    Mr. Brink requires constant personal care.  His current care professional, Willem Erasmus, must provide care for Mr. Brink by assisting him with the toilet, preparation of a special diet, cleaning of wounds, assisting him with his wheelchair, massaging of foot and leg for blood circulation, help in dressing him, driving him and bathing him.  He has to be driven wherever he goes.

327.    From 2006 to 2008, CNA, the DBA carrier for DynCorp, approved numerous medical treatments, nursing care by Guardian Medical, owned by Plaintiff Nicky Pool, and caused her and her company to incur over $150,000 in medical, hospital, nursing and supplies.

They then refused to pay.  To this day they have not paid in spite of assuring the Department of Labor at two informal conferences that they would get a handle on these medical bills and have them paid.

328.    In 2006, CNA authorized a wheel chair for Mr. Brink which was difficult for him to use, because of the injury to his hands.  But he did use it.  However, due to nonpayment of bills by CNA, this manual wheelchair was repossessed, leaving Mr. Brink without a means of getting around.

329.    After his manual wheelchair had been repossessed, it was determined that a manual wheelchair was not appropriate for Mr. Brink's mobility due to his lack of a hand and fingers.  Finally, CNA through Donna Spraggs agreed to provide an automated power wheel chair at a cost of approximately $7,000 US.    They authorized the purchase, and it was custom made for Mr. Brink.  CNA paid by check to the supplier, Fast Pulse Trading 77 Ltd, Check Number 034990518 on February 6, 2007, in the amount of R48,450 (approximately $7,000 USD) then stopped payment on the check on March 19, 2007, causing Mr. Brink to be unable to obtain the wheelchair.  CNA denied it had stopped payment.

330.    Donna Spraggs, the adjuster for CNA on Mr. Brink's claim, invited Mr. Brink along with Nicky Pool to come to Chicago to their offices on Water Street to look at all of the bills that remained unpaid, some $150,000 worth.  So he flew to Chicago with his whole team, doctor, paramedic, wife, at a cost of approximately $10,000.  When they arrived, they were forcibly removed from the CNA building, after had appointment.

331.    On the flight back from Chicago, Mr. Brink stopped in Dubai at DynCorp's

offices, and told them of bad treatment.  DynCorp officials told him of a new ombuds

organization they were forming and had him take a picture with a General which was used for

public relations.   Mr. Brink was offered a position with DynCorp by Mike Warren out of

Houston, for an Employee Assistance Program (EAP).  Mr. Brink would act as the spokesperson

for injured and deceased in Africa.  He filled out application forms, and in reliance on

DynCorp's offer spent thousands of dollars to create an office in his home.  DynCorp then

dropped Mr. Brink and never came through with the job.

332.    Mr. Brink is eligible for a "power knee" which is a prosthetic device that would

enable him to ambulate.  To date, DynCorp and CNA have refused to pay for this.  Mr. Brink

offer in 2010 and 2011 to CNA through counsel in Washington, DC to provide a used power

knee from a fellow DynCorp employee who was replacing his power knee at CNA's expense, if

CNA would pay for it to rebuilt, saving them up to $75,000.  Through counsel they stated they

would but never paid for it.

333.    In hearings before the Department of Labor, CNA through counsel and their

adjustor Donna Spraggs, represented they had never refused to pay for medical bills, denied

wholly they had issued payment for an automated wheelchair and then stopped payment on it, or

that they had ever been provided invoices and records to pay the outstanding medical bills, when

in fact they had been provided same on a number of occasions.  Those hearings in which they

misrepresented numerous facts and failures on their part to pay known invoices in their

possession for two years, were on  November 5, 2009 and June 29, 2010, at which time the

Department of Labor ordered DynCorp and CNA to pay all outstanding medical bills, but they

never did.  These representations had effects in Washington DC and were received by counsel

for Mr. Brink in Washington, DC, by telephone, fax, and mail.

334.    As a result of the Informal Conference, CNA represented it would hire Akeso

Care to collect invoices and medical records to get the outstanding bills paid, and to manage Mr.

Brink's ongoing medical care.  Instead, Akeso told Mr. Brink thereafter it does not collect bills

and records to obtain payment, and began to harass and threaten Mr. Brink concerning

woundcare, refusing him treatment, getting him blackballed by doctors, and refusing payment for

emergency care due to the bleeding of his hands.  Counsel for Mr. Brink received word of these

acts of fraud and extreme infliction of distress in Washington, DC, communicating with the

Department of Labor from Washington, DC concerning these matters on February 2, 2011.

335.    As a result of this failure to pay authorized medical bills, Mr. Brink has been

foreclosed on, sheriffs have taken away his property, and his wife has left him due to the extreme

stress on their relationship from the constant care she had to provide but was not educated to do,

and due to financial stress brought on by CNA's failure to pay.

336.    As a result of nonpayment, Mr. Brink was without a psychologist or psychiatrist

or any medication to treat his extreme PTSD, brain injury and psychological conditions, for two

years.  His loss of treatment for psychological injuries was occasioned by CNA's callous refusal

to pay bills it received on numerous occasions, which were based on treatment authorized by

CNA and its third party South African medical managers it hired to care for Mr. Brink's needs.

For instance, CNA's attorneys were notified on many occasions of the need to pay bills or Mr.

Brink would be without doctors and psychologists.  On August 1, 2007, the third party manager

Vetted, wrote to the attorneys for CNA and DynCorp to plead with them to pay the bills of Dr. Liebenberg, explaining that the excuse given by CNA and attorneys by CNA that they lacked medical notes or records to support payment was without basis as Vetted officials had previously sent 53 pages of medical notes to CNA to support payment months before.  Still CNA refused to pay.

337.    Additionally, CNA delayed any treatment for TBI or brain scan and neurological workup, for five years, and finally agreed to an MRI in June of 2010 after Mr. Brink was admitted to a psychiatric institution on the verge of suicide.

338.    CNA representatives, attorneys and adjustors before the Department of Labor in July of 2010, pretended not to be aware of any outstanding invoices from psychologists or psychiatrists, despite being provided with the same on numerous occasions from the attorney for Mr. Brink from Washington DC and from a prior attorney from Georgia.

339.    Because of the failure to pay bills, Ms. Pool has been blackballed and is unable to perform her nursing trade or continue in business.

340.    CNA hired and fired numerous in country third-party administrators of Mr. Brink's medical care.  Some of these have threatened him with losing benefits or being cut off from medical care or assistance.  The frequent changes in the third party administrators has worked great hardship and caused many gaps in his care.   Due to Mr. Brink's catastrophic injuries, the interruptions in care and management have increased his suffering and caused innumerable hardships on him and his family, causing alienation among family members and friends.

134

341.    Mr. Brink settled his DBA claims with CNA and DynCorp in May of 2011 because he was bankrupted by CNA and DynCorp, and had little alternative to settling if he wanted somewhere to live, stop the collections actions, and prevent further harm to him physically and psychologically.

342.    His nurse case manager, Plaintiff Nicky Pool, was authorized to incur medical bills, supply bills, and hospital bills from authorized providers.  Despite authorizing these expenses, of approximately $200,000, over a two year period, CNA and DynCorp have refused to pay for over three years for these bills and still have not paid them despite settling Mr. Brink's DBA claims. Ms. Pool has persistently sent itemized invoices for services to Mr. Brink and supplies and bills from third parties who were authorized.

343.    As a result of refusal to pay Ms. Pool, she has lost her business (Guardian Medical) and been blackballed by providers in South Africa who will no longer use her services because of CNA and DynCorp's refusal to pay what they authorized her to incur.  The loss of her business has cost her in excess of $1,000,000.00 and will continue to harm her as set forth below.

344.    DynCorp settled his claims in May of 2011 for a sum grossly inadequate for his future life care, current known surgeries needed, and disability payments, but which he was compelled to accept in order to even have a roof over his head and obtain necessary care in a timely way and without collection actions continuously being brought against him and his property.

### Johann Steenberg

345.    Johann Steenberg worked in personal security for many years in South Africa.

135

Prior to that, he was in the South African Army and Special Forces. He was married and had three daughters. He went to work in Iraq for DynCorp on a Personal Security Detail (Shark Teams). He was involved in approximately 26 incidents of roadside bombs, IEDs, mortar fire, small arms fire attacks and was under constant threat to body and soul, and saw friends and co-workers die and be dismembered; he was subjected to enormous trauma, psychological turmoil, physical explosions and fires.

346.    During his time in Iraq from 2004 to 2008, he has been in the near area of many concussion waves of IEDs and other types of bomb attacks These wrenching experiences were extraordinary, and Mr. Steenberg showed real heroism in continuing to do his duty as long as he did. The incidents were the result of war in Iraq, and came from hostile action from insurgents and/or terrorists in war time in Iraq. He did not want to be diagnosed with PTSD, suffer great personal and professional hardship, or to lose his job and livelihood for his wife and children in Iraq. He wanted to keep working.

347.    DynCorp hired a psychologist and required all of those in Baghdad to undergo psychological evaluation for fitness for duty. Dr. Michael Catalanello, PhD. saw Mr. Steenberg on March 16, 2008 and issued a report to Human Resources for DynCorp stating Mr. Steenberg was unfit for duty, suffered from PTSD and associated difficulties due to the "cumulative effect of a number of traumatic experiences in the workplace." This was not initiated or desired by Mr. Steenberg.

348.    CNA hired Tacticor to be the third party administrator for my client's medical

needs and disability payments.  My client selected and saw Dr. Caren Van Wyk, Psychiatrist, on his return several times.  Dr. Van Wyk found him to be totally disabled for work, unable to function in his family, or socially, and filled with road rage and other dysfunctions.  He was prescribed a variety of medications by Dr. Van Wyk.

349.   In early 2009, CNA hired Dr. Cecil Gericke, Psychologist, and Dr. Frans Korb, Psychiatrist, as its approved psychiatric/psychological treaters for Mr. Steenberg.  He has seen them since early 2009.  Dr. Gericke has found Mr. Steenberg to be totally and permanently disabled from any type of gainful employment, and has prescribed a lifetime regimen of therapy, medication, personal care attendant daily.

350.   In addition, as a result of the PTSD and related problems, Mr. Steenberg developed other problems such as stomach acid and ulcer condition, high blood pressure, and bruxism and caries (abscesses of the teeth resulting from grinding of the teeth, also teeth falling out).  These are known conditions that come with severe PTSD.

351.   Dr. Frik Kotze, dentist has diagnosed his dental condition as causally related to his PTSD, and Dr. Louw has diagnosed his peptic ulcer/acid conditions as causally related to his PTSD.  Dr. Louw has opined that the peptic and blood pressure conditions are directly related to Mr. Steenberg's PTSD.  Still CNA would not provide for the dental or peptic treatment.  These had been agreed to in 2009, as well as at Informal Conference in early February 2010 (along with the brain MRI/EEG and other treatment), but the funds were never transferred.

352.   Mr. Steenberg may also suffer from Traumatic Brain Injury (TBI) which often

intensifies Post Traumatic Stress Disorder (PTSD) or is accompanied by it, as well as by memory loss, inability to concentrate, short fuse, and other problems.  Dr. Korb  prescribed in October 2009 a test for TBI, and CNA repeatedly agreed to his receiving the diagnostic tests to detect any organic brain injuries or lesions, MRI with EEG.  It took over a year of wrangling and fighting, with CNA and its attorneys assuring Mr. Steenberg that the monies were transferred to the doctors in South Africa.

353.    Since May of 2009, no fewer than five times, CNA acting on its own or through Tacticor, has revoked Mr. Steenberg's medication payments or failed to make the payments. They have repeatedly failed to pay Dr. Korb and Dr. Gericke, creating problems for him seeing the doctors.  Tacticor has showed up at his home and intruded on his privacy, requesting to photograph his home, and trying to attend his medical appointments.

354.    Over and over, CNA has misrepresented its payment of bills to Lancet laboratories, to Dr. Gericke, payment for medications, payment for mileage, payment for reimbursing medical expenses Mr. Steenberg had to pay for out of pocket.

355.    Over and over CNA has been notified that Mr. Steenberg's teeth were falling out, or he had abscesses, or bleeding ulcers, and CNA refused to take any timely action or pay for matters it had previously agreed were covered and approved.

356.    CNA and DynCorp made him return home for severe and disabling PTSD, but then on his return and relying on their starting him on medications, he was ripped from those medications by their actions, making him go through withdrawals and adverse reactions, making his condition worse than if they had never agreed to start him on medication.

357.    As a result of the games, the ruthless and malicious tactics of pretending to provide for care but refusing to pay, or lying about having wired monies, Mr. Steenberg's suffering has greatly intensified and caused rifts in his relationships with his daughters and wife. He and his family have had to live separated on numerous occasions, and Mr. Steenberg has become a danger to himself and others due to the withdrawals from medication that CNA claims to be providing but has refused.

358.    Mr. Steenberg, through his counsel, has notified the Department of Labor of these problems, and has sent no fewer than a hundred e mails and letters to counsel for CNA to warn them of the ill effects to Mr. Steenberg's mental and physical health of their misconduct. Not once during this time did CNA claim that Mr. Steenberg was not entitled to the treatment and medication and testing. They simply refused to provide what they promised.

359.    CNA and DynCorp agreed to settle his case by paying bi-weekly benefits for permanent total disability and agreed to pay for his knees to treated and operated upon if deemed medically necessary. This agreed order was approved and an order issued by the Department of Labor on July 5, 2011.

360.    In spite of this order, CNA and DynCorp have refused to pay the Permanent Total Rate, instead coming up with a self-declared amount for Permanent Total Disability of the rate for temporary total disability plus one cost of living (COLA) increase, where there would have been 3 increases for one deemed permanently totally disabled as set forth on the weekly wage chart on the Department of Labor's website. The first payment for PTD was late, as had numerous prior payments of TTD, and his treatment for the knees continues to be ignored, which

139

has caused him increased pain and suffering, including falling and hurting himself due to the knees giving out.   Since that time, Mr. Steenberg applied to the Department of Labor for an order of Default showing CNA and DynCorp have refused to pay for medical benefits and compensation required by the order and the law.   CNA and DynCorp have since contacted Mr. Steenberg and his counsel to indicate they will pay the compensation for COLA increase for the 2010 increase and have appointed a third party administrator in South Africa to administer his medical benefits including knee treatment and surgery as necessary.

### Margaretha Bezuidenhout

361.    Petrus Bezuidenhout, was employed by DynCorp International in Iraq as a superintendent, from September 23, 2008 until he died on September 1, 2009, in his sleeping car on base in DynCorp's employment.

362.    His wife Margaretha Bezuidenhout, was notified of his death and was informed that he was already in transit from Iraq to the United States where DynCorp, without her permission, was having an autopsy done.  She was not asked for permission and had no choice in the matter.

363.    DynCorp's autopsy revealed the cause of her husband's death was asphyxiation. They found a chicken bone lodged in his throat.  They also discovered in his blood a sleeping agent that he had a prescription for and ethanol showing he had consumed alcohol the night of his death.

364.    Despite the clear finding of accidental death due to choking, DynCorp and CNA

denied the claim for death benefits under the DBA because the asphyxiation was "complicating drug and ethanol use." They also cited to the policy of DynCorp and a military order that prohibits use of alcohol even though DynCorp is aware that employees can and do obtain alcohol in Iraq on the black market.

365.    In addition to accusing her husband of drug addiction and alcohol abuse, DynCorp and CNA threatened her with not allowing her to get her husband's body unless she signed an agreement. They had taken his body away without authorization to Kuwait to have an autopsy done. Again without permission, they whisked his body away to the United States for another autopsy, and after the fact, informed her and then forced her to sign the agreement stating DynCorp had permission.

366.    Under the law, only if alcohol is the sole cause of death is an injury or death excluded under the DBA. In this case it was not even a cause of death but vaguely alluded to in the autopsy as a factor. The cause of death was clear and unmistakable – choking on a bone. He was required to sleep alone in the sleeping car, and was required to be on base 24/7. Therefore, he was in the "zone of special danger" that covers death or injury if the employee being on a base in any way contributes to or makes more likely the injury. It has been held to apply to cover an injury when an employee urinated outside off duty and was injured, and has been held to apply to cover injuries from drowning while involved in recreation.

367.    Mr. Bezuidenhout was required to sleep in a sleeping box by himself, worked 7 days a week, 12 hours a day and on 24 hour standby. Because of his being on base and being required to sleep in solitary quarters, he had to eat in those quarters, and would likely have been

able to be helped had he been at home or if someone was sleeping in his quarters with him. It was these conditions of employment that made more likely his death by choking (asphyxiation) per the autopsy report. Had he had another person living with him, he might have been given the Heimlich maneuver or some other help such as calling emergency personnel.

368.    DynCorp misrepresented the use of alcohol by Mr. Bezuidenhout, claiming they had discovered alcohol containers in his sleeping car in violation of a military directive, and also claiming that his blood alcohol level was around .20. Mrs. Bezuidenhout had spoken to him an hour or so before he went to sleep the night before his body was discovered, and she noticed nothing unusual with him. He was not a heavy drinker. DynCorp tolerated alcohol consumption on base, and managers often encouraged it to help the contractors deal with the heavy combat stress and deaths of their friends. They sometimes supplied the alcohol to employees of DynCorp. The morning his body was discovered, DynCorp personnel entered Mr. Bezuidenhout's sleeping car and took pictures. The pictures showed no evidence of alcohol or containers of alcohol. The use of two separate autopsies was against normal practice and was done entirely without the knowledge or permission of Mrs. Bezuidenhout.

369.    The Department of Labor at an informal conference in November 2010 found that the zone of special danger rule clearly applies, and the carrier should be making death payments and back pay immediately. Following these findings, the Employer/Carrier paid benefits and has continued paying benefits but decided to continue to investigate the circumstances of the death of Mr. Bezuidenhout.

370.    Following this, the employer and carrier DynCorp and CNA made the

142

determination that because DynCorp did not require individuals to eat in their sleeping quarters, there was no coverage for this death. They suddenly cut off all benefits again. As a result, Ms. Bezuidenhout has been further harmed and caused additional pain and suffering, changed her position due to CNA and DynCorp picking up the death benefits, and taking them away again has caused additional disruption and financial hardship that was not present before.

### Gisela Fourie

371.    Gisela Fourie is the surviving spouse of Christiaan Wynandt Fourie who worked for DynCorp from 2004 to December 2010 as personal security detail on the shark team in Iraq. He was from South Africa and had previously been in the military. He experienced many IEDs, explosions, rocket attacks, small arms fire attacks, ambushes, saw death and mayhem, and lost friends. He left Iraq at the end of 2010 due to the effects of PTSD. He had two small children from a previous marriage who on many occasions stayed with Gisela while Wynandt was on leave and in Iraq as there was and still is a extremely close bond between Gisela and both Wynand's children.

372.    DynCorp had a psychologist on staff and had in place a procedure to screen persons leaving Iraq and working in Iraq for signs of PTSD, depression, anxiety, and other psychological effects of prolonged exposure to combat conditions. Despite its own procedures and representations to employees that it would screen for those with combat stress, PTSD or other psychological conditions, DynCorp frequently neglected to screen persons or when it knew or should have known of the stress and psychological problems of individuals in coping, sleeping, interacting with others, it would simply ignore them.

143

373.    Mr. Fourie was one such person that DynCorp ignored, failed to screen and did not follow up to discover his very significant problems.  He left them abruptly, went to work for Hart Security for a very brief period of 3 weeks and then left Iraq altogether.

374.    When Mr. Fourie was home, he continued to experience the effects of PTSD, stress, anxiety, anger, flash backs, and difficulty interacting with others.  DynCorp and CNA did not pay any medical or screening expense.  Mr. Fourie decided to pursue a claim under the DBA.

375.    Mr. Fourie saw a psychologist who diagnosed him with severe PTSD and Depression.

376.    As he was getting ready to file his claim, committed suicide by gunshot in front of Gisela and the minor children in the home.   He died a few days later from the effects of the gunshot to the head on May 16, 2011.

377.    Following the death of Mr. Fourie, Gisela filed a DBA claim for death benefits and supplied CNA on June 24, 2011 with an affidavit of witnesses and of Gisela Fourie, the death certificate, marriage certificate, report of psychologist, and CNA refused to pay for her or the children to receive benefits.

378.    The Department of Labor has refused to provide Mr. Fourie with an Informal Conference despite CNA delaying and doing nothing on the claim.

379.    As a direct result of DynCorp's neglect to screen and properly attend to departing PSD's like Christiaan Wynandt Fourie, they contributed to his suicide and the distress and lack of funds of his surviving spouse, Gisela Fourie and Wynandt's minor children.  As a direct result

of their delay and fraud, CNA has caused Gisela Fourie and her children and the children of Christiaan Wynandt Fourie great privation and distress.

### Catharina Louw

380.    Catharina Louw worked in Human Resources for DynCorp from 2004 to 2008, and later as the Regional Medic in Iraq from 2008 to December 16, 2010.  During this time, she became personally acquainted with many PSDs working for DynCorp, whom she saw as medic or encountered when injured or dead.  She was subjected to constant threats of explosions, artillery fire, and mortar fire.

381.    After five years in Iraq, DynCorp sent her home as unfit for duty due to psychological reasons, on December 16, 2010.  She filed for benefits in January of 2011.

382.    Ms. Louw was diagnosed with PTSD and depression in 2010 and saw the psychologist on her return to South Africa.

383.    Ms. Louw had several physical injuries, to her back, teeth, and stomach.

384.    Despite requesting benefits in January of 2011, CNA delayed providing any disability benefits on the PTSD or depression, and still have not paid on that despite DynCorp sending her home as psychologically unfit for duty, despite their own IME doctor having diagnosed her with work-related PTSD in more than one report.

385.    They have only just started paying her disability and medical benefits on the back, but refused to use her pay rate as of the date of her being sent home as unfit, using instead the original date of the back injury in 2006 when she made half as much money as when she was sent home from Iraq.  Through this fraud and ruse, CNA has saved thousands of dollars in

145

benefits and still has not accepted Ms. Louw's PTSD and depression claims. On September 26, 2011, CNA have informed claimant that they are willing to accept the PTSD claim and to pay back TTD compensation by e mailing her attorney in Washington, DC.

386.    CNA Global and Dyncorp International hired Mr. Kevin Woods from a company C-Risk International in South Africa to investigate Ms. Louw's claim for PTSD. Kevin Woods was convicted of murder and spent some 6 years on "death row" in Zimbabwe for murders he committed on behalf of the former South African "Apartheid" government. Ms. Louw became very uneasy in his presence and on edge thinking if she might say something he does not want to hear what would he do to her or her family. This caused additional emotional distress, anxiety and had a severe impact on Ms. Louw's Psychological state of mind. This is especially so because of the use of Tacticor and the many stories of harassment, misrepresentations and mistreatment of individuals injured in Iraq and Afghanistan at the hands of Tacticor's representatives working for CNA International Insurance and DynCorp and others in South Africa.

387.    Tacticor has created many problems in dealing with Ms. Louw's, Mr. Steenberg's and other patient's care treatment. They have misrepresented payment to doctors, to claimants, and otherwise have harassed and mistreated Ms. Louw and others. As a result of Tacticor's problems, the psychiatrist for Ms. Louw and many others who were injured while working for DynCorp, Dr. Frans Korb, refused to continue seeing patients as long as CNA and Tacticor used devices to not pay for treatment and medications that was authorized. It took two months for the

situation to be resolved, and caused loss of treatment and great distress to Ms. Louw and many other patients.

388.     As a direct result of DynCorp's and CNA's neglect to accept her psychological disability and pay her accordingly, Mr. Louw has been greatly harmed, causing her worse psychological problems, great financial distress and other damages.

### Sarita Swart

389.     Sarita Swart brings this action on her own behalf and on behalf of her children, Anelle (19 years of age) and Pieter Swart Jr. (16 years of age).   She is their natural guardian and parent, and they were the natural children of Pieter and Sarita Swart.

390.     Her deceased husband, Pieter Swart, worked for DynCorp as a PSD performing security functions in Iraq from 2004 to 2005.

391.     Pieter was involved in a bomb blast while working for DynCorp in Iraq that knocked him to the ground in his hotel room provided by DynCorp in Baghdad.  This was the massive car bombing of the Al Sadeer hotel in March of 2005.

392.     Following the blunt force trauma of the blast, Pieter reported to DynCorp officials on succeeding days that he was unable to breath and weak and pale.  The supervisors of DynCorp sent him to a medic who thought he was ill with flu.  He reported back at the insistence of fellow PSDs who believed there was a serious health condition Pieter was suffering.  Finally, DynCorp supervisors relented and agreed to have him seen in a hospital.

393.     Pieter was taken to the hospital in Baghdad where x-rays were taken and he was diagnosed with a pneumonia/lung infection.

394.     He and other PSDs approached the supervisor of DynCorp PSDs and insisted that

something more was wrong with him than a lung infection because he was unable to work and

go up stairs and was very pale.  He believed he had a heart attack but could not prove it.

395.     The Supervisor gave him his medical card with DynCorp Di-Care through Cigna,

and told him he would have to go back to South Africa and seek medical treatment and release if

he wanted to continue to work, but it was up to him to get treatment using his private insurance.

396.     He returned to South Africa and began a process of having his insurance denied,

and difficulties in getting any medical care due to DynCorp firing him and the insurance

allegedly lapsing.  Finally, the DynCorp insurance company said he could be admitted and

diagnosed.

397.     In October of 2005, Pieter was admitted to a hospital where the specialists

diagnosed him with a mitral valve tear and prolapse in his heart, which they said could only have

been caused by a blunt force trauma – the bomb explosion he was involved in with DynCorp in

Baghdad, Iraq.

398.     For the next several months, Pieter and his wife, Sarita, fought with Cigna and

DynCorp concerning the medical insurance, and finally they denied any coverage for Pieter.  The

doctor would not operate unless the insurance company paid.   The doctors said time was of the

essence to make the mitral valve repair take and prevent death.

399.     CNA and DynCorp International refused any help and eventually Ms. Swart paid

for the mitral valve transplant and repair after borrowing the money, and the doctors did the

mitral valve transplant and repair. But because of the lapse in time, he was too weak, and passed away in the hospital 6 weeks later due to the lengthy delay by DynCorp in getting him proper medical care, the fraud in mishandling his insurance coverage after sending him home and assuring him he was covered by insurance.

400.     DynCorp and CNA Insurance never paid any benefits to Ms. Swart or her children on account of his DBA work-covered injuries from the blast, and the intentional and malicious behavior of DynCorp in denying medical treatment and insurance benefits that resulted in delay of his mitral heart valve repair and transplant, which in turn resulted in his death.

401.     DynCorp and CNA are liable for the pain and suffering endured by Pieter prior to death, the anguish and pain and suffering of Sarita and her two children in watching their father suffer and die, and the death of Pieter and loss of income and services, as well as anguish and bereavement of Sarita and her children from the death of Pieter.

402.     DynCorp delayed the treatment of other PSDs in Iraq that resulted in death and suffering, and Sarita is a suitable representative of those individuals as well.

<u>**Mbusi Cele**</u>

403.     Mbusi Cele was a PSD member of a shark team for DynCorp. He is from South Africa and is of Zulu descent.

404.     Mr. Cele worked for DynCorp International as a Security Supervisor, PSD (Personal Security Detail) guard in Iraq. He made $144,000 per annum, or $2,769 per week.

405.     His Date date was 12/22/05, which was also his last day worked in Iraq. He was injured in the  same blast and vehicle as Daniel Brink.

406.    He was traveling in a convoy in Iraq for DynCorp and was sitting behind the driver.  They were hit by a roadside bomb, causing a massive explosion that severely injured Mr. Cele and others in the convoy who worked for DynCorp.

407.    As a result of the blast, he sustained the following injuries: Right arm amputation, right shoulder loss and damage, shrapnel wounds to the buttocks, left leg nerve damage and drop foot, irritability, mood disorder, psychological injuries and permanent scarring.  He received counseling and medication.  He has also had his wife paid as a daily care providers due to the difficulty of ordinary life activities for Mr. Cele due to his multiple blast injuries.

408.    He received treatment in Iraq, at a U.S. Military hospital.  He was in a coma and was cleaned of shrapnel, pinned, and had his first surgery in the military hospital.  He was evacuated to London where he received his second surgical treatment and recuperation, at St. John's Hospital.  He also had his left leg and buttocks cleaned and shrapnel taken out.  He had his third surgery back in his home country at Milnerton Medi-Clinic where they closed his shoulder wound and then he had another reconstructive and plastic surgery to his shoulder at Vincent Palloti Hopsital, Cape Town, South Africa.

409.    In December of 2006, CNA and DynCorp entered into an agreed award for Mr. Cele to be paid the maximum compensation rate for life due to his being permanently totally disabled physically and psychologically.

410.    Mr. Cele had problems with late payment by CNA and DynCorp.  For the last six months of 2010 of compensation checks.  CNA and DynCorp attorneys represented over and over that the monies had been wire transferred to Mr. Cele's bank.  What would happen is that

his money would arrive a week to two weeks late sometimes, and would have fees taken out for wires, as happened to many others in South Africa. The attorneys blamed the banks of South Africa but took no steps to wire more money earlier to remedy whatever problem they had created.

411.     CNA and DynCorp failed to pay bills on time and had collections actions brought against Mr. Cele which ruined his credit in South Africa. As a result of that, he has been blackballed by merchants, cannot obtain credit, and has had to rely on cash only for purchases. This in turn has worked a hardship on him and his family due to his inability to buy on credit now, and also due to the late payments by CNA which also compounded the hardship of being blackballed, resulting in him frequently being behind in paying for rent, groceries, and the like.

412.     He received notices from TransUnion on November 30, 2010, and another overdue account notice from Dr. Carstens for limb casts and other prosthetic services, as well as Credit Health on January 24, 2010, to name a few. These were for services authorized by CNA that they said they would pay but did not. This caused great distress and difficult for Mr. Cele and intensified his suffering greatly. He desired so much to get out from underneath the lash of CNA and DynCorp's fraud and abuse that he asked to have them commute his benefits.

413.     The commuted value of his lifetime benefits and future prosthesis and medical and psychological and personal care was over $2 million.

414.     CNA would only offer $832,000 to settle the claim and get out of his life. Mr.

Cele took that because he felt he had to get away from them and be rid of their lies about wiring money and paying for things they claimed they paid that he was willing to take less than half of the communtation amount, which was already half of the overall amount by statute.

415.    DynCorp and CNA Insurance have created greater injury, suffering, pain and anguish, and caused loss of credit to Mr. Cele as well as forced him into a position to take far less than his case is worth.

### Coenrad Theunissen

416.    Coenrad Theunissen worked in the South African Police Service for many years in South Africa.  He was married and has one daughter. He worked in Iraq for Erinys Iraq Ltd., (Erinys International Ltd.) as Personal Security Detail member from Iraq from August 15, 2004 to February 6, 2005.  He started his employment in Baghdad, was transferred to Kirkuk and after 3 months in Kirkuk, was sent to Mosul in the North, identified as one of the most dangerous areas in Iraq. In the beginning of his employment in Mosul, his PSD team consisted of only 5 members as they had to wait for reinforcements.

417.    His core duty in Iraq was the protection of members of the United States Army Corps of Engineers. Although none of his fellow PSD's was killed during his employ, he saw many instances during ambushes when Iraqi Policemen and other foreigners were killed and dismembered in attacks. He also witnessed the incident when a suicide bomber entered the mess hall in Camp Marais during lunch, blowing up and killing approximately 80 people, inclusive of American soldiers and Iraqi co-workers. He was subjected to enormous trauma and Psychological turmoil.

418.    During his time in Iraq from August 15, 2004 to February 6, 2005  he was in the near area of many mortar and rocket attacks on their base camp, one IED, small arms fire and sniper attacks.

419.    On February 6, 2005, he was involved in a motor vehicle accident while on duty escorting clients form Mosul to Dahuk.

420.    Mr.Theunissen was in the front gunship of the convoy, seated in the right middle of the vehicle as a shooter. The vehicle was then in a head on collision with a fuel tanker, resulting in the vehicle been thrown approximately 35 meters.

421.    Due to the impact, Mr. Theunissen was hit from something heavy based in the back of the gunship, presumably the ammunition box, and pushed under the right front seat of the gunship. He was knocked unconscious.

422.    When Mr. Theunissen regained consciousness, he was still underneath the front seat and struggled to breathe. One of the other PSD members had to bend the seat in order to free Mr. Theunissen.

423.    Mr. Theunissen and the other injured PSD's were Medevaced to Camp Diamond back in Mosul to the military hospital where they received treatment. It was established that Mr.Theunissen sustained multiple injuries, including but not limited to multiple broken ribs, facial and left ear lacerations, fractured right scapula, punctured left lung, neck injuries, back injuries, altered immune status, had a splenectomy and sustained short term memory loss. After the accident, Mr.Theunissen was transferred to Germany for medical treatment and thereafter returned to South Africa which is his country of origin and residence

424.    Mr. Theunissen wanted to go back to Iraq and continue working but was informed by his employer that he could not due to the seriousness of his injuries. Mr. Theunissen demanded opayment under an accidental death and dismembermenbt policy of insurance purchased by him as a benefit of his employment.  After much fighting with Erinys, he received a payment of $186,000 on or about September 13, 2006, 19 months after his injury.  Erinys paid him as they were insured with Lloyds of London. These monies were only paid to him after extensive legal consultations with a South African law firm which cost Mr. Theunissen approximately $6000 which he had to pay from his own personal pocket resulting in him actually only receiving $180,000. After this payment was effected, his employer insisted that he sign a Letter of Discharge, pertaining to no further claims against Erinys Iraq Ltd, Erinys International Ltd and any subsidiaries.

425.    Mr.Theunissen was never informed by his employer that he qualified for weekly payments under the DBA. His sister, who was also employed by an American Company in Iraq, informed Mr. Theunissen of such and she then engaged in correspondence with Mr David Barnett, a DBA lawyer in America for assistance. Mr. Barnett subsequently confirmed that Mr.Theunissen does qualify for DBA.

426.    Despite the fact that Mr. Barnett confirmed that Mr. Theunissen qualified for DBA and after numerous legal consultations, between the South African Lawyers and the American Lawyer, he finally received his first DBA payment in June 2010. For 5 years, he did not receive any DBA payments. Mr. Barnett informed him that the reason for such was due to

the fact that the insurance carrier for Erinys International, had a credit of $180,000 and that was stated as the reason for his non-payment of DBA for the mentioned period.

427.     During this 5 year period, non-payment of DBA benefits, unable to be employed due to his work-related injuries, Mr. Theunissen could not afford his house rent anymore, paying for his daughter's education and daily expenses, supporting his aged mother etc. He had to give up his home approximately during May 2008, resulting in him and his mother moving in with his sister. Mr Theunissen experienced serious emotional and psychological problems as he could no longer support any of his loved ones and most importantly, his daughter. Mr.Theunissen had to sleep in the garage as his sister's house did not have enough space to cater accommodate everyone.. Mr.Theunissen had no money left and could not assist his sister with all the expenses.

428.     All this resulted in extreme emotional and psychological stress which resulted in a huge family feud which became violent as Mr.Theunissen could not control his aggression. Mr.Theunissen then had to leave his sister's house and had to sell off everything else he had to survive. He lived with his other sister for a few months and then was forced to stay with his ex-wife, slept on the floor in the lounge as there was no space, for approximately 4 months. His aged mother lived in an outside room at his brother's place that also had to provide for his wife and three children. He had nothing left, resulting in extreme humiliation of his self being.

429.     Mr. Theunissen and his sister came to a resolution of their differences  and he moved back during June 2009. As Mr. Theunissen had no money, no assets and no income, his sister, earning a meager salary, had to pay for everything including the house, food, his daughter's education and monthly expenses. She also paid for Mr. Theunissen's medical aid in

order for him to be able to sustain his medicine needed due to his injuries and no immune system. His sister had to take out a loan from a South African financial institution to sustain Mr. Theunissen's medical aid as he was a few months behind with his installment and the medical aid threatened to cancel his benefits. His sister also paid his cellular telephone bill in order for him to have contact with his daughter who resides with her mother in Cape Town which is approximately 1400 km from Pretoria where is sister resides.

430.    Their mother also moved back to his sister as his brother could no longer afford to provide for her as well. The immense monthly expenses resulted in extreme pressure from financial institutions and the whole family suffered as they were about to lose everything.

431.    Mr.Theunissen's mother was diagnosed with cancer during May 2010 and even more pressure was experienced as Mr. Theunissen still did not receive any DBA payments. As Mr. Theunissen was alienated from his other brother and sister, he refrained from being at his mother bedside during her final hours before she passed away on July 6, 2010. To this date, the trauma of also losing his mother while not able to provide for her, has severely impacted his emotional and Psychological status.

432.    After finally meeting other South African A PSD members in the same situation, who conferred with an American attorney, Mr. Theunissen was informed that there should have been an Insurance representative/Medical Case Manger in South Africa, assisting him with his medical claims, handling of his case and referring him for a Post Trauamtic Stress Disorder evaluation report as well as MMI reports, of which he was never informed about, has he received assistance.

433.    Prior to this, during December 2007, Vetted International referred Mr. Theunissen to Dr. W.J.W. Neuhoff, representing Vetted International in South Africa, in order to consult with him, regarding his medical status. Mr.Theunissen was under the impression that the consultation and assessment from Dr. Neuhoff would be the last assessment to consider his disability, taking into consideration that Mr. Theunissen was never informed about Post Traumatic Stress Disorder or MMI. Dr. Neuhoff reflected clearly in his report that Mr. Theunissen was permanently unable to return to the work he was trained to do.

434.    Even after D. Neuhoff presented his report, Mr.Theunissen still did not receive any benefits until June 2010, in which he received a back payment of $78, 798.83, calculated that he was owed $258,798.06 minus the $180,000 paid to him in 2006.  However Mr. Theunissen believes, and had learned through information, and thereon alleges, that since the $180,000 was a benefit of employment and no offset under the DBA exists for this payment of insurance for accidents and disability, this "offset" was wrongfully and fraudulently obtained by the employer through misrepresentation.  Additionally, Mr. Theunissen believes, and had learned through information, that the Lloyds of London insurance policy paid out in British Pounds but that Erinys converted that into dollars to make a profit, and then wired those dollars to South Africa to Mr. Theunissen only after being threatened by attorneys in South Africa, and that such payment in dollars converting into South African Rand resulted in the payment being several thousand Rand less in value to Mr. Theunissen, another act of fraud that damaged him.

435.    On his own accord, Mr. Theunissen engaged the services of a Clinical

Psychologist, Dr. Henk Swanepoel, whom presented a final Post Traumatic Stress Disorder

report for his case to his attorney in Washington, D.C. After this, his physician , Dr. Arina

Brandt, referred him to a Psychiatrist, Dr. Pierre Nel, as he experienced insomnia, severe

memory lost, inability to concentrate, aggression, and other problems. Dr. Pierre Nel prescribed a

new type of medicine to try and counter all these medical problems and emotions. Mr.

Theunissen is still receiving treatment from Dr. Nel.

436.    Due to his back injuries sustained during the accident in Iraq, Mr. Theunissen

needed a back operation, which was performed by Dr. Ettienne Coetzee during February 2010.

Mr. Theunissen received no out of pocket reimbursements for the costs incurred for this

operation as well as any of his other medical bills except for one payment during 2009, whilst

these payments were ordered in a court order that the employer/carrier must pay all necessary

and reasonable medical expenses which resulted from Mr. Theunissen's injuries sustained on 6

February 2005 in Iraq . Mr. Theunissen cannot proceed with his life if he does not receive the

medication prescribed by his medical practitioner as well as by Dr. Nel.

437.    Since January of 2011, counsel for AIG and Erinys and AIG, have engaged in a

campaign to threaten Mr. Theunissen by stating to him, and then to his attorney in Washington,

DC through fax, telephone and mail, that Mr. Theunissen has not been cooperating with AIG,

has not provided medical records to AIG and its in country manager, Akeso Care, has not been to

see doctors, or does not know what the status of his medical situation is.  Counsel for Erinys and

AIG filed papers with the Department of Labor and sent them to Mr. Theunissen's attorney in

Washington, D.C. requesting that his TTD benefits and medical benefits be modified and cut off

due to non-cooperation and lack of medical treatment. This Petition for Modification was filed on or about June 7, 2011. Mr. Theunissen answered through his attorney in Washington, DC on June 27, 2011.

438.    This is false, and has caused additional problems for Mr. Theunissen. He cooperated with Akeso and AIG and provided numerous records of going to doctors and anything they asked for, but it was never Mr. Theunissen's job to provide medical records. AIG and Akeso can and should get them from doctors directly at their own expense, and if they need translation from Afrikans into English, they should pay a translator for such. They sought to blame Mr. Theunissen for their own incompetence and fraudulently asserted matters that were plainly false as he was under continuous care of physicians and psychologist.

439.    Sometime after the $180,000 was paid to Mr. Theunissen, an unknown person inquired from his neighbor, on a Friday night, whether the neighbor knew Mr. Theunissen and whether he was working at that that stage which is a clear indication that the either the carrier or the employer were and possibly still is "spying" on Mr. Theunissen, intruding on his privacy and human rights. Due to the above mentioned Mr. Thuenissen not only has a servere Psychological and emotional state of mind but also on a daily basis has to face additional stress being added to his already badly Psyhological state of mind due to instances like "spying" by the insurance carrier and or employer.

### Marlene Gericke

440.    Marlene Gericke brings this action on her own behalf and on behalf of her

children, Jolinde and Rozanne, natural children of Herman Pretoris and Marlene Gericke, and

Marlene Gericke is their current natural guardian and parent.

441.    Her deceased husband, Herman Pretorius, worked for DynCorp as a PSD in

Baghdad Iraq from April/May 2004 until 16 August 2004, when he was injured/killed in

a IED explosion and subsequently taken hostage by terrorists or insurgents. He was never heard

from or seen again and he is presumed dead.

442.    Immediately after the incident on 16 August 2004 Ms. Pretorius (now

Gericke) started receiving TTD compensation from AIG insurance on a bi-weekly basis. After a

period of approximately 2 years or 104 weeks she received a letter from the Insurance Carrier

for DynCorp International, then AIG Insurance. They informed her that the Department of Labor

has approved their request to commutation of benefits due to her and her children under

the Defense Based Act.

443.    She received a lump sum of $594.781.32 USD for herself and a further

53,305.56 USD for her daughter Jolinde at the time of Herman's death/kidnapping/abduction

was 3 yrs of age and another $19,002.62 USD for her second daughter Rozanne who at the time

of his death/kidnapping/abduction was 9 years of age.

444.    After this settlement, she never heard from DynCorp or AIG again until February

of 2007 when she received  an email from DynCorp International head offices informing her that

there is a possibility that the body of her husband has been found but she would need to please

send Herman's dental records in order for dental recognition to be preformed.

445.    A further three months passed before she received a call

from DynCorp International informing her that the dental records matched those she sent over and her husband's body has been cremated she is to please provide them with the address and other relevant information of a funeral home in South Africa where the ashes could be sent to.

446.    At no stage did she receive any form of proof that the dental recognition proved that the body found was indeed positively that of her missing husband Herman Pretorius. Nor did she receive an autopsy report to inform her of the possible cause of death. Nor did she receive a death certificate, which she had to request this from the South African authorities at her own expense and then even because no details were even made known to her she had to settle for the death certificate stating "presumed dead".

447.    The ashes were sent to the selected funeral home along with a standard United States Postal Services Customs Declaration Form stating the cremation remains were being sent from Torbert Funeral Chapels in Dover USA. Along with this there was also a Certificate of Cremation stating that the remains of Herman Pretorius were cremated on June 15, 2007.

448.    The ashes were in a copper colored urn similar to that of a cookie jar covered in dents and dirt. The container measurements are 18 cm x 47 cm (7 inches by 18 inches) and the ashes contained inside are filled to the top, a local funeral home has confirmed this cannot possibly be the ashes of one person.

449.    Ms. Pretorius and her children did receive their lump-sum from DOL but the $80,000 USD from the Cigna Policy has never been received. Along with this there is also the uncertainty of the family having to live with the unknown, what was the cause of death, where are the records proving that indeed this was his body found 2 and a half years after his

kidnapping/abduction, why was Ms. Pretorius never given the option of having his body being returned home or cremated no DynCorp just decided we will have him cremated leaving Ms. Pretorius no option but to accept.

450.    The amount of commutation from DynCorp and AIG was less than required by law based on misrepresentations by DynCorp and AIG, and Ms. Pretorius (Gericke) was not given any explanation or choice in the amounts she was sent.  She did not know what the amounts were for, was not represented, and otherwise was confused and in a state of shock concerning her husband's whereabouts, what would happen to her and her children, and DynCorp and AIG took advantage of her and did not get informed consent for any of the handling of the remains or for the settlement.

451.    Because Ms. Pretorius was never represented by any legal counsel she had no idea of any legal proceeding and or lump sums due to her, and AIG and DynCorp International took advantage of her through means of her not even being given the option to sign for acceptance of the lump sum, instead just sending her a cheque in the mail. At no stage did a representative from either DynCorp or AIG even so much as pay her a visit or have the decency to call or email to let her know of what exactly was to happen.

452.    These actions resulted in extreme mental and emotional distress and other damages to Ms. Gericke and her children on account of DynCorp and AIG's callous disregard for the handling of the dead remains of Herman, and the handling of his DBA claim.  There was a policy of insurance from CIGNA that was never paid, but Ms. Pretorius did not know what

amounts paid by DynCorp were for what benefit, and she was misled and confused by the actions of DynCorp and AIG.

**Nicky Pool**

453.    Nicky Pool of Guardian Medical was engaged by DynCorp and CNA Global Insurance to be the nurse manager for Daniel Brink in South Africa to administer Mr. Brink's medical needs, organize medical providers, engage the services of doctors, hospitals, physical therapy specialists and suppliers for Mr. Brink's catastrophic injuries.

454.    Beginning in 2007, Ms. Pool was authorized by CNA through its agents and representatives in Chicago, Illinois and elsewhere, to provide for Mr. Brink's care and to provide daily nursing services

455.    Ms. Pool sent regular invoices for services she provided, and for the services, supplies and medical providers whom she engaged to care for Mr. Brink's various needs from hospitalizations, wound care, operations, therapy, and transportation and medical supplies.

456.    CNA paid some of those invoices.  At one point, CNA stopped paying invoices. Ms. Pool asked them for payment and justification for non-payment.  She was given no explanations and continued to be authorized to provide for Mr. Brink's care.

457.    Over the next year, Ms. Pool incurred over $150,000 in medical bills from doctors, hospitals, and her own services for nursing at all hours, which CNA has refused to pay. She watched as this refusal caused Mr. Brink to  lose medical attention and be refused medical care.  Hospitals and doctors began to blackball or exclude Mr. Brink.  As a result, she watched as he deteriorated and suffered immensely.  She provided much care for him in spite of non

payment because of his dire circumstances, which were caused by DynCorp and CNA refusing to pay invoices.

458.    Medical companies and service providers began collection actions against Mr. Brink and he was thrown out of his home and lost his property.  They began actions against Ms. Pool and her company as well.

459.    At no time did CNA ever say Ms. Pool or Guardian Medical was not the authorized nurse or case manager for Mr. Brink in South Africa. Had they not authorized Ms. Pool to act in that capacity or told her she could not incur expenses, she would not have done so.

460.    In order to resolve all outstanding invoices and get Mr. Brink's care back on track, in 2007 Ms. Pool spoke with Donna Spraggs of CNA and her supervisor.  They agreed to have Ms. Pool come to America with Mr. Brink to straighten out all existing amounts owing to Guardian and to other medical providers.  CNA invited her and Mr. Brink to come to America, to the CNA Insurance office headquarters in Chicago, Illinois to meet and resolve the invoices and Mr. Brink's medical situation.

461.    At great expense to herself, and at great expense and physical trouble to Mr. Brink who was in a wheelchair, they traveled to America and brought all the invoices and records with them to meet with CNA in Chicago.

462.     When they arrived at the offices of CNA Global, CNA turned them away and would not let them come up to their offices.  They had to turn around and leave.

463.    Over the next several years, Ms. Pool tried to get CNA to settle accounts, and CNA acted as if they would pay, but they never have.

164

464.    As a direct result of this, Ms. Pool has been blackballed by most of the medical providers in South Africa, has had her business reputation and credit ruined and has not been paid, with finance charges and interest, in excess of $200,000.00, together with out of pocket expenses, and loss of business opportunities for the last several years. She has also suffered great pain and suffering and anguish from the fraud and misrepresentation of CNA and DynCorp.

### Christo Engelbrecht

465.    Mr. Engelbrecht was a Personal Security Detail Officer (PSD) at Olive Security Company in Iraq. Following the completion of his contract with Reed Inc in Iraq he was employed by Olive Group in Iraq on 29th November 2007. As a PSD Operator at Olive Security Group he worked as a member in the Convoy team on the CSS Contract, Contract Number: FA8903-04-D-8686 0005 at Abu-Ghuraib, Iraq, where he worked on route/mission planning, threat assessment, emergency evacuation, counter terrorist evasive driving, weapons proficiency, medical proficiency, VBIED/IED recognition and mission execution.

466.    He was involved with incidents while working including an Iraqi Soldiers face off on December 30, 2007 in which his life was in danger on the way to Kelsu Military Base, while protecting a vehicle that broke down from our convoy whilst waiting for the rest of the convoy to return to our position. He was involved with an IED January 2, 2008 on the road from Abu Ghuraib to Baquba. He formed part of a logistics convoy and was the rear defensive point, on a Saxon vehicle manning a mounted turret gun. He wore full battle kit, weighing approximately 25 - 30kg. On enemy contact IED, the vehicle sustained a dramatic explosion which subjected

him to forceful alternating back and side collision impacts, a surface to ground fall and a massive sound wave blast.  Despite the above, he was required to remain active in defense of the vehicle and position as small arms fire and 5 IED blasts on various vehicles in our convoy, ensued for several hours. The convoy managed to elude capture and he was medically evacuated and stabilised on arrival at our base at Abu-Ghuraib. Medical assessment discovered injuries to his ears, neck, thoracic and lumbar back regions. Also, an injury to his left hand was noted.  Pain management and postural stabilization was done, after which he was repatriated to South Africa for specialized medical investigation and treatment.

467.    On returning from Iraq, he often experiences flashbacks of Iraq incidents, nightmares, has leeping problems, depression, anxiety, anger as well as insomnia and social withdrawal.  His concentration and attention span is seriously impaired, and it correlates with Post Traumatic Stress Syndrome (PTSD) and Major Depression Disorder (MDD) with which he has been diagnosed.

468.    He has hearing loss in the left ear and right ears: from 1000 frequency and higher almost 100% loss in the left ear. He requires a cochlear implant in order to restore hearing in the left ear. He has 70% loss in the right ear.

469.    The grip in his left hand is poor and he cannot fully close the left ring finger. Dr Freed operated on this finger and reported that there might be future implications of arthritis on this finger.

470.    He has neck injuries due to protruding discs from C3 to C11, spinal injury due

to protruding discs, and his spine at L4 and L5 has been injured. Due to constant pain in his back and neck he has to take pain medication on a regular basis and is injected with medication via insertion in his spinal cord to ease the pain.

471.    CNA Global has given him several years of run arounds and refusal to pay his bills. As a result he considered suicide. He realised he needed help and searched for a psychologist to assist.

472.    An appointment was scheduled to see Dr Martin G. Gill (Specialist Othorhinonaryngologist) on the 16th January 2008. Dr Gill referred him to Janine Schnugh (Audiologists) to perform an audiology test. Dr Gill administers cortisone treatment and set up another appointment on the 29th January 2008 and Janine Schnugh for a second hearing test.

473.    Shylondia Peters the adjuster assigned to handle his file at CNA Global contacted him on January 17, 2008 and gave their CNA Global claim number: **HW026869.**

474.    An appointment was scheduled with Dr C.R. Oosthuizen (Orthopaedic Surgeon) on January 22, 2008 for an examination. Following this he was sent for X-rays and MRI scan at the Wilgeheuwel Hospital. Dr Oosthuizen explained he would have a possible fusion in the future on his back and operation on his neck. He also mentioned that he must seek further treatment for his injuries regards the problems that I experience. Dr Oosthuizen referred him to Dr Freed (Orthopaedic Surgeon) due to an injury on his left ring finger.

475.    He started treatment with Dr M.P. Du Plessis (Chiropractor) on January 25, 2008 who is treating him regarding various problems that he has had and continues to this date to have. He met with Dr Freed on the February 28, 2011 (Orthopaedic Surgeon specializing in

hand injuries). The Ring finger on his left hand would not react to any anti-inflammatory medication or Ultra Sound treatment.  Following some X-rays Dr Freed diagnosed that ligaments on his finger are damaged /torn and need to be repaired in theatre. The procedure was scheduled on the 12th March 2008 and was performed by Dr Freed.

476.    On July 29, 2008 Shylondia Peters from CNA Global then informed him that she had requested a nurse on his file to help coordinate medical treatment, Chris Danzi from S&H Medical Management Services, Inc. who made contact August 4, 2008.  On November 11, 2008 Marius Krause a field Agent for Tacticor who was appointed by CNA Global contacted him and stated their company Tacticor is taking over the investigation and will be handling all the administration and future meetings with Doctors whom they require to do test for 2nd opinions regarding his injuries that will include a spine specialist and a ear specialist. He also said that he would write a letter to Tacticor Management to inform them that Mr. Engelbrecht had not yet been paid for any of my medical expenses although the invoices were sent to CNA Global after every appointment.

477.    Jacobus Oosthuizen organised appointments for him to see Dr M.P. Du Plessis (Chiropractor) on April 8, 2009 which Jacobus attended to witness the treatments that received from Dr Du Plessis. Many photographs were taken during this appointment.

478.    In Addition Jacobus Oosthuizen scheduled meetings to see Dr Martin Gill and Jeanine Schnugh on April 21, 2009 but were informed by CNA Global to cancel all these appointments.

479.    CNA Global gave Tacticor instruction to set up an appointment (IME)

Wednesday, 20th May 2009 with Leanne Grimshaw at Debbie Lima Audiologist. Hearing tests were done and during a follow up meeting, Siemens hearing aids was purchased in October 2009, by CNA Global.  He is still having major difficulties with my hearing and use the hearing aids continually since 2009 – 2011.  Dr Gill explained that a Cochlear implant in my left ear is necessary to restore my hearing and I will have to use a hearing device in my right ear.

480.    All payment to Mr. Engelbrecht from CNA Global stopped on August 19, 2009. He tried to establish contact with Shylondia Peters from CNA Global but with no result. Eventually he appealed to the Tacticor's President (Tim), also with no result.

481.    During November 2009 I received a letter from US Department Of Labor (File Number: 02-193883) that was written on November 12, 2009, mentioning that they have been informed that he had suffered an injury at work and was entitled to benefits under the Longshore and Harbor Workers' Compensation Act.

482.    On November 27, 2009 he wrote an e-mail to the department of labour with a heading "Request for assistance - please help!" addressed to: District Director: Richard V. Robilotti and Regional Director: Robert Sullivan. Following this e-mail he formally posted this communication by registered post to them explaining his injuries, in addition adding all the reports of the doctors that he had seen up to November 2009. He requested to be re-instated financially on the DBA Program.

483.    He received an e-mail from Stephen P. Scheetz, the manager of Shylondia Peters, on December 2, 2009, and informed him that he will look at the file and was prepared to assist him. With follow-up e-mails he was notified by Stephen Scheetz that CNA Global had given him

another adjuster, assigned to handle the file - Carol Henderson, and on December 21, 2009 she contacted him by e-mail.

484.    Carol Henderson e-mailed me on 22nd November 2009 with a resolution for the dispute. This involves her and me agreeing to a physician to complete another exam on my physical injuries and provide his findings. Carol mentioned that she would also like the physician to complete a Functional Capacity Evaluation to determine work capabilities if any, and explained that the Functional Capacity Evaluation/testing is considered objective medical evidence. Lastly she commented that we will abide by the mutually agreed physician's recommendations. Thereafter I agreed to comply.

485.    Marius Krause from Tacticor contacted me and together we selected Dr Mark Human (Orthopaedic Surgeon) to do the evaluation, and a meeting was scheduled for the 14th January 2010.

486.    He had various dealings with the Department of Labor examiner, Ron Kucenski and Carolyn Henderson of CNA Global for the next month, and Ms. Henderson agreed to send him to a Defense Medical Exam. She then reneged and said he needed to apply for an Informal Conference with the Department of Labor.

487.    Mr. Engelbrecht went regardless to a Defense Medical Exam with Dr Mark Human (Orthopaedic Surgeon) who evaluated him and requested from CNA Global that Riaan Du Toit (Occupational Therapist) do the functionality test. Jacobus Oosthuizen from Tacticor was present at this appointment. Dr. Mark Human required that a new MRI scan was performed at the Olivedale Clinic, South Africa, and this was performed on January 15, 2010.

488.    He  with Riaan du Toit at his office on January 22, 2010, where he evaluated

Mr. Engelbrecht, performed various tests and consulted with Dr Martin Gill (Specialist

Othorhinonaryngologist) regarding the hearing loss.

489.    Jacobus Oosthuizen from Tacticor set up and attended a second meeting with

Riaan Du Toit to perform the functionality assessment on January 27, 2010. The report and

findings of Dr Mark Human and Riaan Du Toit were sent to Carol Henderson for her perusal on

March 17, 2010.  Mr. Engelbrecht could not get ahold of Ms. Henderson until early April.

490.    The stress became unbearable from waiting for reimbursement for medical

expenses and reinstatement of disability pay, and he felt that every area of his life was exposed

through the process of CNA Global to prove my disabilities to them, and their continuous

distrust of his testimony.  Furthermore they never reimbursed him for any medical treatment

since January 2008, and left him vulnerable regarding the financial ability to seek medical help,

to have me tested for psychological disorders. Up to this point he was not paid for any medical

treatments received since January 2008 except for the hearing aids that were purchased by CNA

Global.  This intensified his distressing psychological experiences and sense of doom and

brought him to consider suicide.

491.    Ms. Henderson informed him that CNA Global will reinstate him on the DBA

program financially and he received payment for the first time in 9 Months with all the arrear

payments paid. Although throughout May – June 2010 there were payment issues – and no

medical reimbursements were received.

492.    He  was told that yet another adjuster had been assigned to handle his file on June

171

21, 2010. This new adjuster's name was Carol A. Spitzer. She told him that there was an error in their system, which explained the late payment problem. These payment problems were resolved and his benefits are now being paid on a regular basis.

493.    He sought medical help stress levels, saw Dr Cecile Gericke (Psychologist), in the new year 2011, as I find it very difficult to sleep at night and daily were using much medication to cope with the physical injuries that I have, and the pain that I experience. Since returning from Iraq, I have had experiences of reliving the incidents there, nightmares, sleeping problems, depression, anxiety, anger, withdrawal from society and other issues.

494.    CNA made offers to try to settle my case for far less than the value of the benefits, which he rejected on two occasions in late 2010. In rejecting the settlement, he spoke with Ms. Spitzer of CNA about why CNA Global never replied regarding his requests for payment of medical expenses since the day that he got injured, January 2, 2008. Carol Spitzer mentioned that she was unaware of this issue, and whether he had access to all the receipts, so that she could reimburse him. He subsequently scanned receipts year to date, and sent to his legal representative he hired in Washington, D.C. Despite having provided all receipts to Tacticor and CNA previously, and providing them again through his counsel, reimbursements did not begin until August of 2011.

495.    He was diagnosed with Major Depression and PTSD. He saw Dr Henk Swanepoel (Clinical Psychologist) for a report on July 7, 2011 regarding a second opinion on his status on Post Traumatic Stress Syndrome (PTSD) and Major Depression Disorder (MDD)

496.    Erin Dykstra of Akeso Care Management in the USA contacted him the July 24,

172

2011, and mentioned that they have been contracted by CNA Global and their job is to oversee and help manage his healthcare and rehabilitation. Their field case manager from MSO (Medical Services Organization, South Africa) Lindelwe Ndlovu, Clinical Consultant contacted him on August 8, 2011 to assist with medical issues such as making appointments for medical care needed. At this point, September 26, 2011, no medical appointment is scheduled by Lindelwe to take care of any of his medical needs and I receive no communication from her, although he mentioned that several appointments to various Dr's are required as CNA Global does not accept that he continue to have further appointments at a Chiropractor.

497.    On the August 29, 2011 Carol A. Spitzer of CNA Global authorized payment of $3,090.69 for outstanding medical bills. This was the first payment he received since 2 January 2011 to reimburse him for payments that he previously paid for medical bills, though there is still an outstanding amount of $9,886.18 due to him from CNA Global for these authorized exams and for mileage.

498.    He has bi-weekly appointments with Dr Cecile Gericke (Clinical Psychologist) and was informed that they have not received any payments from Akeso Care Management or CNA Global yet.

499.    As a direct result of this, Mr. Engelbrecht has suffered harm to his person, his psychological status with increased distress and harm, as well as financially.

VI.  FACTUAL & LEGAL ALLEGATIONS RELATING TO FOREIGN CONTRACTORS

WHO WERE DENIED ACCESS TO DBA SYSTEM

## Malik Hadi

500.    Malik Hadi is an Iraqi who has come to live in America in Texas under a refugee program.

501.    He is 27 years of age, born and raised in Iraq in the south in Ad Diwaniyah district.  He was recruited by Defendant Titan Corp. while he was living in Iraq to perform translation services for the United States military throughout Iraq, including going on missions with the military, interrogating prisoners and citizens of towns in Iraq.

502.    He worked for Titan Corp. for a year and half beginning in 2005 and ending in 2006.  He was paid approximately $10,000 per year.

503.    In September 2006, he was working with U.S. military police in nothern Baghdad when a IED detonated beneath the Humvee in which he was traveling.  The blast tore off his right leg, mangled the left leg and sheared off several fingers on left hand.

504.    He was treated in Jordan and was in hospital in Jordan for 2 months.  He encountered numerous problems with his DBA claim with Titan and AIG in Jordan.  AIG had a representative in Jordan who handled him and other injured contractors from Titan and other companies.

505.    He was given substandard medical care for his leg and prosthetics, AIG delayed the money for injured translators, and many of the Iraqi contractors complained of delays in treatment, payment, but AIG did nothing.

506.    He had problems getting a prosthesis for his right leg.  After delays, when he did

get a prosthesis, the medical personnel did a bad job, and AIG provided substandard material, causing great discomfort.  He and other contractors were subjected to mistreatment and prejudice in Jordan.  AIG did nothing to relieve this problem.

507.    While in Jordan, Mr. Hadi was diagnosed with Post Traumatic Stress Disorder. He could not sleep, had flashbacks, pain in his head, and other problems coping with what he had seen in Iraq and his catastrophic injuries.  The doctor in Jordan recommended he be seen by a psychiatrist and get medication and psychological counseling.  AIG refused to provide it.

508.    AIG tried to get the contractors to leave before they were done with treatment. They eventually deported them.  Mr. Hadi was deported back to Iraq where AIG abandoned him and he could not get medical care.  Payments of compensation were only $612 per month, and the payments were often late.  He could not get to medical care because it was centralized in Baghdad.  It was too dangerous to go into Baghdad to get care.

509.    Mr. Hadi came to United States in July 14, 2008 through a Refugee Program.  Mr. Hadi has been living in Texas ever since, receiving $612 per month, $306 every two weeks.

510.    The payments are often late from AIG, by as much as 10-14 days.  This has a profound effect on Mr. Hadi who can barely live as it is on $612 a month in the United States as a disabled man, in a strange land.  Has not been able to work since his injuries working for Titan in Iraq.  He has no family with him, lives by himself.

511.    His doctors in America have diagnosed him as needing a psychiatrist and

psychological counsel, but AIG has refused for four years to provide it.  He saw a psychiatrist for free from a non-profit refugee when he first came to America, who said he has PTSD and needs help, but AIG has refused to provide it.

512.    Since then many times his doctors, surgeons, pain specialist have said he needs psychiatrist, and have prescribed medication for him to tide him over for his psychological problems, his sleep and anxiety and head pain.  As well, Mr. Hadi has requested numerous times of the AIG adjuster to see a psychiatrist regularly, but  AIG has refused.

513.    Mr. Hadi has continuing surgeries with a vascular surgeon and to take shrapnel out of his legs.  As a result he still has not been able to get a power knee (a sophisticated prosthesis) that would enable him to walk.

514.    AIG sometimes delays surgeries by not getting paperwork through and not paying medical personnel, sometimes by a month at a time.

515.    Mr. Hadi brings this action on his own behalf to obtain increases in pay to meet his presence in the United States, and compensation for the mistreatment, and fraud in not providing treatment for his psychological injuries that has caused great difficulty and distress for him, as well as the late payments by AIG.

516.    Other Iraqi and Afghani contractors have delayed or denied claims for disability payments and death benefits, citing a lack of police reports or other documentary evidence that interpreters' injuries or deaths were related to their work for the military. Other Iraqi interpreters taken to Jordan for medical treatment were pressured to accept lump-sum settlements from insurers, rather than a stream of lifetime benefits potentially worth more, and were told that if

they didn't sign, they would be sent back home -- a potential death sentence for Iraqis associated with the American war effort.

517.    Interpreters who have immigrated to the United States as refugees have ended up penniless, on food stamps or in menial jobs because their benefits under the U.S. insurance program are based on wages and living costs in their home countries. Payments intended to provide a decent standard of living in Iraq or Afghanistan leave the recipients below the poverty level in this country.

518.    Other reports of mistreatment by CNA, AIG and  contracting companies show that than submit a claim through the DBA, CNA, DynCorp and Sandi Group sought to fraudulently cover up the injury, refused to notify Department of Labor as required by law of the injury and death, refused to considered it a covered event, and instead have gone to next of kin of killed Iraqi and Afghani contractors and paid them or their family or tribe cash in Dinar far less than the DBA would pay, and not with any allowance for funeral expenses as provided for in the DBA.

519.    Hundreds of other individuals have been knowingly denied benefits by CNA and AIG who worked for American contractors.  These persons come from a variety of countries, such as Iraq, Afghanistan, India, Uganda, South America, Pakistan, and Phillipines to name a few.  Many of these individuals were employed with one of the defendants either directly or through a third party agent company.  These individuals were denied any medical benefits and disability payments when they were injured.  This was done with the knowledge and approval of the Defendants.

520.    For example, in *Marzook v. Sallyport and CNA Insurance*, the Department of Labor found that CNA had knowingly falsified information to the Department of Labor on the killing of translators hired under a contract, with CNA coverage.  During an Inspector General investigation into the coverup of these deaths and refusal of CNA and the employer to cover these individuals who were clearly killed by insurgents for translating for the American war cause, CAN misrepresented facts.  CNA was then referred for criminal investigation by the Administrative Law Judge.  That case involved 9 families of Iraqi translators who were denied basic DBA benefits required by law with knowledge of the employer and carrier.

521.    Defendant Contractors and insurance carriers knowingly hire these foreign nationals with the idea that if they are hurt or killed, they will not have to pay much for them.  They collect large premiums from the United States, but do not have any system in place in Iraq or Afghanistan to inform these individuals of their rights to medical care, and disability based on their salaries for the U.S. contractors.

522.    For example, in Iraq, numerous foreign nationals have been killed on security detail for DynCorp.  Plaintiff believe and are informed of facts, and thereon allege, that DynCorp has paid off the families $1,000 each and bypassed the DBA altogether.  There are subcontractors of DynCorp such as Sallyport and Sandi Group that are covered by DynCorp and CNA Insurance under the DBA but who have been denied benefits, or officials of said groups have paid off families much less than provided for under the DBA for deaths or injuries of contractors.

523.    Plaintiffs believe and are informed of facts, and thereon allege, that KBR has

similarly refused to pay for killed individuals who are covered under the DBA under their contracts.  Plaintiffs believe and are informed of facts, and thereon allege, that Ronco Consulting has been sued by the Iraqi government by the families of individuals who worked for Ronco in Iraq who were Iraqi nationals who were killed or injured and Ronco and CNA refused to pay or otherwise bypassed the DBA altogether.

524.    In Afghanistan, CNA has an exclusive arrangement with the Army Corp of Engineers.  Many foreign contractors from Afghanistan or surrounding countries have been injured or killed.  The contractors simply pay off the village chiefs or families a token amount, and CNA pays nothing.    It is an open secret that this is occurring with the knowledge of the contractors and CNA.  Yet the monies are being provided to CNA based on the premiums for those injured or killed foreign workers.  In one case, for example, Plaintiffs believe and are informed of facts, and thereon allege, that CNA assured the family of a worker killed on a road crew as a subcontractor for a contracting company who has multiple contracts with Army Corps of Engineers, that they would take care of the benefits under DBA.  One year later, CNA was refusing to pay and canceled the insurance policy of the contractor because the subcontractor did not have DBA insurance, a fact CNA knew and approved of.  Under DBA, the contractor is liable to obtain coverage under the DBA when the subcontractor does not have the coverage. This cancelation by CNA caused the contractor to have its contracts canceled by the Army Corps of Engineers because they are required to carry DBA insurance, but since the Army Corps has an exclusive contract with CNA to provide, CNA was in the position of being judge jury and

executioner of the contractor and the family of the decedent, and got off scot free, while bilking

the government for an estimated $58 million in overcharges.

525.    There are an estimated 10,000 injured or killed foreign workers who have never

been given benefits under the DBA as required by law or have been denied the full complement

of treatment, compensation and other benefits provided by law.

## CLAIMS FOR RELIEF

### Class Claims

526.    The court may determine that there are several classes of civilian contractors who

have been injured by Defendants' common scheme to thwart the DBA and suppress claims and

increase profits, such as dividing claims into those of United States Citizens and Foreign

nationals, as well as subclassing under each of those classes for particular insurance carriers and

contracting companies.  All of them share in common the failure to comply with the law under

the DBA with regard to objective injuries and deaths.  The particular persons who have been

injured are ascertainable from employment and insurance records, aswell as from the Department

of Labor statistics and records.

527.    All of the complaints of these individuals who have been injured satisfy the

requirements of  Fed.R.Civ.P. 23 for (1) numerosity, because there are thousands of such claims

nationally and internationally, (2) commonality of fact and law, as they all fall under the DBA

and other United States laws regarding injuries on foreign bases, and differences of injury or fact

do not predominate, but each complaint is subject to ready classification or subclassification; (3)

typicality, in that the claims of Plaintiffs are typical of the complaints of the class concerning

misconduct and malfeasance with regard to the DBA; and (4) adequacy of representation, in that

Plaintiffs are experienced with the problems of these claims and have fought through difficult

cases and know many of the people who are injured, and class counsel is competent to handle

these claims for individuals to adequately and properly prosecute the claims of those nationally

and internationally. The certification of a class or classes is superior to other methods of

prosecuting these claims for fairly and efficiently bringing these matters.

## COUNT I
(Retaliatory Discharge and Discrimination under 33 U.S.C. § 948a)

528.     Plaintiffs repeat and reincorporate by reference the allegations of paragraphs 1-

527 above as if fully set out herein.

529.     Plaintiffs and those who are similarly situated were discriminated against in the

terms, conditions, and benefits of employment, retirement, insurance, and status due to their

accessing or attempting to access the DBA system or medical and disability benefits. Many were

threatened and prevented from making claims, denied medical treatment, denied timely transport

or medical treatment deliberately to harm and damage them, or to prevent undue expense with

intent and knowledge to the harm it would inflict. They had willful intent to injure claimants

and/or had a substantial certainty that injury was likely to occur to their persons, family, and

finances and personal wellbeing.

530.     Some individuals were delayed in making claims or filling out accident reports by

Defendant contracting companies, and when some individuals did attempt to access the rights

and benefits under the DBA, contractors and insurance adjustors misrepresented their rights to

physicians of their choice, manipulated their care, steered them away from certain types of care,

downplayed rights to obtain screenings, denied types of claims, refused screening for TBI, PTSD, and took actions against people who tried to claim TBI or PTSD.

531.    The Defendant contracting companies through their agents, officers and employees, threatened employees who might file claims, and fired many of their employees shortly after they made claims under the DBA.  Defendants refused to give light duty to employees who claimed DBA injuries, would place them on medical leaves but then fire them from employment, depriving them of opportunity for other jobs, and denied them and their families health insurance benefits.

532.    The policy of Congress in enacting 33 U.S.C. § 948a and requiring companies to maintain DBA insurance and to provide benefits, evidences a strong policy to favor employees' ability to exercise their rights, and when actions are taken in retaliation for exercise of those rights, it violates public policy and entitles Plaintiffs to sue Defendant contracting companies for retaliation, discharge, and discrimination.  In all of the aforementioned acts against the Plaintiffs, the companies violated public policy and discriminated and retaliated against Plaintiffs and those similarly situated.

533.    In all the actions described in this complaint, defendants acted through their agents, officers, attorneys, representatives, insurance carriers through their officers, agents, attorneys and insurance adjustors and managers, which were acting in the course and scope of employement or agency or representation for defendant contracting companies and insurance carriers, and which  defendant companies ratified all of the acts described in this complaint.

534.    Plaintiffs and those similarly situated who have been discriminated against in the

terms, conditions, or benefits of employment, are entitled to reinstatement or damages, and attorneys fees.

## COUNT II
(Racketeer Influenced and Corrupt Organizations Act)

535.     Plaintiffs repeats and incorporates by reference each allegation set forth in paragraphs 1 through 534 above as if fully set out herein.

536.     Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

537.     Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) including wire and mail fraud by using telephone and e mail to misrepresent to injured parties and the DOL and commit crimes under the DBA by denying claims using fraud and misrepresentation, use of filing through fax and mail with the Department of Labor OWCP and OALJ, communications by telephone through their attorneys who were part of the RICO enterprise used to carry out the predicate acts set forth above, as well as various forms of wire and mail fraud through use of banking systems, national and international, used to delay payments to providers or to claimants . In addition, the defendants engaged in banking fraud through stop payments on checks, use of fraud in wire transfers to and from banking institutions, all in violation of banking fraud statutes.

They had willful intent to injure claimants and/or had a substantial certainty that injury was likely to occur to their persons, family, and finances and personal wellbeing.

538.    The injuries were caused by the defendants' commission of one or more of the predicate acts, and Plaintiffs and those similarly situated were the intended target of defendants' conduct.

539.    Plaintiffs further alleges that all Defendants did commit two (2) or more of the offenses that were predicate acts of the RICO enterprise itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

540.    Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce under the government contracts in effect with the United States in Iraq, Afghanistan and elsewhere on bases overseas, including insurance companies, attorneys, adjusters, third party medical providers, third party case administrators, third party investigators and contractors who looked into the affairs of Plaintiffs and those similarly situated.

541.    Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

542.    During the last ten years following the invasion of Afghanistan in 2001, Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and

did so in violation of the RICO law at 18 U.S.C. 1962(c), in Iraq, Kuwait, and Afghanistan, as well as in the United States, as aforementioned in the Complaint.

543.    Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

544.    Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

545.    Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).   18 U.S.C. §§ 1961(4), (5) and (9).

546.    Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

547.    Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d).

548.    In all the actions described in this complaint, defendants acted through their agents, officers, attorneys, representatives, insurance carriers through their officers, agents, attorneys and insurance adjustors and managers, which were acting in the course and scope of

employement or agency or representation for defendant contracting companies and insurance carriers and the RICO enterprise described herein, and which defendant companies ratified all of the acts described in this complaint.

549.    As a direct and proximate result of Defendants' racketeering violations, Plaintiffs and those they represent who are similarly situated were damaged in their persons, property, and credit, as well as in their relationships with doctors and medical personnel who were likewise proximately damaged by the RICO enterprise predicate acts, such injuries being direct, concrete and immediate in causing financial loss and physical harm that resulted in additional financial loss that was itself immediate, direct and concrete. Defendants could and did foresee direct, concrete harm that would occur and did in fact occur to Plaintiffs and those similarly situated.

550.    Under RICO, Plaintiffs are entitled to damages, treble damages, and attorneys fees and costs herein.

### COUNT III
(Bad Faith, Tortious Breach of Covenant of Good Faith)

551.    Plaintiff repeats and incorporates by reference each and every allegation set out in paragraphs 1 through 550 as if set forth fully herein.

552.    They had willful intent to injure claimants and/or had a substantial certainty that injury was likely to occur to their persons, family, and finances and personal wellbeing

553.    Defendant insurance carriers actions above constitute tortious bad faith denial of claims, and bad faith refusal to pay reasonable and necessary medical bills and out of pocket expenses. All defendants owed a duty of good faith and fair dealing when dealing with injured parties under the DBA and in their employment contracts. They acted tortuously in bad faith and

breached the covenant of good faith and fair dealing through harassment of Plaintiffs, firing

plaintiffs who made claims, unreasonably denying claims of various kinds, failing to properly

and adequately investigate claims, delaying payments for medical bills and disability, using

deception in withdrawing approval or pretending approval existed, causing doctors not to want to

work with DBA claimants, misrepresenting coverage to avoid paying, misrepresenting the law

under the DBA, conditioning payment of undisputed portions of claims on settlement of disputed

portions, failing to communicate or failing to timely communicate with injured workers or their

spouses or representatives or medical providers or medical managers, oppressive demands on

injured parties for jumping through hoops, traveling, submitting requests multiple times or

interfering with doctor's appointments or approval of claims, requiring persons to use their

health insurance and misrepresenting the intention to reimburse them, exploitation of injured

workers in foreign countries or vulnerable positions such as in comas, hospital beds, or with

mental and physical conditions that prevent them from protecting themselves.

554.    Additionally, their bad faith and unfair dealing manifested itself through their

pattern of knowingly denying medical and disability claims that were proper, through their

pattern of denying all benefits to certain individuals clearly falling within the DBA, through their

illegal, arbitrary and capricious actions to misrepresent facts to the Department of Labor or

Administrative Judges, using obfuscation, denial, lies, schemes to cover up their denials.

555.    As a direct result of their bad faith conduct and breach of the covenant of good

faith and fair dealing, Plaintiffs and those they represent have been damaged, have lost goods, have emotional pain and suffering, have endured physical pain and suffering, and out of pocket expenses, attorneys fees and interest.

556.    The conduct of Defendants was wanton, willful, malicious, oppressive, intentional, fraudulent, and beyond the bounds of acceptable behavior in a civilized society, justifying an award of punitive damages to punish this conduct and deter others from doing the same in the future.

## COUNT IV
(Unconscionable, Fraudulent and Deceptive Trade Practices)

557.    Plaintiff repeats and incorporates by reference each and every allegation set out in paragraphs 1 through 556.

558.    Defendants misrepresented and deceived Plaintiffs as well those similarly situated as aforesaid.

559.    Plaintiffs and those similarly situated, including officials of the United States and state government, relied on the misrepresentations of Defendants.  They had willful intent to injure claimants and/or had a substantial certainty that injury was likely to occur to their persons, family, and finances and personal wellbeing.

560.    Defendants are engaged in interstate and foreign commerce, and as such engaged in deceptive trade and consumer practices, that damaged the Plaintiffs and those similarly situated.

561.    In all the actions described in this complaint, defendants acted through their

agents, officers, attorneys, representatives, insurance carriers through their officers, agents,

attorneys and insurance adjustors and managers, which were acting in the course and scope of

employment or agency or representation for defendant contracting companies and insurance

carriers, and which defendant companies ratified all of the acts described in this complaint.

562.    Defendants engaged in deceptive, unconscionable acts and practices by

representing they provided all benefits covered under law, when in fact they did not intend to

provide such, and did directly misrepresent and act with deception toward Plaintiffs concerning

the characteristics of their work, benfits, and medical and disability benefits if injured or killed,

threatening to terminate individuals if they claimed injuries, PTSD, TBI, and a variety of other

deceptive and unfair trade practices in connection with obtaining these contracts to hire Plaintiffs

or take over their contracts in midstream, as well as in connection with performance of the

agreements.  Defendants' managers represented to some of those employed with them that they

were really employees but just called Independent Contractors.  Plaintiffs have been damaged in

their persons, property, and out of pocket expenses, and attorneys fees, and they are entitled to

recover under consumer protection statutes, including recovery under the District of Columbia

unfair and deceptive trade practices legislation, as well as deceptive acts and trade practices

within the meaning of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA)

(Fla.Stat. § 501.201 *et seq.*) for Plaintiff Mercadante and others in Florida similarly situated, and

under the North Carolina Unfair and Deceptive Trade Practices Act (UDUPTA), N.C. GEN.

STAT. § 75-1.1 (2005), and the D.C. Consumer Protections and Procedures Act, for failing to

"state a material fact if such failure tends to mislead." 28 D.C. Code § 28-3904(f) and "fail to

supply to a consumer a copy of a sales or service contract, lease, promissory note, trust

agreement, or other evidence of indebtedness which the consumer may execute." 28 D.C. Code

§ 28-3904(q), and the California Unfair Competition Law (UCL), Cal. Bus. Code § 17200 et seq,

in engaging in the above unlawful, fraudulent and unfair practices. The trade and business

practices when done in combination with a Government Contract wherein, as in this case, the

representation that Plaintiffs were employees who would be paid benefits under the DBA if

injured, to induce the United States to enter into such agreements, and in many cases induced

Plaintiffs and those similarly situated were induced in part into entering into employment based

on the false representations that DBA benefits would be paid if employees were injured.

563.    Defendants actions were fundamentally unfair and deceptive toward Plaintiffs and

those who are similarly situated. They were designed to damage Plaintiffs in their finances,

prevent them from obtaining benefits or to cause them to be destroyed for pursuing benefits.

564.    Defendants actions and business dealings relating to the Plaintiffs and those

similarly situated are in interstate commerce or affect commerce, and as such engaged in

deceptive trade and consumer practices, that damaged the Plaintiffs and those similarly situated.

565.    As a direct result of the actions of Defendants, Plaintiffs and those similarly

situated suffered actual damages, costs, and attorneys fees, together with treble damages.

566.    In addition, the actions of Defendants was willful and deliberate, and therefore for

each deceptive and unfair act are liable for treble damages, punitive damages and or a $10,000 -

$15,000 penalty per act.

**COUNT V**
(Civil Conspiracy, Prima Facie Tort)

190

567.     Plaintiffs repeat and incorporate by reference each and every allegation set out in

paragraphs 1 through 566 as if fully set out herein.

568.     Defendants conspired with their insurance carriers, and in some cases among their

subsidiary companies, to commit the acts aforesaid against the Plaintiffs.  Their acts

amount to a civil conspiracy to defraud the public and harm Plaintiffs.  It is also a

conspiracy to deprive injured and disabled workers of DBA benefits in violation of

the DBA.  It is also a conspiracy to commit fraud.  It is also a conspiracy to breach

contracts with employees.

569.     Defendants intentionally inflicted harm on Plaintiffs and their families, which

caused special damages including loss of property, loss of consortium, loss of

savings, loss of income, loss of credit, reputation, and other special damages.  This

conduct by Defendants was without justification, which would otherwise be lawful,

and constitutes a prima facie tort, and conspiracy to commit a tort.  They had willful

intent to injure claimants and/or had a substantial certainty that injury was likely to

occur to their persons, family, and finances and personal wellbeing.

570.     The conspiracy to commit these torts, breaches of duty, and prima facie tort

actually caused the damages set forth herein.

571.     In all the actions described in this complaint, defendants acted through their

agents, officers, attorneys, representatives, insurance carriers through their officers, agents,

attorneys and insurance adjustors and managers, which were acting in the course and scope of

employement or agency or representation for defendant contracting companies and insurance

carriers, and which defendant companies ratified all of the acts described in this complaint.

Plaintiffs have been damaged in their persons, property, and out of pocket expenses, and

attorneys fees.

572.    The conduct of Defendants was wanton, willful, malicious, oppressive,

intentional, fraudulent, and beyond the bounds of acceptable behavior in a civilized society,

justifying an award of punitive damages to punish this conduct and deter others from doing the

same in the future.

### COUNT VI
(Americans with Disabilities Act Against Defendant Contractors)

573.    Plaintiffs repeats and incorporates by reference each and every allegation set out

in paragraphs 1 through 572 as if set out fully herein.

574.    Plaintiffs in the class of those with disabilities who can perform jobs with

reasonable accommodation have disabilities within the meaning of the Americans with

Disabilities Act (ADA), under 42 U.S.C. § 12112(b)(5)(A), 12111(8), can perform the essential

functions of their job or a restructured job with or without reasonable accommodation.

575.    Plaintiffs Harbee Kreesha, Merlin Clark, and Mason Alsaleh were qualified

individuals with disabilities who could work with reasonable accommodations at the time of

their discharge.

576.    Defendant Ronco fired Mr. Clark the day after it and CNA agreed to settle his

workers compensation DBA claims, after having argued that because he was employed with

Ronco, his disability pay should be less than a permanent total disability.  Mr. Clark has received

a right to sue letter from EEOC.

577.   While Plaintiffs Kreesha and Alsaleh were recovering from his leishmaniasis injuries and still being treated, Defendant GLS terminated his employment.  Kreesha and Clark received a right to sue letter from EEOC, Alsaleh has requested a Right to Sue letter in July 2011 from the EEOC in Atlanta.

578.   Plaintiffs' disabilities were motivating factors in the decisions of Defendant contractors not to offer jobs with accommodations, or to fire persons who were on the employment rolls being treated for DBA injuries, or to rehire but fail to accommodate restrictions or disabilities reasonably, or to fail to rehire individuals after their rehabilitation or retaliate against individuals who requested accommodation or made claims.

579.   Defendants also discriminated against Plaintiffs with regard to medical examinations and medical questions.

580.   Defendants' conduct was extreme and outrageous, justifying an award of punitive damages.

581.   In all the actions described in this complaint, defendants acted through their agents, officers, attorneys, representatives, insurance carriers through their officers, agents, attorneys and insurance adjustors and managers, which were acting in the course and scope of employment or agency or representation for defendant contracting companies and insurance carriers, and which  defendant companies ratified all of the acts described in this complaint.

582.   As a direct result of Defendants' violations of the ADA, the Plaintiffs lost income,

suffered emotional damages, and are entitled to recover lost income or back pay, compensatory damages, punitive damages, injunction against Defendants' continuing the behavior, reinstatement or front pay, interest and attorneys fees.

583.     Plaintiffs Clark, Kreesha, and Alsaleh are suitable to act as representatives of the class of persons who were terminated from employment by defendants without providing reasonable accommodations for employment, restructured employment including employment in the United States, as well as individuals who were terminated in discrimination their disabilities and for exercising rights protected by the ADA and the DBA.

## COUNT VII
(Outrage)

584.     Plaintiffs repeat and incorporate by reference each and every allegation set out in paragraphs 1 through 583 as if fully set out herein.

585.     Defendants intended to inflict emotional and mental distress on Plaintiffs, or knew or should have known that emotional distress was likely to result from their conduct.  They had willful intent to injure claimants and/or had a substantial certainty that injury was likely to occur to their persons, family, and finances and personal wellbeing.

586.     Defendants conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

587.     The actions of the defendants were the cause of Plaintiffs' distress.

588.     Emotional and mental distress suffered by the plaintiffs was severe and of such a nature that no reasonable person could be expected to endure it.

589.     In all the actions described in this complaint, defendants acted through their

agents, officers, attorneys, representatives, insurance carriers through their officers, agents,

attorneys and insurance adjustors and managers, which were acting in the course and scope of

employement or agency or representation for defendant contracting companies and insurance

carriers, and which defendant companies ratified all of the acts described in this complaint.

590.    The conduct of Defendants was wanton, willful, malicious, oppressive,

intentional, fraudulent, justifying an award of punitive damages to punish this conduct and deter

others from doing the same in the future.

**COUNT VIII**
(Preliminary and Permanent Injunctive Relief)

591.    Plaintiff repeats and incorporates by reference each and every allegation set out in

paragraphs 1 through 590.

592.    Plaintiff requests that the court exercise its equitable powers to prevent irreparable

harm to Plaintiffs and to those similarly situated who are being harmed in continuous fashion,

and to those who have been denied all access to the DBA system, or to those who are currently

being denied access or will in the future.  Plaintiffs request that the court (1) enjoin these

Defendant insurance carriers and Defendant contracting companies from committing the fraud

and intentionally harming those who are injured as named in the complaint as well as all those

similarly situated, and to refrain from interfering with or harming physician patient relationships

that have the effect of denying medical treatment; (2) to refer the matters to the Department of

Justice (DOJ) and DOL and require investigations by DOJ and the DOL inspector general

concerning the crimes outlined in the Act as well as the racketeering and fraud on the

government being committed; (3) to require investigations by the Secretary of HHS and of

Department of State and Department of Defense concerning medical fraud and intentional interference with the missions of the missions of these departments through contracting fraud; and (4) a mandatory injunction requiring defendants to investigate and produce a mechanism to provide benefits to all those who have been denied any benefits, past, present and future, as well as to remedy any past denial of benefits.

593.    The United States courts have authority to grant injunctive relief under the traditional principles of equity exercised by the English Court of Chancery in 1789. *Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 330-31 (1999). When deciding whether to grant preliminary injunctive relief, the court must weigh four factors, whether "(1) there is a substantial likelihood Plaintiff will succeed on the merits; (2) Plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (citing *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1317-1318 (D.C.Cir.1998) and *Wash. Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). These factors are to be balanced, and if "the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* at 1318 (quoting *City Fed. Fin. Corp. V. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

594.    The factors identified by the D.C. Circuit in *Ellipso* and progeny weigh heavily in favor of the Court granting the equitable relief Plaintiff seeks to immediately remedy continuing and irreparable harm to persons, to the United States Government, and to the public interest and

196

United States Citizens who are paying these contractors and insurance carriers from the public treasury to make profits while committing these terrible acts against those seeking to protect the United States from its enemies abroad.

595.   Most of the Plaintiffs have already been determined by OWCP, DOL, and even by the insurance carriers themselves to be due and owed benefits, but are still denied the full benefits the law requires, and absent preliminary and permanent injunctive relief will continue to misrepresent, commit fraud, intentional deny benefits without any justification, and discriminate against claimants and persons who report injuries.

596.   Because Plaintiffs face actual and continuing physical and psychological harm from the acts of Defendants and their agents, attorneys, and representatives, plaintiffs and the class of persons they represent will suffer irreparable injury if the court fails to grant the requested injunctive relief.

597.   The requested injunctive relief will impose no injury on the Defendants as the law already requires them to provide these benefits regardless of whether an administrative claim or legal action is brought, and because it will merely require the Defendants to comply with the DBA, LHWCA, and FARs and DFARs already in place.

598.   Finally, the requested injunctive relief will further the public interest by increasing the likelihood that the U.S. Government will not waste taxpayer dollars, and encourage contractors and injured persons to take risk by supporting the U.S. Government and its bases abroad in accomplishing their missions.

**WHEREFORE**, Plaintiffs pray that this court enter judgment against Defendants collectively for $2 Billion in actual damages, and an additional sufficient amount in punitive damages as follows:

1.    Under COUNT I, for damages for violation of the DBA prohibition on discrimination, reinstatement, back pay and interest, and attorneys fees;

2.    Under COUNT II, under RICO for racketeering enterprise liability, for damages, disgorgement of profits from the enterprise, treble damages, and attorneys fees;

3.    Under COUNT III, for damages for tortious bad faith and tortious breach of the covenant of good faith and fair dealing, for pain and suffering, punitive damages, attorneys fees and interest;

4.    Under COUNT IV, for fraud and deceptive trade practices, for damages, penalties, interest, punitive damages, and attorneys fees;

5.    Under COUNT V, for civil conspiracy and prima facie tort, for damages, out of pocket expenses, pain and suffering, mental anguish, punitive damages, interest and attorneys fees;

6.    Under COUNT VI, for ADA discrimination and failure to accommodate, and for retaliation, for back pay, front pay, compensatory damages, punitive damages, injunctive relief to cease all violations of the ADA, reinstatement, and attorneys fees, costs and expert expenses in this matter;

7.    Under COUNT VII, for outrage, for damages, pain and suffering, mental anguish, punitive damages, and attorneys fees; and

8.    Under COUNT VIII, for preliminary and permanent injunctive relief in the form

of a mandatory injunction to cause investigations into the illegal conduct of Defendants, to

prevent continuing harm to the public interest in the form of a prohibitory injunction against the

loss of revenue to the government through the actions of Defendants, and the harm to individuals

and families in the United States and abroad, and to require a system to be created to track the

non payment of benefits, past, present and future, to individuals who are injured under DBA

covered contracts with the United States government.

9.    And for such other and further relief to effect substantial justice and redress the

wrongs complained of herein.

Dated: September 26, 2011                    Respectfully submitted,

_____

Scott J. Bloch, Esq.
DC Bar No. 984264
LAW OFFICES OF SCOTT J. BLOCH, PA
1050 17th St., N.W.
Suite 600
Washington, DC 20036
Tel. (202) 496-1290
Fax. (202) 478-0479
sbloch@bcounsel.com

William J. Skepnek, Esq.
Pending admission pro hac vice
THE SKEPNEK LAW FIRM
1 Westwood Road
Lawrence, KS    66044
Telephone: (785) 856-3100
Fax: (785) 856-3099
bskepnek@skepneklaw.com

Counsel for Plaintiffs

199

Of Counsel:

Joshua Gillelan, III
Longshore Claimants' National Law Center
Georgetown Place, Suite 500
1101 30th Street, N.W.
Washington, DC 20007
(202) 625-8331
Fax: (202) 787-1920

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable as a matter of law.

Scott J. Bloch, Esq.