UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DANIEL BRINK, *et al.*,<br>            Plaintiffs,<br><br>   v.<br><br>XE HOLDING, LLC, *et al.*,<br>            Defendants. | No. 1:23-cv-00325-MSN-LRV |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Global Linguist Solutions' ("GLS") Motion to Dismiss Plaintiffs' Transferred Fourth Amended Complaint (ECF 269). Upon consideration of the pleadings and for the reasons set forth below, the Court will **GRANT** the motion and dismiss Plaintiffs Harbee Kreesha and Mohsen Alsaleh's claims against GLS.

**I.   BACKGROUND**

    **A.   Procedural History**

This case comes to the Court via a long and winding path. In 2011, nearly thirty plaintiffs (and/or their surviving relatives),[1] in their individual capacities and on behalf of all persons similarly situated, sued approximately twenty government contractors and insurance carriers[2]

---

[1] The following plaintiffs were parties to the original suit filed on November 22, 2011: Daniel Brink; Ronald Bell; Merlin & Marcie Clark; CJ Mercadante; Johann Steenberg; Steven Thompsen; Jack Jones; Fred Busse; Mark Griffin; Wallace Byars; Antonio Ambrose; Cody McAnally; Patrick J. Brewer; Coenrad Theunissen; Malik Hadi; Jafar J. Bayatafshar; Robert Biddle; Margaretha Bezuidenhout; Harbee Kreesha; Mohsen Alsaleh; Gisela M. Fourie; Mbusi Cele; Marlene Gericke; Nicky Pool; Mark McLean; Allen Porch III; Catharina Louw; Surita Swart; Christo Engelbrecht; Desire Tablai; and Christine Holguin-Luge.

[2] The following defendants were parties to the original suit filed on November 22, 2011: XE Holding, LLC; CAN Global Insurance; AIG Insurance Company; ACE Insurance Co.; Zurich Insurance; Tacticor International; Dyncorp International LLC; Northrup Grumman; Halliburton Corp.; Kellogg-Brown & Root LLC; Ronco Consulting; Wackenhut Services International; Parsons Group; ITT Corp.; Global Linguist Solutions, LC; Lear Siegler, Inc.; US Investigations Services USIS International, Inc.; Titan Corp; CSA Inc.; AECOM Government Services, Inc; Erinys Ltd.; and the Khudairi Group.

alleging federal statutory violations and common law torts.[3] The suit was originally filed in the U.S. District Court for the District of Columbia ("D.D.C.").[4] Collectively, the plaintiffs sought $2 billion dollars in damages to "remedy the injuries and destruction caused to the lives, finances, and mental and physical well-being of thousands of American families and others whose loved ones were injured while serving America under contracts with the United States, and to punish the companies who made massive profits." ECF 2 ¶ 1.

On December 21, 2012, D.D.C. dismissed the entire complaint. *See Brink v. XE Holding, LLC*, 910 F. Supp. 2d 242, 245 (D.D.C. 2012). Plaintiffs then appealed to the DC Circuit, which affirmed the dismissal of all claims *except* for those brought under the Americans with Disabilities Act ("ADA"). *See Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1128-1129 (D.C. Cir. 2015). As to those claims, the D.C. Circuit remanded the case to the district court "to explain its decision not to grant leave to some of the appellants to correct the defects in their ADA claims." ECF 165.

Several years later, the remaining plaintiffs filed a fourth amended complaint, which is operative here. ECF 214 ("Compl."). Multiple defendants moved to dismiss that complaint. *See* ECF 219-224. On September 10, 2020, the case was reassigned to D.D.C. Magistrate Judge Zia M. Faruqui for full case management, who issued a total of four report & recommendations. *See* ECF 245, 247,8, 257.

The fourth such report and recommendation, issued on September 29, 2022, recommended that Plaintiffs Harbee Kreesha and Mohsen Alsaleh's claims againstGLS be severed from this action and transferred to this Court. ECF 257. Judge Faruqui further recommended that GLS's

---

[3] The complaint alleged violations of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 948(a), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1861– 65, and the American with Disabilities Act, 42 U.S.C. § 12111. The common law tort claims included breach of the covenant of good faith and fair dealing, civil conspiracy, and intentional infliction of mental and emotional distress, among others. Compl. ¶ 1.
[4] The case number assigned by the D.D.C. was 1:11-cv-01733.

Motion to Dismiss (ECF 221) be denied without prejudice such that GLS could refile its dismissal motion after the case was transferred. *Id.* On February 27, 2023, after it did not receive objections from any party, D.D.C. accepted Magistrate Judge Faruqui's findings and adopted the recommendations contained therein in full. ECF 262. The case was transferred to this Court on March 14, 2023. ECF 264.

On April 4, 2023, GLS filed a Motion to Dismiss Plaintiffs' Transferred Fourth Amended Complaint along with a supporting memorandum. ECF 269; ECF 270 ("MTD"). Plaintiffs filed a response on April 18, 2023, ECF 278-79 ("Opp."), and GLS filed its reply on April 24, 2023, ECF 283 ("Reply"). GLS's motion suggests that dismissal is warranted because this Court lacks subject matter jurisdiction over Kreesha and Alsaleh's ("Plaintiffs") claims, Plaintiffs have failed to state a claim upon which relief can be granted, and Plaintiffs have not pled viable class claims. GLS waived a hearing on their motion, ECF 271, and the Court is satisfied that oral argument would not aid in the decisional process.

### B. Factual Background

Plaintiffs sued GLS on their own behalf and as representatives of similarly situated GLS employees[5] for discrimination under the ADA. Compl. ¶¶ 1, 98–123.

#### 1. Kreesha

Kreesha is a United States Citizen who began working for GLS in June 2009. *Id.* ¶ 37. His job was as a translator on classified projects with United States military and intelligence services,

---

[5] Plaintiffs described the class as follows: "All Americans who worked for Global Linguist Solutions or its subsidiaries, in Iraq and Afghanistan who had injuries under the DBA that disabled them from working, and who have qualified disabilities under the ADA, who were subject to GLS's policy of letting them go from work and refusing to rehire, reasonably accommodate their disabilities, and who could perform the essential functions of the job as translator and advisor to GLS with or without reasonable accommodation." Fourth Am. Compl. ¶ 98. Plaintiffs also described the following class of individuals: "All current and future individuals who worked for GLS and who require accommodations of job restructuring or extended medical leave to be accommodated in from January 1, 2009, to the present." *Id.*

where he helped translate during interrogations, hostage negotiations, and conversations with informants. *Id.* In December 2009, a sandfly bit Kreesha while he was on the job in Iraq and he contracted Leishmaniasis. *Id.* ¶ 40. Kreesha was transferred to Germany for treatment and then returned to the United States. *Id.* His symptoms and problems stemming from Leishmaniasis included nerve damage, gastrointestinal problems, vein damage, lymph damage, blood clots, pain, and difficulty walking. *Id.* ¶ 42. These conditions meant that he could not perform work translating and cultural advising for the U.S. military in war zones on account of the physical demands of those roles. *Id.* ¶ 106. GLS did not provide Kreesha with a domestic translation job that would accommodate his conditions. *Id.*

On July 19, 2010, GLS fired Kreesha for not returning from his medical leave, which began with the onset of his Leishmaniasis. *Id.* ¶ 47. After he was fired, Kreesha demanded certain disability accommodations, including being kept on employment rolls and being able to perform translations in the United States. *Id.* ¶ 111. Kreesha then filed an EEOC complaint and obtained a right-to-sue letter on August 28, 2010. *Id.* ¶ 47.

### 2. Alsaleh

Alsaleh is a United States citizen who worked for GLS in Iraq from June 2008 to January 2010, working on missions translating and interpreting for US military personnel. *Id.* ¶ 51. In September 2009, Alsaleh was bitten by a sandfly and contracted Leishmaniasis. *Id.* ¶ 53. After the military intervened to ensure Alsaleh was treated, he began a monthlong treatment protocol in Iraq in December 2010. *Id.* His condition continued to worsen, and he was then evacuated to the United States. *Id.* ¶ 54. Alsaleh suffered from cardiac issues, pain, shortness of breath, sleep disorder, fatigue, and recurring lesions. *Id.* ¶ 56. In May 2010, Alsaleh's doctor told him that his recurring symptoms were not linked to Leishmaniasis and there was nothing further treatment could do for him. *Id.* ¶ 58. Alsaleh's conditions meant that he could not perform work translating and cultural

4

advising for the U.S. military in war zones on account of the physical demands of those roles. *Id.* ¶ 108. GLS did not provide Alsaleh with a domestic translation job that would accommodate his conditions. *Id.*

GLS fired Alsaleh on July 19, 2010, for not returning from medical leave. *Id.* ¶59. After he was fired, Alsaleh demanded accommodations, including being kept on employment rolls and being able to perform translations in the United States. *Id.* ¶111. In December 2010, Alsaleh applied for a job with GLS, but was told that his file had a "do not rehire" not on it. *Id.* ¶ 59. Alsaleh filed an ADA complaint with the EEOC and received a right-to-sue letter on September 22, 2011. *Id.*

### 3. Class Allegations

In addition to their individual claims, Plaintiffs allege that GLS had a policy of "letting go and refusing to rehire" individuals with disabilities. *Id.* ¶¶ 98, 122. Plaintiffs Kreesha and Alsaleh allege they are suitable to act as representatives of a class of persons who were terminated from GLS due to this policy, as well as a class individuals who were terminated based on discrimination for exercising rights protected by the ADA and DBA. *Id.* ¶¶ 98-99.

## II.   LEGAL STANDARD

### A.   12(b)(1)

This Court must grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) if it concludes it lacks subject matter jurisdiction over the action. A party moving to dismiss under 12(b)(1) may argue either "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," or that "the jurisdictional allegations of the complaint were not true." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A plaintiff bears the burden of establishing a jurisdictional basis for their claims. *Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009).

### B.     12(b)(6)

This Court must grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). A plaintiff need not include "detailed factual allegations:" but must make more than bald accusations or mere speculation; "naked assertions devoid of further factual enhancement" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). When considering a motion under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citation omitted).

### III.     ANALYSIS

Because subject matter jurisdiction implicates the power to decide the merits of Plaintiffs' case, this Court must first consider GLS's jurisdictional challenge. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

### A.     Subject Matter Jurisdiction

GLS's argument proceeds in two steps. First, it invokes the doctrine outlined in *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017) to argue that Plaintiff's ADA claims are for all intents and purposes claims under the Defense Base Act ("DBA") and must be construed as such. Second, GLS argues that since Plaintiffs did not exhaust their administrative remedies under the DBA, this Court lacks jurisdiction to hear them.

### 1. The DBA's statutory scheme

The DBA was enacted to "provide uniformity and certainty in the availability of compensation for injured employees on military bases outside the United States." *Davila-Perez v. Lockheed Martin Corp.*, 202 F.3d 464, 468 (1st Cir. 2000). To allow for compensation, the DBA applies 'the provisions of the Longshore and Harbor Workers' Compensation Act [("LHWCA")] . . . in respect to the injury or death of any employee" covered under the DBA. 42 U.S.C. § 1651(a). These provisions are exclusive of any other workers compensation laws: "The liability of an employer . . . under this chapter shall be exclusive and in place of all other liability of such employer . . . under the workmen's compensation law of any State, Territory, or other jurisdiction." *Id.* § 1651(c). In addition to providing a compensation regime for employees' injuries or death, the DBA (via the LHWCA) prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against an employee . . . because such employee has claimed or attempted to claim compensation from such employer." 33 U.S.C. § 948(a). Under the DBA/LHWCA, a plaintiff may not file directly in federal court, but must bring his claim before the Department of Labor's Office of Workers' Compensation Programs. *Brink v. Continental Ins. Co.*, 787 F.3d 1220, 1128 (D.C. Cir. 2015) (citing 33 U.S.C. §§ 919, 921(b)(3)). Only after a final order by the Department of Labor's Benefits Review Board may he then bring an action in federal. 33 U.S.C. § 919.

### 2. Exhaustion under *Fry v. Napoleon County Schools*

GLS's argument hinges on Supreme Court's decision in *Fry*. That case dealt with the interaction between claims under the ADA and the exhaustion of remedies under the Individuals with Disabilities in Education Act ("IDEA"), which requires schools to provide a free and appropriate public education to students with qualifying disabilities. Because the ADA and IDEA provide overlapping protections, Congress has provided that "before the filing of a civil action

7

under [the ADA] seeking relief that is also available under [the IDEA,] the [IDEA's] administrative procedures shall be exhausted to the same extent as would be required has the action been brought under [the IDEA]." *Fry*, 580 U.S. at 161 (quoting (20 U.S.C. § 1415(l)).

The question before the Court in *Fry* was what standard a court must apply in determining whether the relief sought in an ADA claim was "relief that is also available" under the IDEA. The Court held that "[w]hat matters is the crux—or in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.* at 169. "The use (or non-use) of particular labels and terms is not what matters;" a reviewing Court must instead consider whether the plaintiff is requesting a free and appropriate public education or, in the alternative, simply bringing an ordinary disability discrimination claim under the ADA. *Id.* at 169-171. If the former, then an ADA suit must be dismissed if the plaintiff has not exhausted her administrative remedies.

### 3. Application of Fry to the DBA and Plaintiffs' claims

GLS analogizes this case to *Fry*, claiming that "Plaintiffs' ADA claims are really asserting DBA discrimination and retaliation claims," and should therefore be dismissed for failure to exhaust the administrative remedies under the DBA. MTD 15-18. But GLS's argument omits a crucial analytical step. The Court's decision in *Fry* was grounded in the IDEA's statutory scheme, which expressly imposes the IDEA's administrative exhaustion requirements on IDEA-duplicative ADA claims. 580 U.S. at 161 (quoting (20 U.S.C. § 1415(l)). GLS points to no equivalent provision in the DBA or LHWCA, and this Court is aware of none. It instead focuses on the DBA's exclusivity provision, which limits liability "under the workmen's compensation law of any State, Territory, or other jurisdiction." 42 U.S.C. § 1651(c). But that provision's plain text further undermines Plaintiff's arguments, since it only applies to workers compensation laws. By contrast, 20 U.S.C. § 1415(l)—the provision of the IDEA at issue in *Fry*—calls out the ADA by name.

Because GLS has not shown that *Fry*'s statutory analysis should apply here, its argument that this Court lacks jurisdiction to hear DBA-duplicative ADA claims is without merit.

Moreover, even if the *Fry* framework did apply Plaintiffs could still bring their failure-to-accommodate claims under the ADA without exhausting their administrative remedies under the DBA. GLS argues that "the 'gravamen' of Plaintiffs' [ADA] Complaint is the DBA." MTD 15. GLS claims this conclusion is warranted because Plaintiffs allege they suffered DBA-compensable injuries, that "GLS terminated them **because** of those DBA-compensable injuries when they could not return to work," and their original complaint alleged DBA discrimination. MTD 15-16. According to GLS, "[p]ermitting Plaintiffs to repackage their garden variety DBA disability/retaliation claims as ADA claims through artful pleading would render the DBA's 'exhaustion rule too easy to bypass.'" MTD 16 (quoting *Fry*, 580 U.S. at 170). In short, GLS argues that because Plaintiffs' claims are "based on DBA injuries," they are at bottom DBA, not ADA claims.

This argument does not stand up to scrutiny. The Supreme Court in *Fry* suggested asking a hypothetical question to determine whether an ADA claim seeks "relief that is also available" under the IDEA: "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* at school[?]" 580 U.S. At 171. Adapted to this case, the relevant question is whether a disabled person could have brought essentially the same claim if the alleged conduct had occurred at a workplace that was not an overseas military base. The answer is yes. Because Plaintiffs "could file essentially the same claim against" a domestic non-military employer—separate and apart from any workers compensation claims related to their injuries—the crux of their complaint does not assert a DBA claim. *Z.W. ex rel. Warner v. Horry County Sch. Dist.*, 68 F.4th 915, 920 (4th Cir. 2023). Plaintiffs' Complaint alleges that they were

9

discriminated against on account of their disabilities. That claim claim is analytically distinct from allegations that they were discriminated against because they made a claim for compensation under the DBA. *See* 33 U.S.C. § 948(a).

Because Defendant's legal arguments regarding the application of *Fry* to Plaintiffs' Complaint fail, this Court possesses subject matter jurisdiction and may consider the merits of Plaintiffs' claims.

### B.  Disability Discrimination Under the ADA

Having confirmed its jurisdiction, this Court will proceed to address GLS's argument under Rule 12(b)(6) that Plaintiffs have not stated a claim under the ADA for failure to accommodate their disabilities.

#### 1.  The ADA's legal framework

To show an employer's failure to accommodate under the ADA, a plaintiff must show "that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (cleaned up). If a plaintiff makes such a showing, the employer may defeat the claim by "demonstrating that the reasonable accommodations would impose an undue hardship." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021) (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 395 (2002)).

A "reasonable accommodation" is a modification or adjustment to a person's "work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable[s] an individual with a disability who is qualified to perform the essential functions of that position." *Id.* (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). A reasonable accommodation may include "reassignment to a vacant position," but "the ADA does not require

that an employer create a new position for a disabled employee." *Laird v. Fairfax County*, 978 F.3d 887, 892 n.3 (4th Cir. 2020) (citations omitted).

Further, when an employee notifies his employer of his disability and desire for accommodations, the employer has a duty to "engage in an interactive process to identify a reasonable accommodation." *Wilson*, 717 F.3d at 346. An employer may be liable under the ADA for failure to engage in such an interactive process if the plaintiff shows that "the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." *Id.* at 347 (quoting *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 91 (1st Cir. 2012)).

### 2. Plaintiffs did not identify a reasonable accommodation that GLS denied

GLS argues Plaintiffs have not identified a "reasonable accommodation" via their allegations that Defendants failed to provide them with a domestic translation job or indefinite medical leave. MTD 9-12.[6] GLS notes that Plaintiffs alleged that "GLS had jobs that were similar to" their roles in Iraq and "work was available from GLS" in the United States, but failed to identify any such position or claim that there was a vacancy in such a U.S.-based position. MTD 10 (quoting Compl. ¶¶ 104, 111). In response, Plaintiffs claim that "GLS has positions currently and in the past" for Arabic translators in the United States and "non-war zones" abroad. Opp. 8-9. Plaintiffs attached to their Opposition a declaration and screenshots of GLS's website purporting to show the existence of such jobs. Opp. Ex. 3 at 3, 6-7.

The Court finds that Plaintiffs have not alleged that GLS could have transferred them to a position in the United States or a light duty position in a "non-war zone." While "reassignment to a vacant position" may be a reasonable accommodation, the Complaint does not say anything about

---

[6] GLS does not argue that Plaintiffs are not disabled, or that it lacked notice of their disability. *See generally* MTD.

11

the existence of such vacant positions at the time Plaintiffs were fired, or allege that Plaintiffs would have been qualified for those positions. *Laird*, 978 F.3d at 892 n.3. And "the ADA does not require that [GLS] create a new position" for Plaintiffs. *Id.* Furthermore, Plaintiffs may not cure this pleading deficiency by pointing to facts not alleged in their Complaint. *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F.Supp.2d 909, 917 n.9 (E.D. Va. 2004) (noting that it is "axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss"); *see also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 549 (E.D. Va. 2008) (refusing to allow plaintiffs to amend their Complaint through the attachment of declarations to their Opposition).[7]

GLS also argues that if no appropriate vacancy was available, the ADA did not require it to allow Plaintiffs to remain on medical leave for "an indefinite period of time." *Id.* (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465-466 (4th Cir. 2012)). In response, Plaintiffs cite to case law in support of the proposition that granting a leave of absence to deal with a disability can be a reasonable accommodation. Opp. 16-18, 23 (citing *Robert v. Bd. of County Commissioners of Brown County*, 691 F.3d 1211, 1217 n.2 (10th Cir. 2012)). Plaintiffs further cite to an exhibit purporting to show a GLS policy that if an employee goes on medical leave and does not return within 90 days, he "may be terminated." Opp. 3 (citing Ex. 1). In reply, GLS points out that it "did not terminate Plaintiffs within 90 days of beginning medical leave," and that their policy provided only that an employee *may* be terminated after 90 days and with HR approval. Reply 2.

---

[7] Even if the Court were to look outside "the four corners of the Complaint," *Nemet*, 564 F. Supp. 2d at 549, it would not change the analysis. The job listings that Plaintiffs attached to their Opposition are from years after Plaintiffs were terminated from their jobs with GLS, and it is unclear whether the positions referenced would have accommodated Plaintiffs' disabilities. *See* Reply at 10-11.

12

Here too the Court finds that Plaintiffs have not identified a reasonable accommodation that GLS refused. Plaintiffs do not identify any finite duration of medical leave that would have enabled them to return to their jobs, and Plaintiffs' caselaw confirms that an "indefinite reprieve" from the essential functions of a position is "unreasonable as a matter of law." *Robert*, 691 F.3d at 1219. And, once again, Plaintiffs' reference to facts not alleged in the Complaint, such as GLS's purported policy, is immaterial to GLS's motion to dismiss. *Nemet*, 564 F. Supp. 2d at 549. [8]

### 3. Plaintiffs did not request reasonable accommodations

GLS argues that Plaintiffs' Complaint fails to state a claim for the independent reason that Plaintiffs do not allege they requested reasonable accommodations during their time as GLS employees. MTD 8-9. GLS posits that in order to show that it "refused" to make a reasonable accommodation, Plaintiffs must allege "at minimum" that they "communicated" a "wish for accommodation of [their] disability." MTD 8 (quoting *Parkinson v. Anne Arundel Med. Ctr.*, 79 F. App'x 602, 604-605 (4th Cir. 2003). According to GLS, "Plaintiffs' 49-page complaint does not contain any allegation that they **communicated** accommodation requests during their GLS tenure." MTD 8-9. In their response, Plaintiffs argue that under the ADA, "the employer is obligated to engage in an interactive process with a disabled employee" once it "is on notice of a disabled employee." Opp. 21 (citing *Johnson v. District of Columbia*, 207 F. Supp. 3d 3, 14 (D.D.C. 2016)). According to Plaintiffs, GLS's failure to initiate such a process thus violated the ADA. Opp. 22. In reply, GLS argues that "GLS did not have to engage in the interactive process" because Plaintiffs "never timely requested accommodations." Reply 7 (citing *Johnston v. Envision Physician Servs.*, 2022 WL 3211435, at *5 (E.D. Va. Aug. 2, 2022)).

---

[8] Once again, even if the Court could consider GLS's policy, it would not show that GLS failed to offer a reasonable accommodation. GLS policy as alleged does not require termination after 90 days, but merely allows for it, and does not foreclose an interactive process. Reply 7.

13

The Court agrees with GLS that to show that an employer "refused to make" a reasonable accommodation, a plaintiff must demonstrate that they at least requested an accommodation prior to their termination. "[B]efore [Plaintiffs] could establish that GLS refused to provide reasonable accommodation in violation of the ADA, [they] *first* must have, at minimum, communicated to [GLS] a wish for accommodation of his disability." *Parkinson*, 79 F. App'x at 604 (citing *Ballard v. Rubin*, 284 F.3d 957, 960-962 (8th Cir. 2002)). Similarly, the duty to engage in an interactive process is "triggered when an employee communicates to his employer his disability and his desire for accommodation." *Wilson* 717 F.3d at 346. Because Plaintiffs have not shown that they requested accommodations prior to their termination, they cannot have stated a claim against GLS for "refusing" a reasonable accommodation, and GLS did not violate a duty to engage in an interactive process.

### C. Class Claims

Plaintiffs have also alleged claims on behalf of two classes: "Americans who worked for [GLS] . . . and who have qualified disabilities under the ADA, who were subject to GLS's policy of letting them go from work and refusing to rehire, reasonable accommodate [sic] their disabilities," and, second, a class of "current and future individuals who worked for GLS and who require accommodations of job restricting or extended medical leave to be accommodated in from [sic] January 1, 2009, to the present." Compl. ¶ 98. Because the Court will dismiss Plaintiffs individual claims and Plaintiffs have not yet moved for class certification, the Court will also dismiss Plaintiffs' class claims. *See Lawrence v. Zilog, Inc.*, 242 F.3d 382 (9th Cir. 2000) ("Because no class was ever certified in this case, and the named plaintiffs lack a viable claim, dismissal was proper.").

14

Even if Plaintiffs' individual claims were not dismissed, GLS also argues that Plaintiffs may not bring class claims because they have not alleged that they raised their class-wide claims before the EEOC. MTD 19-20. Plaintiffs argue in response simply that they "exhausted all necessary administrative remedies by filing their claims with EEOC." Opp. 30.

The requirement that a plaintiff exhaust his remedies before the EEOC does not mean that every member of a proposed class must do so. Rather, members of a class or other Plaintiffs may "rely on another individual's charge if that charge alleges class-wide discrimination." *Bryson v. Fluor Corp.*, 914 F. Supp. 1292, 1294 (D.S.C. 1995). But such a charge must at least give a defendant "sufficient notice of class-wide allegations." *Id.* at 1296. Generally, a class claim is proper "if it could reasonably have been expected to grow from the charge filed." *Miller v. Baltimore Gas & Elec. Co*, 202 F.R.D. 195, 207 (D. Md. 2001).

Here, the Court finds that Plaintiffs have not sufficiently alleged that their charges put GLS on notice of their class claims. The paragraphs outlining Plaintiffs' class claims make no reference to their EEOC charges. *See* Compl. ¶¶ 98-99. And the Complaint's description of Plaintiffs' individual EEOC charges is too threadbare for the Court to infer that those charges adequately presaged their class claims. Compl. ¶¶ 47, 59 (simply claiming that Plaintiffs each "filed a complaint with the EEOC for discrimination under the [ADA]"). That is, they do not demonstrate that Plaintiff's EEOC claims alleged that GLS maintained a "policy" of terminating disabled individuals and "refusing to rehire" them, or discriminatory policies with respect to "job restructuring or extended medical leave." Compl. ¶ 98. For this reason, the class allegations in Plaintiffs' Complaint will be dismissed.

### D.     Leave to Amend

Plaintiffs have requested that if the Court dismisses their Complaint, they be provided leave to amend. Opp. 30. GLS has argued that the Complaint should be dismissed with prejudice, as Plaintiffs have repeatedly failed to state a claim and amendment would be futile. MTD 24-25.

The Court finds that Plaintiffs should not be granted leave to amend. While a court "should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), such leave may be withheld on account of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment." *Bloch v. Executive Office of the President*, 14 F. Supp. 3d 841, 856 (E.D. Va. 2016) (quoting *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 480 (4th Cir. 2006)). Plaintiffs have offered no rationale why this Court should ignore their "repeated failure to cure deficiencies by amendments previously allowed," or provided any reason that nearly *thirteen years* and *four* amendments were insufficient for them to adequately state a claim. *See Glaser*, 464 F.3d at 480 ("We conclude that the district court did not abuse its discretion in ruling that the plaintiffs' [four] opportunities to present their claim warranted denial of the motion to amend."). Furthermore, while Plaintiffs have pointed to additional facts not alleged in the Complaint in their Opposition, the Court finds that these facts would not change its analysis,[9] and that amendment would be futile. *See Dungey v. Culmen Int'l LLC*, 2022 WL 4357443, at *6 (E.D. Va. Sept. 20, 2022).

### IV.    CONCLUSION

For the foregoing reasons it is hereby

---

[9] *See supra* nn. 7, 8.

16

**ORDERED** that Defendant GLS's Motion to Dismiss Plaintiffs Fourth Amended Complaint (ECF 269) is **GRANTED**; and it is further

**ORDERED** that all claims against Defendant GLS in Plaintiffs' Fourth Amended Complaint are **DISMISSED WITH PREJUDICE.**

The Clerk is directed to close this civil Action.

It is **SO ORDERED.**

/s/
Michael S. Nachmanoff
United States District Judge

August, 26, 2024
Alexandria, Virginia